*NONCONFIDENTIAL VERSION*

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  THE HONORABLE TIMOTHY M. REIF

Court No. 20-03698

**OCTAL, INC., OCTAL SAOC-FSZ,**

*Plaintiffs,*

v.

**UNITED STATES,**

*Defendant,*

**and**

**ADVANCED EXTRUSION, INC., *et al.*,**

*Defendant-Intervenors.*

## DEFENDANT UNITED STATES' NONCONFIDENTIAL MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

JASON F. MILLER
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC  20436
Telephone (202) 205-3233
Fax: (202) 205-3111

DOMINIC L. BIANCHI
General Counsel
 (202) 205-3061

ANDREA C. CASSON
Assistant General Counsel
for Litigation
(202) 205-3105

**DATED:  MAY 27, 2021**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

I.  STATEMENT PURSUANT TO RULE 56.2 .........................................1

    A.  Administrative Determination Sought to be Reviewed ...................1

    B.  Questions Presented and Summary of Argument ........................1

        1.  Is the Commission's Volume Finding Supported by
            Substantial Evidence and in Accordance with Law?...................1

        2.  Are the Commission's Conditions of Competition Findings
            Supported by Substantial Evidence and in Accordance with Law? ..........2

        3.  Is the Commission's Price Effects Finding Supported
            by Substantial Evidence and in Accordance with Law? ............3

        4.  Is the Commission's Impact Finding Supported by
            Substantial Evidence and in Accordance with Law? ................4

II.  STATEMENT OF FACTS ................................................................5

    A.  Domestic Like Product, Domestic Industry, and Cumulation ........5

    B.  Conditions of Competition ...............................................6

    C.  Volume ......................................................................8

    D.  Price Effects ...............................................................8

    E.  Impact .......................................................................10

III.  STANDARD OF REVIEW ...........................................................12

IV.  ARGUMENT ...........................................................................14

    A.  The Commission's Volume Finding is Supported by
        Substantial Evidence and in Accordance with Law ...................15

        1.  The Commission's Volume Finding Should Be Sustained ......15

        2.  OCTAL's "Adverse Volume Effects" Arguments Fail ............15

    B.  The Commission's Conditions of Competition Findings Are
        Supported by Substantial Evidence and in Accordance with Law ...............18

## TABLE OF CONTENTS (cont'd)

1.   The Commission's Substitutability Finding Is Supported by Substantial Evidence and in Accordance with Law.............................18

2.   The Commission's Finding on the Importance of Price Is Supported by Substantial Evidence and in Accordance with Law ...........23

C.   **The Commission's Price Effects Finding is Supported by Substantial Evidence...........................................................28**

1.   The Commission's Price Effects Finding Should be Sustained................28

2.   OCTAL's Market Share Shift Argument Fails...........................................29

3.   OCTAL's Lost Sales Arguments Fail........................................................33

D.   **The Commission's Price Effects Finding is in Accordance with Law............35**

E.   **The Commission's Impact Finding is Supported by Substantial Evidence and in Accordance with Law ...........................................38**

1.   The Commission's Impact Finding Should Be Sustained ........................38

2.   OCTAL's "Correlation" Argument Fails...................................................39

3.   OCTAL's Dumping Margin Arguments Fail ............................................41

a.   The Statute Nowhere Mandates a Causal Link Analysis Between Dumping Margins and Injury ........................................41

b.   OCTAL Has Not Shown Any Deficiency in the Commission's Consideration of Dumping Margins ...................43

V.   **CONCLUSION ........................................................................................45**

**TABLE OF AUTHORITIES**

Cases                                                                                                    Page(s)

*Acciai Speciali Terni, S.p.A. v. United States*,
   19 CIT 1051 (1995) ...........................................................................................25

*Allegheny Ludlum Corp. v. United States*,
   30 CIT 1995, 475 F. Supp. 2d 1370 (2006)...........................................................14

*Altx, Inc. v. United States*,
   25 CIT 1100, 167 F. Supp. 2d 1353 (2001),
   *aff'd*, 501 F.3d 1291 (Fed. Cir. 2007) ...................................................................36

*Altx, Inc. v. United States*,
   370 F.3d 1108 (Fed. Cir. 2004).......................................................................17, 44

*Asociacion de Productores de Salmon y Trucha de Chile AG v. United States*,
   26 CIT 29, 180 F. Supp. 2d 1360 (2002)........................................................43, 45

*Chemours Co. FC, LLC v. United States*,
   492 F. Supp. 3d 1333 (Ct. Int'l Trade 2021) ...................................................12, 45

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
   467 U.S. 837 (1984)........................................................................................14, 37

*Cleo Inc. v. United States*,
   30 CIT 1380 (2006), *aff'd*, 501 F.3d 1291 (Fed. Cir. 2007).................................36

*Coal. for Fair Trade of Hardwood Plywood v. USITC*,
   180 F. Supp. 3d 1137 (Ct. Int'l Trade 2016) ...................................................43, 44

*Consol. Fibers, Inc. v. United States*,
   32 CIT 855, 574 F. Supp. 2d 1371 (2008)......................................................43, 45

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966).............................................................................................12

*Goss Graphics Sys., Inc. v. United States*,
   22 CIT 983, 33 F. Supp. 2d 1082 (1998),
   *aff'd*, 216 F.3d 1357 (Fed. Cir. 2000) .......................................................13, 24, 28

*Grupo Industrial Camesa v. United States*,
   85 F.3d 1577 (Fed. Cir. 1996)..............................................................................36

*ITG Voma Corp. v. USITC*,
   253 F. Supp. 3d 1339 (Ct. Int'l Trade 2017),
   *aff'd*, 753 F. App'x 913 (Fed. Cir. 2019)............................................................16, 17

## TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**                                                                                          **Page(s)**

*JMC Steel Grp. v. United States,*
   70 F. Supp. 3d 1309 (Ct. Int'l Trade 2015) ........................................................14

*LG Elecs., Inc. v. USITC,*
   26 F. Supp. 3d 1338 (Ct. Int'l Trade 2014) ........................................................44

*Mittal Steel Point Lisas Ltd. v. United States,*
   542 F.3d 867 (Fed. Cir. 2008).............................................................................41

*Nippon Steel Corp. v. United States,*
   458 F.3d 1345 (Fed. Cir. 2006)...........................................................................13

*Nucor Corp. v. United States,*
   28 CIT 188, 318 F. Supp. 2d 1207 (2004) ..........................................................13

*Papierfabrik August Koehler AG v. United States,*
   36 CIT 40, 808 F. Supp. 2d 1350 (2012),
   *aff'd without opinion,* 493 F. App'x 104 (Fed. Cir. 2013).....................................42

*Shandong TTCA Biochem. Co., Ltd. v. United States,*
   35 CIT 545, 774 F. Supp. 2d 1317 (2011) ....................................................14, 24

*Timken U.S. Corp. v. United States,*
   421 F.3d 1350 (Fed. Cir. 2005)...........................................................................13

*U.S. Steel Grp. v. United States,*
   96 F.3d 1352 (Fed. Cir. 1996).............................................................................13

*United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv.*
   *Workers Int'l Union, AFL-CIO, CLC v. United States,*
   348 F. Supp. 3d 1328 (Ct. Int'l Trade 2018) ......................................................36

*Universal Camera Corp. v. NLRB,*
   340 U.S. 474 (1951)......................................................................................12, 13

*USEC Inc. v. United States,*
   34 F. App'x 725 (Fed. Cir. 2002) .......................................................................13

*Whirlpool Corp. v. United States,*
   37 CIT 1775 (2013) ............................................................................................43

*Zenith Radio Corp. v. United States,*
   437 U.S. 443 (1978)............................................................................................14

## TABLE OF AUTHORITIES (cont'd)

**Statutes**                                                                 **Page(s)**

19 U.S.C. § 1516a(b)(1)(B)(i)....................................................................................12

19 U.S.C. § 1673d(b)(1) ...........................................................................................42

19 U.S.C. § 1677(7)(B) ............................................................................................16

19 U.S.C. § 1677(7)(B)(i)(III) ..................................................................................42

19 U.S.C. § 1677(7)(C)(i)..................................................................................2, 15, 16

19 U.S.C. § 1677(7)(C)(ii)................................................................................4, 16, 35

19 U.S.C. § 1677(7)(C)(ii)(I)........................................................................4, 35, 36, 42

19 U.S.C. § 1677(7)(C)(ii)(II)...........................................................................35, 36

19 U.S.C. § 1677(7)(C)(iii)...........................................................................17, 40, 41

19 U.S.C. § 1677(7)(C)(iii)(V) ......................................................................41, 42, 45

19 U.S.C. § 1677(7)(E)(ii) .............................................................................35, 40

19 U.S.C. § 1677(7)(G).............................................................................................14

19 U.S.C. § 1677(7)(J).....................................................................................5, 11, 40

28 U.S.C. § 2639(a)(1).............................................................................................12

**Legislative Materials**                                                     **Page(s)**

Statement of Administrative Action to the Uruguay Round Agreements Act,
    H.R. Rep. No. 103- 316, vol. I (1994) ...........................................................13, 45

Trade Preferences Extension Act of 2015,
    Pub. L. No. 114-27, 129 Stat. 362 (2015)................................................................11

**Regulations**

19 CFR § 207.2(f)....................................................................................................34

19 CFR § 207.4 ........................................................................................................34

## TABLE OF AUTHORITIES (cont'd)

**U.S. International Trade Commission Publications**

*Carbon and Alloy Steel Threaded Rod from Thailand*,
Inv. No. 731-TA-1444 (Final), USITC Pub. 4998 (Dec. 2019)..............................37

*Certain Collated Steel Staples from China*,
Inv. Nos. 701-TA-626 and 731-TA-1452 (Final), USITC Pub. 5085 (Jul.
2020) ............................................................................................................................25

*Certain Lightweight Thermal Paper from China and Germany*,
Inv. Nos. 701-TA-451 and 731-TA-1126-1127 (Remand), USITC Pub. 4334
(Sep. 2011)...................................................................................................................42

*Certain Tissue Paper Products From China*,
Inv. No. 731-TA-1070B (Final), USITC Pub. 3758 (Mar. 2005)...........................37

*Large Diameter Welded Pipe from China and India*,
Inv. Nos. 701-TA-593-594 and 731-TA-1402 and 1404 (Final), USITC Pub.
4859 (Jan. 2019)..........................................................................................................37

*Large Residential Washers from China*,
Inv. No. 731-TA-1308 (Final), USITC Pub. 4666 (Jan. 2017)...............................24

*Quartz Surface Products from India and Turkey*,
Inv. Nos. 701-TA-624-625 and 731-TA-1450-1451 (Final), USITC Pub. 5061
(Jun. 2020) ...................................................................................................................37

*Refillable Stainless Steel Kegs from Mexico*,
Inv. No. 731-TA-1427 (Final), USITC Pub. 4976 (Oct. 2019) ..............................25

*Ripe Olives from Spain*,
Inv. Nos. 701-TA-582 and 731-TA-1377 (Final), USITC Pub. 4805 (Jul.
2018) ............................................................................................................................37

*Small Diameter Graphite Electrodes from China*,
Inv. No. 731-TA-1143 (Final), USITC Pub. 4062 (Feb. 2009)..............................37

*Sodium Nitrite from China and Germany*,
Inv. Nos. 701- TA-453 and 731-TA-1136-37 (Final), USITC Pub. 4029 (Aug.
2008) ............................................................................................................................37

*Steel Concrete Reinforcing Bar from Mexico and Turkey*,
Inv. Nos. 701-TA-502 and 731-TA-1227 (Final), USITC Pub. 4496 (Oct.
2014) ............................................................................................................................37

## TABLE OF AUTHORITIES (cont'd)

**U.S. International Trade Commission Publications (cont'd)**                    **Page(s)**

*Welded Stainless Steel Pressure Pipe from China*,
    Inv. Nos. 701-TA-454 and 731-TA-1450-1144 (Final), USITC Pub. 4064
    (Mar. 2009) ....................................................................................................................37

*BUSINESS PROPRIETARY*
*INFORMATION DELETED*

Defendant U.S. International Trade Commission ("Commission") hereby opposes the motion for judgment upon the agency record filed by OCTAL Inc. and OCTAL SAOC-FSZ (collectively "Plaintiffs" or "OCTAL"). The Commission respectfully asks the Court to affirm the Commission's final affirmative determinations regarding Polyethylene Terephthalate ("PET") Sheet from Korea and Oman, as they are supported by substantial evidence and otherwise fully in accordance with law.

## I.   STATEMENT PURSUANT TO RULE 56.2

### A.   Administrative Determination Sought to be Reviewed

Plaintiffs seek review of the Commission's final affirmative determinations in the antidumping duty investigations of PET Sheet from Korea and Oman. Notice of the determinations in these investigations was published at 85 Fed. Reg. 55,862 (Sept. 10, 2020) (PD140).[1] The public version of the Commission's Views and Staff Report for these investigations is contained in *Polyethylene Terephthalate (PET) Sheet from Korea and Oman*, Inv. Nos. 731-TA-1455 and 731-TA-1457 (Final), USITC Pub. 5111 (Sept. 2020) (PD141).

### B.   Questions Presented and Summary of Argument

#### 1.   Is the Commission's Volume Finding Supported by Substantial Evidence and in Accordance with Law?

Yes. Cumulated subject imports entered in the [⬛⬛⬛⬛⬛⬛⬛⬛] of pounds in each year of the 2017-2019 period of investigation ("POI"). Views at 30-31; CR at Table C-4. Over the same period, these imports increased substantially to capture a majority share of the U.S.

---

[1] Citations to the public record are indicated by "PD," referring to list number 1 on the index of the administrative record, and citations to the confidential record are indicated by "CD," referring to list number 2 on the index of the administrative record. Citations to the Commission's confidential Views ("Views") and confidential Staff Report ("CR") are to CD403.

market.  Views at 30-31; CR at Table C-4.  This evidence fully supports the Commission's

findings that the volume of cumulated subject imports, and the increase in that volume, are

significant in absolute terms and relative to consumption in the United States.  Views at 32.

OCTAL's various arguments as to the putative lack of "adverse volume effects" fail

because they do not speak to any statutory obligation or demonstrate that the Commission's

construction of the statute is unreasonable.  Plaintiffs' Br. at 10-24 (Dkt. No. 24) ("PlBr.").  The

Commission was not required under the statute to consider the *effects* of subject imports in

reaching its finding regarding the *volume* of those imports.  19 U.S.C. § 1677(7)(C)(i).  Plaintiffs

cannot successfully challenge the Commission's volume finding by raising issues the

Commission was not obligated to consider in reaching that finding.

## 2. Are the Commission's Conditions of Competition Findings Supported by Substantial Evidence and in Accordance with Law?

Yes.  The record supports the Commission's finding that cumulated subject imports,

including "D-PET" from Oman, are highly substitutable with the domestic like product.  *See*,

*e.g.*, CR at II-11, Tables II-7, II-9 & II-10.  In arguing otherwise, Plaintiffs both ignore the record

in these investigations and mischaracterize the Staff Report.  PlBr. at 11-17.  Further, OCTAL's

claim that D-PET is superior to domestic PET sheet cannot be reconciled with the fact that prices

for D-PET are lower than prices for the domestic like product.  *See*, *e.g.*, CR at Table E-6.

The record likewise supports the Commission's finding that price is an important factor

in PET sheet purchasing decisions.  *See*, *e.g.*, CR at Tables II-6-7 & II-12.  OCTAL's suggestion

that certain purchaser questionnaire responses should have been accorded more weight than

others in assessing the importance of price overlooks the Commission's role as the fact finder

insofar as OCTAL's claim does not establish that the Commission's weighing of the evidence

was unreasonable.  PlBr at 29.  Plaintiffs' claims that the Commission did not address all

submitted questionnaire responses in assessing the importance of price, and ignored evidence on the importance of non-price purchasing factors, are belied by the Commission's Views themselves. *Id*. at 19-24, 29, 31; Views at 29, 35 & n.151.

### 3.    Is the Commission's Price Effects Finding Supported by Substantial Evidence and in Accordance with Law?

Yes.  The Commission properly found significant underselling by cumulated subject imports and that cumulated subject imports had adverse price effects on the domestic industry. Cumulated subject imports undersold the domestic like product in 74 of 76 possible quarterly comparisons – or 97 percent of the time – by substantial margins.  CR at Table E-6.  In a market where price is an important factor in purchasing decisions and subject imports and the domestic like product are highly substitutable, these substantially lower-priced subject imports took market share from the domestic industry.  CR at Table C-4.  Moreover, the record confirmed that the domestic industry lost sales to subject imports due to their lower prices.  *See*, *e.g.*, CR at Table V-10.  Accordingly, substantial record evidence supports the Commission's finding that cumulated subject imports had adverse price effects on the domestic industry.  Views at 38.

Plaintiffs' argument that the market share shift from the domestic industry to subject imports from Oman was unrelated to these imports' lower prices is unavailing.  PlBr. at 19-24 and 37-38.  The record – including OCTAL's own sworn hearing testimony – reflects that price is a very important purchasing factor for D-PET from Oman.  *See*, *e.g.*, Hr'g Tr. at 172-173 (PD115).

Equally unavailing are OCTAL's arguments regarding the Commission's lost sales analysis.  OCTAL inaccurately claims that this analysis is based on certain purchaser responses the Commission's Staff considered "unusable."  PlBr. at 30-31.  Staff did not consider these responses unusable; to the contrary, Staff used them extensively.  CR at Tables V-9-12.

**BUSINESS PROPRIETARY**
**INFORMATION DELETED**

Plaintiffs also mischaracterize the lost sales evidence, and there is no merit to their effort to minimize the importance of the volume of imports from Oman confirmed to have taken sales from the domestic industry for price reasons.  PlBr. at 30-31.

While Plaintiffs contend that the statute does not permit a finding of adverse price effects based on significant underselling in the absence of significant price depression or suppression (PlBr. at 25) the statute in fact contains no such prohibition.  The absence of a price depression or suppression finding does not preclude a finding of adverse price effects.  *See* 19 U.S.C. § 1677(7)(C)(ii).  OCTAL's proposal not only adds a limitation to the statute that does not exist, it also reads the price underselling provision – 19 U.S.C. § 1677(7)(C)(ii)(I) – out of the law and is inconsistent with the Court's precedent.  In any event, even if the law is not clear on its face, the Commission's longstanding, publicly announced construction of the statutory price effects provision is both reasonable and consistent with the statutory purpose, and is therefore entitled to deference.

> **4.    Is the Commission's Impact Finding Supported by Substantial Evidence and in Accordance with Law?**

Yes.  The record supports the Commission's finding that subject imports had a significant impact on the domestic industry.  The quantity and value of the domestic industry's commercial U.S. shipments, and the revenues from its commercial sales, decreased over the POI, despite the [█] percent increase in apparent U.S. consumption in the merchant market over this period. CR at Table C-4.  Moreover, the domestic industry lost [█] percentage points of merchant market share to cumulated subject imports over the POI.  CR at Table C-4.  Because cumulated subject imports took market share from the domestic industry, the industry's performance was worse than it would have been otherwise.  Views at 42-43.  Further confirming the significant impact that cumulated subject imports had on the domestic industry, majorities of domestic

producers reported that these imports had negative effects on investment, growth, and development.  Views at 44; CR at Table VI-7.

Contrary to OCTAL's contention, there was a correlation between increasing subject imports over the POI and decreasing profitability for the vast majority of the domestic industry.  CR at Table F-3.  OCTAL also mistakenly argues that a negative determination is compelled anytime domestic industry profitability increases as subject imports increase.  PlBr. at 42.  In amending the statute in 2015, however, Congress explicitly instructed that profitability by itself does not mandate a negative determination.  19 U.S.C. § 1677(7)(J).  Many critical performance factors other than profitability likewise indicated that cumulated subject imports had a significant impact on the domestic industry, and the Commission found that the domestic industry would have performed materially better in the absence of the dumped imports.  Views at 42–44.  Simply, the statute does not require the particular correlation evaluation that OCTAL proposes.

Nor does the statute prescribe any specific way that the Commission must perform its evaluation of the magnitude of the dumping margins, much less the causal linkage analysis Plaintiffs would mandate.  PlBr. at 50-53.  The cases OCTAL cites do not support its contention that the Commission's evaluation of the dumping margins was deficient.  PlBr. at 44-47.  To the contrary, the Commission appropriately considered the magnitude of the dumping margins.

## II.     STATEMENT OF FACTS

### A.       Domestic Like Product, Domestic Industry, and Cumulation

In September 2020, the Commission unanimously determined that an industry in the United States was materially injured by reason of PET sheet from Korea and Oman found by the U.S. Department of Commerce to be sold in the United States at less than fair value.  Views at 3.  The Commission defined a single domestic like product coextensive with the scope, determined

5

**BUSINESS PROPRIETARY**
**INFORMATION DELETED**

that appropriate circumstances existed to exclude [                    ] from the domestic industry, and cumulated subject imports from Korea and Oman for purposes of its material injury analysis. Views at 7-18.[2]

## B. Conditions of Competition

*Captive Production*. The Commission determined that the statutory captive production provision applied to these investigations and accordingly focused primarily on the merchant market in its analysis. Views at 22-25.

*Demand*. U.S. demand for PET sheet is driven by demand for its end use products, which include a wide variety of food, beverage, and retail packaging. Views at 7, 25. Apparent U.S. consumption of PET sheet in the merchant market increased overall by [    ] percent during the POI. Views at 25.

*Supply*. Cumulated subject imports were the largest source of supply to the U.S. merchant market throughout most of the POI. OCTAL SAOC-FSZ, the sole producer in Oman, shut down production for six weeks in 2018 due to damage from a tropical cyclone. Nonsubject imports were the smallest source of supply to the U.S. merchant market throughout the POI. Views at 26-27.

*Substitutability and Other Conditions.* The Commission found a high degree of substitutability between domestically produced PET sheet and cumulated subject imports. Views at 27. Substantial majorities of responding market participants, in comparisons between PET sheet from Korea and the domestic like product, and in comparisons between PET sheet from Oman and the domestic like product, reported that such PET sheet is always or frequently

---

[2] Plaintiffs have not appealed these issues, or captive production.

interchangeable.  Views at 16, 27.  Likewise, majorities or pluralities of purchasers reported that the domestic like product and subject imports from Oman were comparable in 15 of 22 purchasing factors, and, in comparisons of subject imports from Korea with either the domestic like product or subject imports from Oman, at least one of the two responding purchasers reported that the products being compared were comparable for each purchasing factor.  Views at 16–17, 27.

Notwithstanding OCTAL's contention that its "D-PET" product from Oman is superior to the domestic like product, the Commission observed that purchasers generally found the domestic like product and subject imports from Oman comparable.  Views at 28.  Moreover, majorities of purchasers found the domestic like product comparable to subject imports from Oman in those factors deemed "very important" by most purchasers (14 of 17).  Views at 28.  The record also reflected that purchasers used subject imports from Oman and the domestic like product interchangeably, most notably when supply from Oman became disrupted by cyclone damage and purchasers turned to the domestic like product.  Views at 28-29.  Accordingly, the Commission found that neither D-PET's physical qualities or its other characteristics meaningfully limit the substitutability between subject imports from Oman and the domestic like product.  Views at 28.

The Commission found that price is an important factor in purchasing decisions for PET sheet.  Views at 29.  Nearly all responding purchasers (16 of 17) reported that price is a very important factor in their PET sheet purchasing decisions, and the majority of purchasers (11 of 17) reported that they usually purchase the lowest-priced PET sheet.  Views at 29.  Majorities of U.S. producers and importers, and at least half of responding purchasers, reported that non-price differences were only sometimes or never significant in purchasing decisions for PET sheet in

BUSINESS PROPRIETARY
INFORMATION DELETED

comparisons between the domestic like product and subject imports.  Views at 29.  More

purchasers ranked price as among the top three factors they consider in their purchasing

decisions for PET sheet than any other factor besides quality.  Views at 29.  Consequently, the

Commission concluded that, while other factors may also be important, the record clearly

indicated that price is an important factor in purchasing decisions for PET sheet.  Views at 29.

The Commission indicated that it would address Plaintiffs' argument that purchasers buy

subject imports from Oman mainly for non-price reasons in the price effects section of its

opinion.  Views at n.128.  For reasons discussed in Section II.E. below, the Commission found

this argument unpersuasive.

### C.    Volume

The Commission found the volume of cumulated subject imports, and the increase in that

volume, significant in both absolute terms and relative to consumption in the United States.

Views at 32.  Cumulated subject imports' volume in the merchant market increased overall by

[ ] percent from 2017 to 2019, from [        ] pounds to [        ] pounds.  Views

at 30-31.  Cumulated subject imports' share of the U.S. merchant market increased by [  ]

percentage points over the POI, from [   ] percent in 2017 to [   ] percent, a majority share,

in 2019.  Views at 31.  The Commission indicated that it would address OCTAL's arguments as

to the supposed lack of effects of cumulated subject imports in the price effects and impact

sections of its opinion.  Views at n.140.

### D.    Price Effects

The Commission analyzed price effects in the context of its findings of a high degree of

substitutability between the domestic like product and cumulated subject imports, and that price

is an important factor in purchasing decisions for PET sheet.  Views at 33.  The Commission

8

BUSINESS PROPRIETARY
INFORMATION DELETED

found that cumulated subject imports pervasively undersold the domestic like product throughout

the POI by significant margins.  Views at 34.  Specifically, cumulated subject imports undersold

the domestic like product in 74 of 76 possible quarterly comparisons, with [████████]

pounds of subject imports reported in those quarters, and with an average underselling margin of

16.6 percent.  Views at 34.  The Commission also observed that the domestic industry lost sales

to these lower-priced imports, noting that, of the 10 purchasers who responded that they

purchased subject imports instead of the domestic like product, five reported price as a primary

reason for doing so.  Views at 34.  Likewise, contemporaneous documentation of price

negotiations indicated that domestic producers lost sales to subject imports because of their

lower prices.  Views at 34 & n.148.  The Commission also observed that there was an [██]

percentage point market share shift from the domestic industry to lower-priced cumulated subject

imports over the POI.  Views at 34 n.149.

The Commission rejected OCTAL's argument that the domestic industry lost sales and

market share to subject imports from Oman mainly for non-price reasons.  Views at 35.  While

acknowledging that the record contained statements from certain firms indicating that they

purchased subject imports from Oman for non-price reasons – Views at 35 & n.151 – the

Commission observed that OCTAL itself testified at the hearing as to the importance of price in

purchasing decisions for PET sheet from Oman, and that the questionnaire responses of the same

firms indicating that they purchased subject imports from Oman for non-price reasons reflect that

they consider price as very important in their purchasing decisions for PET sheet.  Views at 35-

36.  Moreover, all five firms reporting price as a primary reason for their purchase of subject

imports over the domestic like product purchased subject imports exclusively from Oman.

Views at 36-37.  The Commission also noted the ample record evidence indicating that D-PET's

**BUSINESS PROPRIETARY**
*INFORMATION DELETED*

lower carbon footprint is not a primary driver for choosing D-PET over the domestic like product.  Views at n.154.  Based on the foregoing, the Commission found the underselling to be significant.  Views at 37.

The Commission found that subject imports did not depress prices for the domestic like product to a significant degree, as prices for domestic pricing products were higher at the end of the POI than at the beginning.  Views at 37-38.  The Commission also found that subject imports did not prevent price increases which otherwise would have occurred to a significant degree, as the record did not indicate that the domestic industry had incurred a cost-price squeeze over the POI.  Views at 38.

The Commission concluded its price effects analysis as follows: "we find that subject imports significantly undersold the domestic like product, gaining sales and market share at the domestic industry's expense due to their lower prices.  We therefore find that cumulated subject imports had significant adverse price effects on the domestic industry."  Views at 38.

### E.     Impact

The Commission found that, notwithstanding some improvements in the domestic industry's performance, which occurred as apparent U.S. consumption increased over the POI, cumulated subject imports had adverse effects on the domestic industry.  Views at 42.  The quantity and value of the domestic industry's commercial U.S. shipments, and the revenues from its commercial sales, decreased over the POI, despite the [█] percent increase in apparent U.S. consumption in the merchant market.  Views at 43.  Cumulated subject imports also took sales and market share from the domestic industry.  Views at 42.  Moreover, because subject imports took market share from the domestic industry, its production, shipments, and revenues were lower than they would have been otherwise.  Views at 42-43.  Further, majorities of domestic

**BUSINESS PROPRIETARY**
**INFORMATION DELETED**

producers reported that the subject imports had negative effects on investment, growth, and development.  Views at 44.

The Commission rejected Plaintiffs' argument that subject imports did not injure the domestic industry because aggregate profitability increased over the POI, observing that profitability alone does not provide a basis for a negative determination under 19 U.S.C. § 1677(7)(J).[3]  Views at 43-44.  The Commission also noted data in the record indicating that most firms in the domestic industry experienced declining financial performance during the POI: most domestic producers had lower operating margins in 2019 than in 2017, and reported operating losses in 2019.  Views at 44.

The Commission also rejected OCTAL's argument that, in effect, the Commission must find a linkage between material injury and the act of dumping, and that, in the investigations under review, such linkage was lacking because Commerce calculated a 4.74 percent dumping margin for OCTAL SAOC-FSZ.  The Commission observed that the statute does not task the Commission with determining whether the domestic industry is materially injured by reason of *dumping*, but rather directs the Commission to determine whether the domestic industry is materially injured by reason of *dumped imports*.  Views at 43 n.184 (emphasis in original).

The Commission likewise rejected OCTAL's argument to the effect that, because it serves a different segment of the U.S. market than U.S. producers – *i.e.*, large purchasers – the impact of subject import competition on the domestic industry is attenuated.  It noted that OCTAL serves a [█████████████████], which purchase in [█████████].  Views at 45.

---

[3] This provision was added to the statute by the Trade Preferences Extension Act of 2015 ("TPEA").  Pub. L. No. 114-27, 129 Stat. 362 (2015).

The Commission considered whether other factors may have had an impact on the domestic industry during the POI to ensure that it was not attributing injury from such other factors to subject merchandise.  Views at 45.  It observed that neither demand trends nor non-subject imports explained the magnitude of the domestic industry's sales and market share losses over the POI: apparent U.S. consumption increased over the POI, and nonsubject imports took far less merchant market share from the domestic industry than cumulated subject imports. Views at 45-46 & n.195.

In light of the above, the Commission concluded that an industry in the United States is materially injured by reason of cumulated subject imports of PET sheet from Korea and Oman that are sold in the United States at less than fair value.  Views at 47.

## III.    STANDARD OF REVIEW

Under the Tariff Act of 1930, this Court must uphold the Commission's determinations, findings, and conclusions unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see also Chemours Co. FC, LLC v. United States*, 492 F. Supp. 3d 1333, 1335 (Ct. Int'l Trade 2021).  The Commission's determinations are presumed to be correct, and the burden is on the party challenging the determination to demonstrate otherwise.  28 U.S.C. § 2639(a)(1).

The Supreme Court has defined "substantial evidence" as being "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951).  Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).  Thus, under

the substantial evidence standard, a Court may not, "even as to matters not requiring expertise …

displace the {agency's} choice between two fairly conflicting views, even though the court

would justifiably have made a different choice had the matter been before it *de novo*." *Universal*

*Camera*, 340 U.S. at 488.

      The Commission is the trier of fact in injury investigations.  As such, "{i}t is the

Commission's task to evaluate the evidence it collects during its investigation" and "{c}ertain

decisions, such as the weight to be assigned a particular piece of evidence, lie at the core of that

evaluative process." *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1357 (Fed. Cir. 1996);

*Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350 (Fed. Cir. 2006).  Accordingly, the

Commission has "discretion to make reasonable interpretations of the evidence and to determine

the overall significance of any particular factor in its analysis." *Goss Graphics Sys., Inc. v.*

*United States*, 22 CIT 983, 1004, 33 F. Supp. 2d 1082, 1100 (1998), *aff'd*, 216 F.3d 1357 (Fed.

Cir. 2000).

      Furthermore, since the Commission "'is presumed to have considered all of the evidence

on the record,'" it is "'not required to explicitly address every piece of evidence presented by the

parties'" during an investigation.  *Nucor Corp. v. United States*, 28 CIT 188, 234, 318 F. Supp.

2d 1207, 1247 (2004) (quoting *USEC Inc. v. United States*, 34 F. App'x 725, 731 (Fed. Cir.

2002)).  Instead, the Commission need only address the "issues material to {its} determination"

so that the "path of the agency may reasonably be discerned."  Statement of Administrative

Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103- 316, vol. I at

892 (1994) ("SAA"); *see also Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1354–57 (Fed.

Cir. 2005).

"When evaluating challenges to the ITC's choice of methodology," the Court has explained, "the court will affirm the chosen methodology as long as it is reasonable." *JMC Steel Grp. v. United States*, 70 F. Supp. 3d 1309, 1316-17 & n.4 (Ct. Int'l Trade 2015) (citing *Shandong TTCA Biochem. Co., Ltd. v. United States*, 35 CIT 545, 556, 774 F. Supp. 2d 1317, 1327 (2011)).

In reviewing the Commission's construction of a statute, this Court "applies the *Chevron* two-prong analysis, which first looks at whether Congress has spoken directly to the issue." *Allegheny Ludlum Corp. v. United States*, 30 CIT 1995, 1998, 475 F. Supp. 2d 1370, 1375 (2006) (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984)). If the intent of the statute is clear, then "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. However, "where Congressional intent is unclear, 'the court does not simply impose its own construction on the statute … {r}ather ... the question for the court is whether the agency's {action} is based on a permissible construction of the statute.'" *Allegheny Ludlum*, 30 CIT at 1998, 475 F. Supp. 2d at 1375 (quoting *Chevron*, 467 U.S. at 843). Moreover, so long as the agency's construction is a reasonable one, it need not be the only reasonable interpretation, or even the most reasonable interpretation. *Id*. (citing *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450 (1978)).

## IV.   ARGUMENT

As an initial matter, we note that all of Plaintiffs' efforts to undermine the Commission's findings are based on discussions of Omani imports only, ignoring that these imports were cumulated with subject imports from Korea for purposes of the Commission's injury analysis, as required under the statute. Views at 18; 19 U.S.C. § 1677(7)(G). OCTAL's arguments therefore

**BUSINESS PROPRIETARY**
**INFORMATION DELETED**

fail to address the findings the Commission actually made, and which it was required to make, which concerned the *cumulative* volume, *cumulative* price effects, and *cumulative* impact of subject imports.

### A.   The Commission's Volume Finding is Supported by Substantial Evidence and in Accordance with Law

#### 1.   The Commission's Volume Finding Should Be Sustained

In accordance with its statutory mandate, the Commission "consider{ed} whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant." 19 U.S.C. § 1677(7)(C)(i).  The results of that evaluation conclusively establish the reasonableness of the Commission's volume finding.  Specifically:

(1)   Cumulated subject import volume increased in the merchant market by over [ ▇ ] percent over the POI, from [ ▇▇▇▇▇ ] pounds in 2017 to [ ▇▇▇▇ ] pounds in 2019.

(2)   Cumulated subject imports' share of the U.S. merchant market increased by [ ▇ ] percentage points over the POI, from [ ▇ ] percent in 2017 to [ ▇ ] percent– a majority share – in 2019.

Views at 30-31; CR at Table C-4.

This record, reflecting subject imports in the [ ▇▇▇▇▇▇ ] of pounds that substantially increased to capture a majority share of the U.S. market, more than suffices to support the Commission's volume finding.  It should be sustained.

#### 2.   OCTAL's "Adverse Volume Effects" Arguments Fail

Implicitly conceding that it cannot contest the Commission's volume finding under the statute as written, OCTAL seeks to rewrite the statute.  Specifically, OCTAL wrongly argues

that the Commission is required under the statute to evaluate the *effects* of subject imports in reaching its finding about whether the *volume* of those imports is significant.  PlBr. at 10-11. The statutory volume provision, however, nowhere speaks of "effects."  It explicitly and exclusively directs the Commission to evaluate the "volume" of subject imports and "any increase in that volume."  19 U.S.C. § 1677(7)(C)(i).  The Commission's volume findings implicate a permissible and well-established construction of the statute and should be affirmed.

OCTAL cites no evidence to support its claim that the word "significant" somehow implies a Commission obligation to perform an "effects" analysis as part of its statutory consideration of volume.  PlBr. at 10-11.  This is unsurprising, as none exists.  Far from it, the text and structure of the statute confirm the opposite conclusion, as reading the word "significant" to mandate an effects analysis would render the statutory price effects and impact provisions redundant.  *See* 19 U.S.C. § 1677(7)(C)(ii)–(iii).  That the Commission is not required to evaluate the effects of subject imports in its volume analysis is further confirmed by the heading language of 19 U.S.C. § 1677(7)(B).  This heading bifurcates the Commission's injury assessment between an analysis of "volume," on the one hand, and its "*consequent* impact" (*i.e.*, its effects), on the other.  *Id*. (emphasis added).

Indeed, this Court has expressly rejected the same argument that OCTAL makes here. The plaintiff in *ITG Voma Corp. v. USITC*, like the Plaintiffs in this case, challenged the Commission's finding of significant volume based on a putative lack of effects.  253 F. Supp. 3d 1339, 1357 (Ct. Int'l Trade 2017), *aff'd*, 753 F. App'x 913 (Fed. Cir. 2019).  The Court affirmed the Commission's volume finding, holding that "ITG Voma's argument presumes incorrectly that the Commission is required by law to consider the domestic industry's condition and financial performance in its volume analysis.  Rather, the Commission must consider the

domestic industry's condition and financial performance when analyzing whether subject imports adversely impacted the domestic industry." *Id*. (citing 19 U.S.C. § 1677(7)(C)(iii)).

As confirmed by the text of the statute and the Court's case law, the well-established statutory volume analysis only concerns the volume of subject imports, and nowhere additionally mandates a contextual analysis of volume *effects*. The Court should decline to "ask more of the Commission than required by the statute." *Altx, Inc. v. United States*, 370 F.3d 1108, 1123 (Fed. Cir. 2004).

Because the Commission is not required under the statute to evaluate the effects of subject imports in reaching its finding about the volume of those imports, OCTAL's arguments as to the putative lack of "adverse volume effects" fail. PlBr. at 11-24. In short, OCTAL cannot challenge the Commission's volume finding by raising issues the Commission was nowhere obligated to even consider in reaching that finding.

Properly understood, OCTAL's assertions and arguments regarding supposed "adverse volume effects" are challenges to the Commission's conditions of competition findings that subject imports and the domestic like product are highly substitutable and that price is an important factor in PET sheet purchasing decisions, as well as the Commission's price effects finding. Accordingly, we address the substance of these claims below, and not in the context of volume.

B.     **The Commission's Conditions of Competition Findings Are Supported by Substantial Evidence and in Accordance with Law**

1.     **The Commission's Substitutability Finding Is Supported by Substantial Evidence and in Accordance with Law**

The Commission correctly found the domestic like product highly substitutable with cumulated subject imports, including D-PET from Oman.  Views at 27.[4]  The following record evidence supports this finding.

First, substantial majorities of responding market participants, in comparisons between PET sheet from Korea and the domestic like product, and in comparisons between PET sheet from Oman and the domestic like product, reported that such PET sheet is always or frequently interchangeable.  Views at 16, 27; CR at Table II-10.  Specifically, in comparing the domestic like product with subject imports from Korea, 16 of 17 U.S. producers reported that they were always or frequently interchangeable; 9 of 10 U.S. importers reported that they were always or frequently interchangeable; and all responding purchasers reported that they were always or frequently interchangeable.  CR at Table II-10.  In comparing the domestic like product with subject imports from Oman, 16 of 21 U.S. producers reported that they were always or frequently interchangeable; six of seven U.S. importers reported that they were always or frequently interchangeable; and six of nine purchasers reported that they were always or frequently interchangeable.  CR at Table II-10.

Second, majorities or pluralities of purchasers reported that the domestic like product and subject imports from Oman were comparable in 15 of 22 purchasing factors, and, in comparisons of subject imports from Korea with the domestic like product, at least one of the two responding

---

[4] The sole Omani producer, OCTAL, shipped only D-PET to the United States during the POI.  CR at I-12-13 & Table IV-4.

purchasers reported that the products being compared were comparable for each purchasing factor.  Views at 16-17, 27; CR at Table II-9.[5]  Notably, most purchasers (five of nine) rated D-PET from Oman and the domestic like product as having both comparable product clarity and comparable formability.  CR at Table II-9.  Both here and in the administrative proceeding below, OCTAL has asserted D-PET's superiority to the domestic like product with respect to these specific factors.  *See, e.g.*, PlBr. at 15; OCTAL's Prehr'g Br. at 23 (CD362).[6]

Third, majorities of purchasers found the domestic like product comparable to subject imports from Oman in the most important purchasing factors (*i.e.*, those factors deemed very important by at least 14 of 17 responding purchasers).  Views at 28; CR at Tables II-7, II-9.  For example, five of nine purchasers reported that domestic and Omani PET sheet are comparable with respect to both product clarity and formability, and seven of nine reported them comparable with respect to quality meets industry standards.  *See* CR at Table II-9.

Fourth, most purchasers (12 of 17) rated "PET is D-PET" as not important or only somewhat important as a purchasing factor.  Views at 28; CR at Table II-7.  These responses indicate that most purchasers did not view D-PET as meaningfully superior to or different from other PET sheet, including the domestic like product.

---

[5] The 15 purchasing factors for which majorities or pluralities of purchasers reported that the domestic like product and subject imports from Oman were comparable were: availability, delivery terms, delivery time, discounts offered, minimum quantity requirements, packaging, payment terms, whether the product is A-PET, product clarity, product formability, whether the quality meets industry standards, whether the quality exceeds industry standards, reliability of supply, technical support/service, and U.S. transportation costs.  CR at Table II-9.

[6] Further undermining OCTAL's claim that D-PET is superior to the domestic like product, most purchasers rated U.S. and Omani PET sheet as comparable with respect to "quality meets industry standards" (seven of nine) and "quality exceeds industry standards" (six of nine). *See* CR at Table II-9.

**BUSINESS PROPRIETARY**
**INFORMATION DELETED**

Finally, the record demonstrates that purchasers have used D-PET and the domestic like product interchangeably, most notably when supply from Oman became disrupted by cyclone damage.  Views at 29; [██████████████] Purchaser Questionnaire Response at 11-12, Q.III-10(c) (CD248); [██████████████] Purchaser Questionnaire Response at 11, Q.III-10(c) (CD360).[7]  When this event occurred, purchasers turned to the domestic like product.

The Commission's finding that the domestic like product is highly substitutable with cumulated subject imports, including D-PET from Oman, is supported by substantial evidence. Nothing in Plaintiffs' selective and misleading attempt to establish that D-PET is superior to the domestic like product demonstrates otherwise.  PlBr. at 11-17.  For one thing, OCTAL fails to address the fact that its D-PET product is *lower priced* than the domestic like product.  *See, e.g.*, CR at Table E-6; Hr'g Tr. at 146 (PD115) (testimony of OCTAL's Chief Operating Officer, Barenberg, acknowledging that OCTAL's U.S. sales prices are lower than U.S. producers' prices).  That D-PET is sold at discount prices undermines Plaintiffs' claim that it is a premium product.[8]

While the Commission's substitutability finding was based on a comprehensive review of all responding purchasers' assessments, as well as those of other market participants, Plaintiffs have attempted to establish that D-PET is superior to the domestic like product by cherry picking

---

[7] Hereinafter, [██████████████] and [██████████████] will be referred to as [██████] and [██████████], respectively.

[8] Further, in claiming that D-PET is superior to domestic PET sheet, OCTAL overlooks that more purchasers reported that U.S. product meets minimum quality specifications than reported that D-PET meets these specifications.  *See* CR at Table II-11 (17 purchasers reported that U.S. product always or usually meets minimum quality specifications, whereas only eight purchasers reported that D-PET from Oman always or usually meets these specifications).

for discussion only those small number of purchaser responses and submissions that they claim

support their position.  PlBr. at 13-15.  Notably, while the Commission received 17 final phase

purchaser questionnaire responses (CR at II-1), Plaintiffs focus only on three.  PlBr. at 13–15

(only discussing the views of [████████████████████████████████████

████████] – and ignoring entirely the views of all other purchasers comparing D-PET and the

domestic like product).  But, even assessing substitutability with reference only to Plaintiffs'

preferred evidence does not yield their desired result:  even among the three purchasers whose

views OCTAL selectively discusses, one reported that D-PET and the domestic like product are

*frequently* interchangeable (*see* [██████████] Purchaser Questionnaire Response at 23, Q.IV-1

(CD360)) and two indicated that that they used domestic PET sheet in place of Omani product

during the shortfall of D-PET occasioned by Cyclone Mekunu.  *See* [██████] Purchaser

Questionnaire Response at 11-12, Q.III-10(c) (CD248); [████████] Purchaser Questionnaire

Response at 11, Q.III-10(c) (CD360).

　　　The Commission, on the other hand, appropriately evaluated all purchaser responses

comparing D-PET and the domestic like product, not merely those isolated responses Plaintiffs

may prefer.  OCTAL appears to suggest, wrongly, that the Commission somehow erred by

considering all purchaser comparisons between D-PET and the domestic like product, instead of

only considering the comparisons made by purchasers that happened to buy D-PET over the POI.

PlBr. at 23 ("Customers that never purchased D-PET had no credible basis to address its superior

performance attributes").  There is no basis for Plaintiffs' apparent belief that only purchasers

that happened to buy D-PET during the POI were able to credibly compare this product with

domestic PET sheet; as the Commission observed, the record provides no indication that any of

the purchasers that compared the domestic product and subject imports from Oman lacked a

**BUSINESS PROPRIETARY**
**INFORMATION DELETED**

basis for their comparison. Views at 28, n.119.  Moreover, endorsing Plaintiffs' reasoning would require the Commission, as a matter of course, to ignore in its investigations pertinent, credible evidence on substitutability from sophisticated purchasers, well aware of the differences (or lack thereof) between the relevant products, unless these purchasers happen to buy certain products during the POI.  There is certainly no requirement for this approach in the statute, and Plaintiffs fail to demonstrate that the Commission's chosen approach to the evaluation of this evidence is unreasonable.  In any event, the majority of responding purchasers that bought D-PET over the POI (█████ ] of seven) reported that it is always or frequently interchangeable with domestic PET sheet. [9]

Additionally, the section of the Staff Report cited by OCTAL in no way "confirmed that OCTAL's D-PET sheet from Oman had significantly different physical characteristics" than the domestic like product, as OCTAL claims.  PlBr. at 12-13 (citing CR at I-11-12, the "manufacturing processes" subsection of the Report).  This part of the Staff Report explains the PET sheet production *processes* in the United States and Oman, not the characteristics of the resulting products.  CR at I-10-13.  The sole reference to "different physical properties" in this part of the Report is simply a recitation of OCTAL's own claims regarding D-PET.  CR at I-12.  Nothing in the cited pages indicates that either the Commission itself or its Staff considered D-PET different from or superior to the domestic like product.  Rather, in the section of the Report which actually addresses substitutability issues – Section II – the data, which are extensively

---

[9] *See* [███████████ ] Purchaser Questionnaire Response at 21, Q.IV-1 (CD231); [████████████████ ] Purchaser Questionnaire Response at 23, Q.IV-1 (CD349); [████████ ████████████ ] Purchaser Questionnaire Response at 22, Q.IV-1 (CD253); [████████ ] Purchaser Questionnaire Response at 23, Q.IV-1 (CD360).  Hereinafter, [██████ ], [█████████████ ], and [███████████████████ ] will be referred to as [████████ ], [█████████ ], and [███████ ], respectively.

cited by the Commission in its Views, corroborate the opposite conclusion.  *See* CR at Tables II-9-10 & Table II-12; Views at 16-17, 27-29.  Likewise, in Section II of the Report, Staff indicated that "{b}ased on available data, staff believes that there is a high degree of substitutability between domestically produced PET sheet and PET sheet imported from subject sources."  CR at II-11.

The record supports the Commission's substitutability finding.  In suggesting otherwise, OCTAL ignores the weight of the evidence and appears to misread the Staff Report.  OCTAL fails to demonstrate that the Commission's substitutability finding is unsupported by substantial evidence.

### 2.  The Commission's Finding on the Importance of Price Is Supported by Substantial Evidence and in Accordance with Law

The Commission reasonably found that price is an important factor in PET sheet purchasing decisions.[10]  Views at 29.  Nearly all responding purchasers (16 of 17) reported that price is a very important factor in their PET sheet purchasing decisions.  Views 29; CR at Table II-7.  Majorities of U.S. producers and importers, and at least half of responding purchasers, reported that non-price differences were only sometimes or never significant in purchasing decisions for PET sheet in comparisons between the domestic like product and subject imports.  Views at 17 and 29; CR at Table II-12.[11]

---

[10] OCTAL persistently mischaracterizes the Commission's finding on the importance of price.  The Commission did not find that price is "the only" purchasing factor (PlBr. at 11 (emphasis in original)) or that "price is the most important purchasing factor."  *Id*. at 26.  Rather, based on the record evidence, the Commission found that price is an important factor in PET sheet purchasing decisions.  Views at 29.

[11] Specifically, 15 of 17 U.S. producers, five of nine U.S. importers, and two of three U.S. purchasers reported that non-price differences were only sometimes or never significant in comparing domestic PET sheet and Korean imports.  Fourteen of 21 U.S. producers, four of six

*(cont'd on next page)*

Further confirming the importance of price in purchasing decisions, the majority of purchasers (11 of 17) reported that they usually purchase the lowest-priced PET sheet.  Views at 29; CR at II-13.  Likewise, more purchasers ranked price as among the top three factors they consider in their purchasing decisions for PET sheet (20 firms) than any other factor besides quality (21 firms).  Views at 29; CR at Table II-6.

Plaintiffs ignore this compelling record showing that the vast majority of purchasers considered price very important in their purchasing decisions.  Instead, they wrongly suggest that the Commission was required to accord more weight to the questionnaire responses of OCTAL's customers than other purchaser responses in assessing the importance of price.  PlBr. at 29 (asserting that "the most significant information" on the importance of price comes from its customers).   As an initial matter, this suggestion overlooks that it is within the Commission's discretion as factfinder to choose *any* reasonable methodology and to make reasonable interpretations of the evidence.  *See Shandong TTCA Biochem.*, 35 CIT at 556, 774 F. Supp. 2d at 1327-28; *Goss Graphics Sys.*, 22 CIT at 1004, 33 F. Supp. 2d at 1100.[12]  In any event, even focusing on just the responses of OCTAL's customers, as Plaintiffs prefer, reveals that these

---

U.S. importers, and five of 10 U.S. purchasers reported that non-price differences were only sometimes or never significant in comparing domestic PET sheet and Omani imports.  CR at Table II-12.

[12] Moreover, the Commission in other investigations has explained that it generally does not accord more weight to certain purchaser questionnaire responses over others.  *See Large Residential Washers from China*, Inv. No. 731-TA-1308 (Final), USITC Pub. 4666 at 15-16, n.71 (Jan. 2017) (explaining that it is "not {Commission} practice" to weight certain purchaser questionnaire responses more heavily than others).

**BUSINESS PROPRIETARY
INFORMATION DELETED**

firms *all* considered price a *very* important factor in their purchasing decisions,[13] and that all but one of them either always or usually purchase the lowest-priced PET sheet.[14]

Additionally, while Plaintiffs emphasize that price is not the most frequently cited "number one most important purchasing factor," this argument misses the mark.  PlBr. at 25-28. Price need not be the *most* important factor in purchasing decisions to be *an* important factor in purchasing decisions.  *See Acciai Speciali Terni, S.p.A. v. United States*, 19 CIT 1051, 1059-160 (1995) (sustaining the Commission's finding as to the importance of price where purchasers did not list it as the most important purchasing factor, but listed price as "a very important factor").  Indeed, the Commission routinely finds price an important purchasing factor – and ultimately reaches an affirmative determination – where, as here, price is not the most oft-cited number one factor, but the record clearly indicates its importance.  *See, e.g.*, *Certain Collated Steel Staples from China*, Inv. Nos. 701-TA-626 and 731-TA-1452 (Final), USITC Pub. 5085 at 18 & n.88 (Jul. 2020); *Refillable Stainless Steel Kegs from Mexico*, Inv. No. 731-TA-1427 (Final), USITC Pub. 4976 at 31 (Oct. 2019).



---

[13] *See* [████████████] Purchaser Questionnaire Response at 18, Q.III-24 (CD252); [████] Purchaser Questionnaire Response at 19, Q.III-24 (CD248); [████████████] Purchaser Questionnaire Response at 16, Q.III-24 (CD231); [████] Purchaser Questionnaire Response at 18, Q.III-24 (CD349); [████████] Purchaser Questionnaire Response at 18, Q.III-24 (CD253), [████████████] Purchaser Questionnaire Response at 19, Q.III-24 (CD251); [████████████] Purchaser Questionnaire Response at 19, Q.III-24 (CD360). Hereinafter, [████████████] and [████████████] will be referred to as [████████████], respectively.

[14] *See* [████████████] Purchaser Questionnaire Response at 19, Q.III-27 (CD252); [████████████] Purchaser Questionnaire Response at 17, Q.III-27 (CD231); [████████████] Purchaser Questionnaire Response at 19, Q.III-27 (CD349); [████████] Purchaser Questionnaire Response at 19, Q.III-27 (CD253); [████████] Purchaser Questionnaire Response at 20, Q.III-27 (CD251); [████████] Purchaser Questionnaire Response at 20, Q.III-27 (CD360) (in each case reflecting that these firms either always or usually but the lowest-priced PET sheet).

**BUSINESS PROPRIETARY**
**INFORMATION DELETED**

OCTAL's claim that the Commission did not "address all 17 U.S. purchaser questionnaire responses" in reaching its finding on the importance of price is inaccurate and belied by the Views themselves.  *See* PlBr. at 29, 31.  The Commission explicitly discussed all 17 of these responses, observing, among other things, that "{n}early all responding purchasers **(16 of 17)** reported that price is a very important factor in their PET sheet purchasing decisions." Views at 29 (citing Table II-7) (emphasis added).  Moreover, the Table in the Staff Report to which the Commission cited lists in detail the importance of various purchasing factors as reported by each of the 17 responding purchasers.  *See* CR at Table II-7.

Contrary to Plaintiffs' contention, the Commission did not "ignore" evidence on the importance of OCTAL's production capability as a non-price purchasing factor for certain of OCTAL's larger customers.  PlBr. at 19-24.[15]  In fact, the Commission expressly acknowledged these customers' statements that they purchased D-PET for non-price reasons.  *See* Views at 35 & n.151, citing [█████████] declaration (CD248) and [█████████] Purchaser Questionnaire response (CD360), which both discuss OCTAL's production capacity as a purchasing factor, and which are the *exact* evidence on the importance of OCTAL's capacity that Plaintiffs wrongly claim the Commission ignored (PlBr. at 17-18).[16]  The Commission did not

---

[15] It is in fact OCTAL that has ignored relevant evidence, *viz.*, that for the majority of its responding customers ([███] of seven), its larger production capacity is simply not an important purchasing factor.  *See* [█████████] Purchaser Questionnaire Responses at Q.III-24 (CD231); [█████████] Purchaser Questionnaire Response at Q.III-24 (CD349); [█████████] Purchaser Questionnaire Response at Q.III-24 (CD253); and [█████████] Purchaser Questionnaire Response at Q.III-24 (CD251) (in each case rating "single producer able to provide all your PET sheet needs" as either only somewhat important or not important as a purchasing factor).

[16] Not only does OCTAL overlook that the Commission addressed the precise arguments and evidence that OCTAL claims the Commission ignored, OCTAL also states, incorrectly, that the Commission instead addressed an argument OCTAL never made.  PlBr. at 19 n.2.  In fact, OCTAL *did* make the argument, addressed on page 45 of the Views, that, due to its larger

*(cont'd on next page)*

26

ignore this evidence; rather it simply found that that this evidence did not outweigh the overwhelming evidence on the importance of price, including from those same large customers OCTAL emphasizes.  Views at 35-36 (finding the evidence regarding the importance of non-price purchasing factors to certain of OCTAL's larger customers not to outweigh the evidence on the importance of price, including evidence on the importance of price to these very same customers).

Similarly puzzling is OCTAL's claim that the Commission ignored evidence on the importance of D-PET's supposed superior quality as a non-price purchasing factor for its large customers.  PlBr. at 19-24.  Not only did the Commission expressly acknowledge these customers' submissions on precisely this issue, *see* Views at 35 & n.151, it also assessed their views on the supposed superiority of D-PET as part of its substitutability analysis.  Views at 28.  As discussed in this analysis, far from confirming D-PET's superiority to the domestic like product, the record revealed the products to be highly substitutable.

At bottom, the Commission did not ignore evidence on non-price purchasing factors.  Instead, the Commission acknowledged this information, but decided not to give it controlling weight in light of conflicting evidence in the record:

> We acknowledge that the record contains statements from certain firms that they purchased subject imports from Oman for non-price reasons … {h}owever, we find that these statements do not outweigh the aggregate data from market participants as a whole, which … reflects that price is an important factor in purchasing decisions for PET sheet and that most purchasers usually purchase the lowest-priced product.

---

production capacity, it serves a different market segment than U.S. producers – *i.e.*, large purchasers.  *See*, *e.g.*, OCTAL's Posthr'g Br. at 9 (CD370) ("… OCTAL is not really competing in the same segment of the market as the smaller scale domestic producers supplying smaller scale thermoformers … .").

**BUSINESS PROPRIETARY**
**INFORMATION DELETED**

Views at 35.  This was both reasonable and within the Commission's discretion.  *See Goss*

*Graphics*, 22 CIT at 1004, 33 F. Supp. 2d at 1100 (The Commission has the "discretion to make

reasonable interpretations of the evidence and to determine the overall significance of any

particular factor in its analysis").

### C.   The Commission's Price Effects Finding is Supported by Substantial Evidence

#### 1.   The Commission's Price Effects Finding Should be Sustained

The Commission's finding that cumulated subject imports had adverse price effects on

the domestic industry is supported by substantial evidence.  It is undisputed that over the POI

[⬛⬛⬛⬛⬛] pounds of cumulated subject imports undersold the domestic like product in 74

of 76 possible quarterly comparisons – or 97 percent of the time – with an average underselling

margin of 16.6 percent.  Views at 34; CR at Table E-6.  It is likewise undisputed that over the

same period, cumulated subject imports took [⬛] percentage points of merchant market share

from the domestic industry.  Views at 35 n.149; CR at Table C-4.  The record confirmed a high

degree of substitutability between cumulated subject imports and the domestic like product, and

that price is an important factor in PET sheet purchasing decisions. Views at 33 (reiterating the

Commission's conditions of competition findings as context for its price effects analysis); CR at,

*e.g.*, Tables II-9–10 (confirming a high degree of substitutability) and Tables II-6–7 (confirming

the importance of price in purchasing decisions).  The Commission reasonably found that this

evidence confirmed that the pervasive and substantial underselling by cumulated subject imports

resulted in a loss of domestic industry market share.  Views at 38.

Other record evidence also supports the Commission's finding that cumulated subject

imports had adverse price effects on the domestic industry.  Specifically, the record confirmed

that the domestic industry had lost sales to subject imports due to their lower prices.  Views at

**BUSINESS PROPRIETARY**
**INFORMATION DELETED**

34-35.  Of the 10 purchasers that indicated that they purchased subject imports rather than the domestic like product, half indicated that price was a primary reason for doing so.  Views at 34; CR at Table V-10.  Contemporaneous documentation of price negotiations likewise indicated that domestic producers lost sales to subject imports because of their lower prices.  Views at 34 & n.148 (describing four of these negotiations); Petitioner's Posthr'g Br. at Ex. 4 (CD371).  For example, in an email from [██████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████ ].  *See* Petitioner's Posthr'g Br. at Ex. 4, Attach. 2 (CD371).

　　　In sum, in a market in which price is an important factor in purchasing decisions, the domestic industry lost market share to significantly lower priced, highly substitutable subject imports, and the record confirms that the domestic industry lost sales to these imports due to their lower prices.  The record therefore amply supports the Commission's finding that cumulated subject imports had adverse price effects on the domestic industry.  Views at 38.

### 2.　OCTAL's Market Share Shift Argument Fails

　　　While OCTAL has attempted to argue, both here and before the Commission, that the market shift from domestic product to imports from Oman was "demonstrably unrelated to prices" (PlBr. at 37), the record confirms the opposite.  Views at 36-37.[17]  The Commission fully acknowledged the submissions from some of OCTAL's customers indicating that they purchased

---

[17] OCTAL also appears to be under the misimpression that the Commission was required in its price effects analysis to perform a granular evaluation comparing quarterly shifts in market share with quarterly import pricing.  PlBr. at 38.  There is no such requirement.  In any event, given that cumulated subject imports undersold the domestic like product in nearly all quarterly comparisons (CR at Table E-6), a quarterly evaluation would only further confirm a correlation between underselling and the market share shift.

**BUSINESS PROPRIETARY**
**INFORMATION DELETED**

subject imports from Oman for non-price reasons.  Views at 35 & n.151.  However, the

Commission went on explain why, nevertheless, the record reflected that price is an important

purchasing factor for D-PET from Oman, including for those very customers whose responses

OCTAL emphasizes.

As the Commission observed, the same firms that indicated they purchased subject

imports from Oman for non-price reasons still rated price as a *very* important factor in their

purchasing decisions for PET sheet.  Views at 36.[18]  Likewise, all firms reporting price as a

primary reason for their purchase of subject imports rather than the domestic like product

purchased subject imports exclusively from Oman.  Views at 36-37.[19]

Further, OCTAL's own COO testified at the Commission hearing as to the importance of

price in purchasing decisions for PET sheet from Oman.  Views at 36; Hr'g Tr. at 172-173

(PD115) (Barenberg: "… if we were to go out and raise price … we would absolutely lose

business without question.").[20]  So too did OCTAL's customers.  Indeed, the very D-PET

customers upon whose responses OCTAL relies confirmed at the hearing that price is important

to them.  *See* Hr'g Tr. at 154 (PD115) (testimony of McGuire, Clearly Clean: "Well, I will tell



[18] *Citing* [■■■■■■■■■■] Purchaser Questionnaire Response at Q.III-24 (CD252);
[■■■■] Purchaser Questionnaire Response at Q.III-24 (CD248); [■■■■■]
Purchaser Questionnaire Response at Q.III-24 (CD349); and [■■■■■■■] Purchaser
Questionnaire Response at Q.III-24 (CD360).

[19] *Citing* [■■■■] Preliminary Phase Lost Sales/Lost Revenue Survey Response at 1
(CD82); [■■■■■■■■■] Preliminary Phase Lost Sales/Lost Revenue Survey Response at 1
(CD95); [■■■■■■] Purchaser Questionnaire Response at Q.II-1(a) (CD231); [■■■■■]
Purchaser Questionnaire Response at Q.II-1(a) (CD253); and [■■■■■■] Purchaser
Questionnaire Response at Q.II-1(a) (CD251).  Hereinafter, [■■■■] and [■■■■■■■] will
be referred to as [■■] and [■■■■■], respectively.

[20] At the hearing, OCTAL's counsel also acknowledged the importance of price in D-
PET purchasing decisions, noting that "there are some customers who like … that OCTAL has
this cost advantage."  Hr'g Tr. at 213 (Porter) (PD115).

you price is always a motivating factor. There's no doubt about it."); *see also* Hr'g Tr. at 155 (PD115) (testimony of Orkisz, Inline: "So, yeah, price is a big driver...").  That both D-PET customers appearing at the hearing in support of OCTAL nevertheless testified as to the importance of price is telling.[21]

Plaintiffs' attempt to contest the Commission's assessment on the importance of price in D-PET purchases, and the resulting connection between price and the market share shift, is thus unavailing.  PlBr. at 19-24, 37-38.[22]  OCTAL does not even address the fact that its own testimony, as well the testimony and questionnaire responses of its customers, confirms the importance of price in D-PET purchases.  Instead, OCTAL emphasizes other evidence that either simply confirms what the Commission acknowledged – that certain OCTAL customers indicated that non-price purchasing factors played a role in their decision to purchase PET sheet from Oman – or is irrelevant.  PlBr. at 21-22.  As the Commission explained, the statements by D-PET customers on which OCTAL relies (PlBr. at 21-22) do not equate to statements that these customers did not consider price to be an important factor.  Views at 35-36.  Indeed, as discussed *supra*, these same customers, both at the hearing and in their purchaser questionnaire responses, confirmed the importance of price in their purchasing decisions.

---

[21] The record on substitutability between subject imports from Oman and the domestic like product further confirms the importance of price in D-PET purchases.  As most purchasers (six of nine) consider the products to be always or frequently interchangeable, it reasonably follows that the difference between purchasing from one supplier over another could be determined by price.  CR at Table II-10.

[22] The shift in market share from the domestic industry to the lower-priced subject imports answers Plaintiffs query as to how there could be significant underselling but not significant price depression.  PlBr. at 36.  In a price sensitive market such as this one, in the face of competition from lower priced subject imports, one would expect domestic producers to either lower price or lose market share.

BUSINESS PROPRIETARY
INFORMATION DELETED

The other evidence Plaintiffs cite in their bullet points (PlBr. at 21-22) is simply not relevant to what purchasing factors drove the market share shift.  The "production process diagram" OCTAL cites, [█████████████████████████████████████████████████████████████████████████████████████████████████████████████████].  *See* OCTAL's Posthr'g Br. at Ex. 4 (CD370).  Likewise, the carbon footprint study OCTAL cites [██████████████████████████████████████████████████████████████████████████████████████████].  *See* OCTAL's Post-Conf. Br. at Ex. 6 (CD103).  Indeed, as the Commission explained in detail, and which OCTAL does not acknowledge, the record does not reflect that carbon footprint is an important non-price purchasing factor.  Views at 36 n.154.[23]

In emphasizing that its large customers indicated that the ability to purchase D-PET was very important (PlBr. at 22), OCTAL fails to mention that these same firms, as discussed *supra*, also reported that *price* was very important.   Further, the Commission's finding that most purchasers usually purchase the lowest-priced product is not "demonstrably wrong" with respect to D-PET purchasers, as Plaintiffs claim.  *Id.*  To the contrary, as discussed *supra*, all but one of the purchasers who bought PET sheet from Oman over the POI reported that they always or usually purchased the lowest-priced product.

---

[23] Among other things, the Commission observed that, in contrast to price, carbon footprint was not among the most frequently cited top three purchasing factors (CR at Table II-6), and only three of 17 purchasers ranked carbon footprint as a very important factor (CR at Table II-7).  Views at 36 n.154.  Moreover, as the Commission further observed, the vast majority of purchasers (seven of eight) reported that U.S.-produced PET sheet was either superior or comparable to PET sheet from Oman with respect to recycled content, *i.e.*, "R-PET" (CR at Table II-9).  Views at 36 n.154.  To the extent that PET sheet purchasing decisions are motivated by sustainability concerns, the record reflects, as the Commission noted, that the focus of these concerns is on recycled content, not lower carbon footprint.  *See* Petitioner's Post-Hr'g Br. at Exs. 1, 17, 18 & 19 (CD371) (containing the sustainability goals of several large domestic retailers, major U.S. purchasers of downstream PET packaging products).

**BUSINESS PROPRIETARY**
**INFORMATION DELETED**

Nor did the Commission find, as OCTAL claims, that D-PET purchasers "only care about price and nothing else." PlBr at 23.[24]  The Commission in actuality considered all of the views expressed by purchasers in questionnaire responses and elsewhere in the record, and specifically gave close scrutiny to the evidence pointed to by OCTAL concerning the views of its customers. Views at 35 & n.151.  Based on this evaluation, the Commission found, as well supported by the attested purchaser questionnaires, that all but one of the seventeen responding purchasers (including OCTAL's customers) reported that price is a *very* important factor, and eleven of them (including [█] of the seven purchasers of PET Sheet from Oman) always or usually purchase the lowest-priced product.[25]

### 3.    OCTAL's Lost Sales Arguments Fail

Contrary to Plaintiffs' claim (PlBr. at 30-31), the Commission did in fact evaluate and take into account the lost sales data from the "Lost Sales and Lost Revenue" section of the Staff Report.  On page 34 and footnote 147 of the Views, the Commission specifically referred to information from Table V-10 – evidence which is an integral part of that section of the Report, and which summarizes purchasers' responses as to whether and why they purchased subject imports instead of a domestic product.  Indeed, the Commission had to have considered the evidence in the Lost Sales and Lost Revenue section of the report to conclude that there were

---

[24] Indeed, the Commission explicitly stated that factors besides price may also be important, but that the record clearly indicated that price is important in PET sheet purchasing decisions.  Views at 29.

[25] OCTAL makes two additional unavailing arguments in this section of its brief that it repeats in contesting the Commission's lost sales analysis.  PlBr. at 23-24 (arguing that the Commission improperly relied on certain purchaser responses, and making the irrelevant observation that the volume of sales lost to subject imports primarily due to price was less than the total volume of D-PET purchases).  These are rebutted below in explaining why Plaintiffs' lost sales arguments fail.

**BUSINESS PROPRIETARY**
**INFORMATION DELETED**

confirmed lost sales to cumulated subject imports primarily due to their lower prices.  Views at

34.

Equally unavailing is Plaintiffs' claim that the Commission relied in its lost sales analysis

on two preliminary phase responses that the Commission's Staff considered "unusable."  PlBr. at

30.  Staff did not consider either [⬛⬛⬛⬛⬛] responses unusable.  To the contrary, Staff

incorporated these responses in the lost sales tables.  *See* CR at Tables V–9–12.  OCTAL

emphasizes that [⬛⬛⬛⬛⬛] were not among the firms listed in the Staff Report at II-1 n.4

as having provided usable purchaser questionnaire responses during the *final phase* of the POI.

PlBr. at 30.  But these two firms did submit usable (and certified) purchaser questionnaires

during the *preliminary phase* of these investigations, which Staff and the Commission deemed

reliable for purposes of inclusion in the summary of lost sales and lost revenue allegations.  *See*

CR at V-16 & n.20.  Of course, the record in these investigations consists of all evidence

collected and documents submitted in the whole investigation, including both the preliminary

and final phases.  *See* 19 CFR §§ 207.2(f), 207.4.  As both [⬛⬛⬛⬛⬛] preliminary

phase responses were useable, and formed part of the record for these investigations, there is no

basis for OCTAL's suggestion that the Commission was somehow barred from considering

them.

Plaintiffs also mischaracterize the lost sales evidence.  PlBr. at 30-31.  Five firms – not

three, as OCTAL states – reported price as a primary reason for purchasing subject imports over

the domestic like product.  CR at Table V-10.  Moreover, OCTAL's description of the price

negotiation evidence merely as "[⬛⬛⬛⬛⬛⬛⬛]" entirely ignores the

*content* of this correspondence.  *See* PlBr. at 30.  These negotiations indicate that the domestic

industry lost sales to subject imports because of price.  Views at 34 & n.148.

Nor is there merit to Plaintiffs' effort to minimize the importance of the volume of imports from Oman confirmed to have taken sales from domestic product for price reasons. PlBr. at 30-31. The Staff's purpose in investigating lost sales, and the Commission's citation to that information, is not to substitute for or match the actual shipment volume data. Rather, the Commission cited this evidence as indicative of representative instances in which the domestic industry lost sales to cumulated subject imports because of price. Views at 34. This evidence corroborates the finding that the lower priced imports gained sales and market share at the domestic industry's expense and had adverse price effects on the domestic industry. Views at 37, 38.

### D.  The Commission's Price Effects Finding is in Accordance with Law

Plaintiffs contend that the statute does not permit a finding of adverse price effects based on significant underselling in the absence of significant price depression or suppression. PlBr. at 25. The statute contains no such prohibition.

Under the statute, a lack of price depression and suppression does not preclude a finding of adverse price effects. All that the statutory price effects analysis requires is that the Commission "*consider*" whether there has been price depression/suppression. 19 U.S.C. § 1677(7)(C)(ii) (emphasis added). It nowhere additionally mandates the Commission *find* either depression or suppression to conclude that subject imports have had adverse price effects. *Id*. To the contrary, the statute explicitly states that the presence or absence of any statutory factor under the Commission's price effects analysis is not decisive. *Id*. at § 1677(7)(E)(ii).

Not only does Plaintiffs' argument seek to add a limitation to the statute that does not exist, it is also wrong because it reads a specific provision – the price underselling provision – out of the statute. *See id*. at § 1677(7)(C)(ii)(I). The statutory price effects analysis comprises

two distinct inquiries: one on underselling, and one on price depression and suppression.  *Id*. at §§ 1677(7)(C)(ii)(I), (II).  This Court has been clear that in its evaluation of underselling, the Commission is doing something different than in its evaluation of price depression and suppression.  *See United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. United States*, 348 F. Supp. 3d 1328, 1335 (Ct. Int'l Trade 2018) (characterizing the statutory price effects provision as a "two pronged analysis," and remanding the Commission for "merely relying" in its assessment of underselling on its price suppression and price depression findings); *see also Altx, Inc. v. United States*, 25 CIT 1100, 1109, 167 F. Supp. 2d 1353, 1365 (2001), *aff'd*, 501 F.3d 1291 (Fed. Cir. 2007) (stating that the Commission's underselling and depression/suppression analyses are "discrete" and that the Commission may not "collapse{}" them).  But if significant underselling is merely an "intermediate finding" (PlBr. at 36), the sole purpose of which is to feed into and form part of the suppression/depression analysis, this would collapse the underselling provision into the suppression/depression provision, contrary to the statute and the case law.

As the Federal Circuit and this Court have previously found, the Commission can justifiably find price effects without finding price depression or suppression.  *See, e.g., Grupo Industrial Camesa v. United States*, 85 F.3d 1577, 1582 (Fed. Cir. 1996) (upholding affirmative determinations based on a finding that subject imports, as here, gained market share through significant underselling); *Cleo Inc. v. United States*, 30 CIT 1380, 1396 (2006), *aff'd*, 501 F.3d 1291 (Fed. Cir. 2007) (upholding the Commission's affirmative determination, and holding that "{t}he significance of underselling need not be based on a finding that underselling actually suppressed or depressed domestic prices") (citing *Altx*, 25 CIT at 1109, 167 F. Supp. 2d at 1365-66).

Thus, under the natural reading of the statute, as previously affirmed by the Federal Circuit and this Court, the Commission was permitted to find adverse price effects where there was significant underselling, notwithstanding the absence of a finding of significant price depression or suppression.  For example, as applied to these investigations, the significant underselling was accompanied by lost sales and lost market share.  Conversely, OCTAL's proposed interpretation reads the underselling provision out of the statute and is in tension with the Court's precedent.[26]  Further, even if were not clear from the face of the statute, which is not the case, the Commission's interpretation was reasonable, consistent with the statutory purpose, and entitled to deference.  *See Chevron*, 467 U.S. at 842-43.  Notably, that significant underselling can serve as a basis for finding adverse price effects has been the Commission's longstanding construction of the statutory price effects provision.[27]  As such, the Commission's

---

[26] Elsewhere in its brief, OCTAL appears to effectively concede that underselling leading to a market share shift can establish adverse price effects under the statute.  *See* PlBr. at 37 ("If the Commission wants to rely on volume shifts to establish adverse price effects, the volume being shifted must be shifting for price reasons.").

[27] In each of the following investigations, for example, the Commission found adverse price effects based on significant underselling in the absence of a finding of significant price depression or suppression, and ultimately reached an affirmative determination:  *Quartz Surface Products from India and Turkey*, Inv. Nos. 701-TA-624-625 and 731-TA-1450-1451 (Final), USITC Pub. 5061 at 27-30 (Jun. 2020); *Carbon and Alloy Steel Threaded Rod from Thailand*, Inv. No. 731-TA-1444 (Final), USITC Pub. 4998 at 29-33 (Dec. 2019); *Large Diameter Welded Pipe from China and India*, Inv. Nos. 701-TA-593-594 and 731-TA-1402 and 1404 (Final), USITC Pub. 4859 at 43-46 (Jan. 2019); *Ripe Olives from Spain*, Inv. Nos. 701-TA-582 and 731-TA-1377 (Final), USITC Pub. 4805 at 29-31 (Jul. 2018); and *Welded Stainless Steel Pressure Pipe from China*, Inv. Nos. 701-TA-454 and 731-TA-1450-1144 (Final), USITC Pub. 4064 at 22-25 (Mar. 2009).

*See also Steel Concrete Reinforcing Bar from Mexico and Turkey*, Inv. Nos. 701-TA-502 and 731-TA-1227 (Final), USITC Pub. 4496 at 25-29 (Oct. 2014); *Small Diameter Graphite Electrodes from China*, Inv. No. 731-TA-1143 (Final), USITC Pub. 4062 at 16-19 (Feb. 2009); *Sodium Nitrite from China and Germany*, Inv. Nos. 701- TA-453 and 731-TA-1136-37 (Final), USITC Pub. 4029 at 25-28 (Aug. 2008); *Certain Tissue Paper Products From China*, Inv. No. 731-TA-1070B (Final), USITC Pub. 3758 at 18-20 (Mar. 2005).

**BUSINESS PROPRIETARY**
**INFORMATION DELETED**

finding of adverse price effects based on significant underselling leading to a shift in market share from domestic producers to subject imports in these investigations was not a "novel approach," as Plaintiffs wrongly claim. PlBr. at 35.

**E.    The Commission's Impact Finding is Supported by Substantial Evidence and in Accordance with Law**

**1.    The Commission's Impact Finding Should Be Sustained**

Substantial record evidence supports the Commission's finding that cumulated subject imports had a significant impact on the domestic industry. Views at 43. The quantity and value of the domestic industry's commercial U.S. shipments, and the revenues from its commercial sales, decreased over the POI, despite the [■■■] percent increase in apparent U.S. consumption in the merchant market over this period. Views at 43; CR at Table C-4. Specifically, the quantity and value of the domestic industry's commercial U.S. shipments decreased overall by [■■■] and [■■■] percent, respectively, and its revenues from commercial sales decreased overall by [■■] percent over this period. CR at Table C-4. As a result of decreased shipments, and notwithstanding the expanding market, the domestic industry lost [■■] percentage points of merchant market share to cumulated subject imports. CR Table C-4. In turn, because cumulated subject imports captured sales and took market share from the domestic industry during the POI, the industry's performance was worse than it would have been otherwise. *See* Views at 42-43, (citing CR at Table C-4). *See also* CR at IV-20 & Table IV-10.

Further confirming the significant impact that cumulated subject imports had on the domestic industry, majorities of domestic producers reported that subject imports had negative effects on investment, growth, and development. Views at 44; CR at Table VI-7. Finally, as the Commission observed, other factors – such as demand trends or nonsubject import competition – do not explain the magnitude of the injury to the domestic industry attributed to subject imports.

**BUSINESS PROPRIETARY**
**INFORMATION DELETED**

Views at 45-46.  Apparent U.S. consumption increased over the POI, and nonsubject imports increased at the expense of the domestic industry by far less than cumulated subject imports. Views at 45; CR at Table C-4 (showing a [ ▮ ] percent increase in apparent consumption over the POI, and that, in contrast to subject imports' [ ▮ ] overall percentage point increase in market share, nonsubject imports' market share increased overall by only [ ▮ ] percent over the POI).

In sum, substantial record evidence supports the Commission's impact finding.  Unable to demonstrate that the Commission's weighing of the evidence was in any way unreasonable, OCTAL again overlooks important facts in the record and attempts to read into the statute non-existent methodological obligations.

## 2.    OCTAL's "Correlation" Argument Fails

Plaintiffs incorrectly argue that the record demonstrates no correlation between increasing subject imports over the POI and decreasing domestic industry profitability over this period.  PlBr. at 41.  The profitability of most domestic producers deteriorated over the POI. Views at 44; CR at Table F-3 (containing domestic producers' merchant market financial results).  Overall, most firms' operating margins were lower in 2019 than in 2017.  CR at Table F-3 (showing a negative trend in the overall operating margin for most firms, from [ ▮▮▮▮ ] percent in 2017 to [ ▮▮▮▮ ] in 2019).  Further, the majority of firms (9 of 13) reporting financial results for 2019 reported operating *losses* that year.  CR at Table F-3.  While OCTAL emphasizes the industrywide trend in profitability, this trend was heavily influenced by the strong performance of a single producer, with [ ▮▮▮▮▮ ] financial results distinct from that of the other domestic producers.  CR at Table F-3.[28]  Moreover, even

---

[28] Indeed, the evidence indicated that this producer makes a premium, niche product that may not compete directly with subject imports.  Views at 44; CR at III-14 n.6 & VI-2 n.4; *see*

*(cont'd on next page)*

**BUSINESS PROPRIETARY**
**INFORMATION DELETED**

with respect to the industrywide trend, this was materially worse than it would have been absent

subject imports.  Views at 44.  Plaintiffs are simply wrong that the record demonstrated no

correlation between increasing subject imports over the POI and negative impact on the domestic

industry's profitability.

OCTAL also mistakenly argues that, if domestic industry profitability increases as

subject imports increase, this compels a negative determination.  PlBr. at 42 ("As subject imports

increased market share, the domestic industry operating profitability has improved, not

weakened.  Th{is} … demonstrated that subject imports did not have an adverse impact on the

domestic industry.").  But the statute does not place outcome determinative weight on the

domestic industry's profitability.  Rather, profitability is only one of many impact factors the

Commission considers under the statute, none of which is dispositive.  *See* 19 U.S.C.

§ 1677(7)(C)(iii), (E)(ii).  Indeed, as the Commission observed, the statute specifically states that

the agency may *not* make a negative determination merely because the industry is profitable, or

its profitability has recently improved.  *Id.* at § 1677(7)(J); Views at 43-44.  Consequently, even

assuming the facts were as OCTAL claims, which they are not, this would not defeat the

Commission's significant impact finding.  Where, as in the investigations at issue, several factors

other than profitability indicate injury by reason of subject imports, a finding of significant

impact is supported by substantial record evidence and fully in accordance with law, irrespective

of profitability trends.  Moreover, even if an industry is profitable at the end of the POI, it would

be reasonable for the Commission to reach an affirmative material injury determination where, as

---

*also* [███████████████████] Producer Questionnaire Response at 32 (CD288)
 (indicating that the firm did not sell any of the four pricing products).  That the profitability of
the one producer apparently not in competition with subject imports [████████] while the other
producers' profitability deteriorated merely underscores the causal linkage between subject
imports and deteriorating domestic industry profitability.

in these investigations, it finds that the domestic industry as a whole would have performed materially better absent subject imports.  Views at 44.

OCTAL's challenge to the Commission's impact analysis likewise suffers from Plaintiffs' misconception that the Commission is required to perform a micro-analysis of the specific relationship between subject import trends and profitability trends.  PlBr. at 40, 42-43. As the Federal Circuit has confirmed, the Commission's impact analysis need not adhere to *any* "{p}rocrustean formula," much less the specific methodology OCTAL proposes.  *See Mittal Steel Point Lisas Ltd. v. United States,* 542 F.3d 867, 878-79 (Fed. Cir. 2008).  While Plaintiffs complain about the absence of the word "correlation" in the Commission's Views (PlBr. at 43) they overlook that this word is nowhere mentioned in the relevant statutory provision, which prescribes no specific methodology.  19 U.S.C. § 1677(7)(C)(iii).  In any event, the Commission did evaluate the correlation between subject import trends and the state of the domestic industry, although it declined to apply the results-driven, narrowly-targeted comparison that OCTAL would have preferred.  Namely, it found, as supported by substantial record evidence, that cumulated subject import volume increased during the POI (Views at 30-31) while also finding, as further supported by the record, that during this same period, the domestic industry suffered declines in production, shipments, and revenues.  Views at 42-43.

### 3.   OCTAL's Dumping Margin Arguments Fail

#### a.   The Statute Nowhere Mandates a Causal Link Analysis Between Dumping Margins and Injury

The statute requires the Commission to evaluate "the magnitude of the margin of dumping."  19 U.S.C. § 1677(7)(C)(iii)(V).  But it prescribes *no* specific way that the Commission must perform this evaluation, much less the causal linkage analysis Plaintiffs would

mandate.[29]  PlBr. at 50-53.  In arguing that 19 U.S.C. § 1677(7)(C)(iii)(V) requires the

Commission to analyze whether dumping margins have caused material injury, Plaintiffs again

ask the Court to read non-existent methodological obligations into the statute.

It is unsurprising that there is no support in the text for OCTAL's proposed reading, as

the statutory investigation of material injury concerns the effects of *merchandise*, not margins.

As the Commission explained, the statute directs the agency to determine whether dumped

*imports* – not dumping margins – are causing or threatening material injury.  Views at 43 n.184

(emphasis in original); 19 U.S.C. § 1673d(b)(1).  As the Commission further explained, the

statute directs the Commission to consider whether "there has been significant price underselling

by the imported *merchandise*...," and does not further direct the Commission to find whether

underselling was caused by dumping.  Views at 43 n.184 (quoting 19 U.S.C. § 1677(7)(C)(ii)(I))

(emphasis added).  Likewise, in laying out the Commission's impact analysis, the statute directs

the Commission to consider "the impact of imports of such *merchandise* . . . ."  19 U.S.C.

§ 1677(7)(B)(i)(III) (emphasis added).  The Commission's obligation is to determine the effects

on the domestic industry of dumped *merchandise*, not dumping itself.[30]

---

[29] Accordingly, contrary to what Plaintiffs suggest, the "plain meaning" of 19 U.S.C. § 1677(7)(C)(iii)(V) in no way requires the Commission to evaluate whether the domestic industry is materially injured by reason of dumping margins.  PlBr. at 50.

[30] Plaintiffs argue incorrectly that the *Thermal Paper* remand determination the Commission cited in its Views provides no support for this position.  PlBr. at 52.  To the contrary, as the Commission stated in the *Thermal Paper* remand determination (in the threat of material injury context):  "The statute does not require the Commission to find that the threatened material injury is by reason of dumping . . .  Instead, the statute requires that the threat of material injury to a domestic industry be by reason of the corresponding class or kind of imports covered by the Commerce affirmative determination."  *Certain Lightweight Thermal Paper from China and Germany*, Inv. Nos. 701-TA-451 and 731-TA-1126–1127 (Remand), USITC Pub. 4334 at 7 (Sept. 2011), *aff'd sub nom.*, *Papierfabrik August Koehler AG v. United States*, 36 CIT 40, 808 F. Supp. 2d 1350F (2012), *aff'd without opinion*, 493 F. App'x 104 (Fed. Cir. 2013).

This Court has expressly rejected OCTAL's proposed reading, holding that the statute does not require an analysis of whether dumping margins have caused injury.  *See Whirlpool Corp. v. United States*, 37 CIT 1775, 1798 (2013) ("The Commission was not required to analyze whether the [[ ]] percent dumping margin of subject imports from [[ ]] injured the domestic industry"); *Consol. Fibers, Inc. v. United States*, 32 CIT 855, 863, 574 F. Supp. 2d 1371, 1380 (2008) ("{T}he statutory language does not . . . require that {the Commission} demonstrate that dumped imports, through the effects of particular margins of dumping, are causing injury.") (internal quotation omitted); *Asociacion de Productores de Salmon y Trucha de Chile AG v. United States*, 26 CIT 29, 45, 180 F. Supp. 2d 1360, 1376 (2002) ("Nothing in the statutory scheme compels {the Commission} to reach a certain conclusion concerning the dumping margins – the statute only compels {the Commission} to consider such margins.").

### b.      OCTAL Has Not Shown Any Deficiency in the Commission's Consideration of Dumping Margins

Plaintiffs rely extensively on the decision in *Coalition for Fair Trade of Hardwood Plywood v. USITC*, 180 F. Supp. 3d 1137, 1172–75 (Ct. Int'l Trade 2016).  *See* PlBr. at 46-47, 49-50.  While the Court in that one case stated that something more than a recitation of the dumping margins is required under the statute, the Commission in the instant investigations considered the dumping margins, and did not merely recite them.  *See Hardwood Plywood*, 180 F. Supp. 3d at 1174.  Specifically, the Commission explicitly considered the magnitude of the dumping margins from both subject countries, including the high margins for Korean producers unacknowledged by OCTAL, and explained that it took into account in its impact analysis that Commerce had made final affirmative dumping determinations with respect to all subject producers in both Korea and Oman.  Views at 39 n.162.  The Commission further considered the role of the magnitude of the dumping margins by indicating that these margins are less probative

as to the impact of subject imports than the underselling by these imports, and the consequent

effect of this underselling on the domestic industry.  Views at 39 n.162 (stating that the

Commission's analysis of significant underselling by subject imports is "particularly probative"

as to the impact of these imports).  The Commission additionally considered the role of the

magnitude of the dumping margins in its impact analysis by explaining that the statute does not

require finding a causal link between dumping margins and injury to find that subject imports

had a significant impact on the domestic industry.  Views at 43 n.184.  In light of these

considerations, the Commission's evaluation of dumping margins was entirely consistent with

*Hardwood Plywood*.

Nor do any of the other cases OCTAL cites indicate that the Commission was required

under the statute to give more consideration than it did to the dumping margins.  PlBr. at 45-47.

*Altx III* and *LG Electronics* merely confirm that the Commission must evaluate the magnitude of

the dumping margins as part of its impact analysis; neither specify how the Commission must do

so.  *Altx*, 370 F.3d at 1123 (merely stating that the Commission must consider the magnitude of

the dumping margin under the statute); *LG Elecs., Inc. v. USITC*, 26 F. Supp. 3d 1338, 1358 (Ct.

Int'l Trade 2014) (same).  Indeed, in *Altx III* the Federal Circuit affirmed the Commission's

choice to provide very limited consideration to the dumping margin.  The Court upheld the

agency's decision not to rely in its analysis on an economic model incorporating the dumping

margin, writing that "the Commission fully complied with its statutory duty by at least

'*consider{ing}* ... the magnitude of the margin of dumping.'  19 U.S.C. § 1677(7)(C)(iii)(V).  We

decline to ask more of the Commission than required by the statute."  *Altx*, 370 F.3d at 1123

(emphasis in original).

Likewise, nothing Plaintiffs cite from the statute supports their contention that the

Commission's evaluation of the dumping margins was deficient.  *See* PlBr. at 44-47.  OCTAL

merely reiterates that the statutory impact analysis requires the Commission to evaluate the

magnitude of the dumping margin.  *Id*.   The statute, however, does not require that the

Commission employ any particular methodology in assessing these margins, or give controlling

weight to them, as Plaintiffs would prefer.  To the contrary, the Court has repeatedly confirmed

that limited consideration of dumping margins suffices under the statute.  *See Consol. Fibers,* 32

CIT at 862-63, 574 F. Supp. 2d at 1379-80 (affirming the Commission when it simply stated that

the dumping margins were "not … conclusive for {its} analysis of impact") (quotation omitted);

*Asociacion de Productores de Salmon*, 26 CIT at 44-45, 180 F. Supp. 2d at 1375-76 ("reciting

the margins of dumping … and declining to attach any significance to the margins" was

sufficient).

The SAA instructs that the Commission must "specifically reference . . . factors and

arguments that are material and relevant, or must provide a discussion or explanation in the

determination that renders evident the agency's treatment of a factor or argument."  SAA at 892;

*see also Chemours*, 492 F. Supp. 3d at 1337.  The Commission specifically referenced the

magnitude of the dumping margins and provided discussion and explanation that rendered

evident its treatment of this factor.  Views at 39 n.162 & 43 n.184.  The Commission thus

appropriately considered the magnitude of the dumping margins.

## V.     CONCLUSION

For the foregoing reasons, the Court should affirm the Commission's unanimous

affirmative determinations.  They are supported by substantial evidence and otherwise fully in

accordance with law.

Respectfully submitted,


Dominic L. Bianchi
General Counsel

*/s/ Andrea C. Casson*
Andrea C. Casson
Assistant General Counsel for Litigation

*/s/ Jason F. Miller*
Jason F. Miller
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-3233
Facsimile: (202) 205-3111
jason.miller@usitc.gov

*Attorneys for Defendant United States*

## CERTIFICATE OF COMPLIANCE

Pursuant to Chambers Procedures 2(B)(1) and (2), I hereby certify that the attached

**DEFENDANT UNITED STATES' NONCONFIDENTIAL MEMORANDUM IN**

**OPPOSITION TO PLAINTIFF'S MOTIONS FOR JUDGMENT ON THE AGENCY**

**RECORD** contains 13,981 words, according to the word-count function of the word processing

system used to prepare this brief (Microsoft Office 365 ProPlus).


Dated: May 27, 2021                          /s/ *Jason F. Miller*
                                             Jason F. Miller
                                             Attorney-Advisor
                                             Office of the General Counsel
                                             U.S. International Trade Commission
                                             500 E Street, SW
                                             Washington, DC 20436
                                             Telephone: (202) 205-3233
                                             Facsimile: (202) 205-3111
                                             jason.miller@usitc.gov

47

**CERTIFICATE OF SERVICE**

I, Jason Miller, hereby certify that on this 28th day of May 2021, a true and correct copy

of **DEFENDANT UNITED STATES' NONCONFIDENTIAL MEMORANDUM IN**

**OPPOSITION TO PLAINTIFF'S MOTIONS FOR JUDGMENT ON THE AGENCY**

**RECORD** was filed electronically using the Court's CM/ECF system, by which notice and a

true and correct copy will be sent to counsel of record for all parties to the case.

/s/ *Jason F. Miller*
Jason F. Miller
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-3233
Facsimile: (202) 205-3111
jason.miller@usitc.gov