# UNITED STATES COURT OF INTERNATIONAL TRADE

*Before*: The Honorable Judge Timothy M. Reif

|  |  |
|---|---|
| OCTAL Inc. and OCTAL SAOC-FSZ ) | |
| ) | |
| Plaintiffs, ) | **Court No. 20-03698** |
| ) | |
| v. ) | **<u>PUBLIC VERSION</u>** |
| ) | *Confidential information is* |
| United States ) | *contained in brackets on pages* |
| ) | *6 and 16.* |
| Defendant and ) | |
| ) | *Such information has been* |
| Advanced Extrusion, Inc. *et al* ) | *redacted in the Public Version.* |
| ) | |
| Defendant-Intervenors. ) | |
| ) | |

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF RULE 56.2 MOTION FOR JUDGEMENT ON THE AGENCY RECORD

Daniel L. Porter
James P. Durling
James C. Beaty
Ana Amador

**Curtis, Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, NW
Washington, DC, 20006

*Counsel for Plaintiffs*

June 24, 2021

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ..................................................... 1

ARGUMENT ...................................................................................................... 3

I.   CONTRARY TO THE COMMISSION'S ARGUMENT, THE APPLICABLE
     STANDARD OF REVIEW DOES NOT REQUIRE THE COURT TO RUBBER
     STAMP THE COMMISSION'S DETERMINATION ............................................ 3

II.  THE COMMISSION'S VIEWS ON INJURY ARE NOT SUPPORTED BY
     SUBSTANTIAL EVIDENCE AND ARE OTHERWISE NOT IN
     ACCORDANCE WITH LAW ................................................................. 5

     A.   The Commission's Conclusion That U.S. Customers Purchased OCTAL
          PET Sheet Because of Price Rather Than Non-Price Reasons Is Not
          Supported by Substantial Evidence ................................................. 5

          1.   The record evidence contradicts the Commission conclusion
               about the importance of non-price factors for purchasing
               OCTA PET sheet ................................................................. 6

          2.   The Commission efforts to dismiss the importance of non-
               price factors fail ................................................................. 10

     B.   The Commission Conclusion of Adverse Price Effects Is Not Supported By
          Substantial Evidence and Is Not In Accordance With Law ....................... 12

          1.   The Commission's conclusion about the importance of price
               to purchasers of OCTAL's PET sheet from Oman is not
               supported by substantial evidence ............................................ 13

          2.   The comments by an OCTAL official were taken out of
               context ............................................................................ 16

          3.   The Commission failed to integrate its findings about the
               different elements of possible price effects ................................ 18

C.    The Commission Conclusion of Adverse Impact Is Not Supported by Substantial Evidence And Is Otherwise Not In Accordance With Law ..... 21

    1.    The Commission did not properly evaluate the lack of correlation between imports and the condition of the domestic industry ................................................................................ 21

    2.    The Commission did not properly evaluate OCTAL's low dumping margin as required by the statute ......................................... 23

CONCLUSION ............................................................................................................. 28

# TABLE OF AUTHORITIES

## Cases

*Altx, Inc. v. United States,*
    25 CIT 1100, 167 F. Supp 2d 1353 (2001) ........................................................ 21

*Asociacion De Productores De Salmon Y Trucha De Chile Ag v. United States ITC,*
    26 CIT 29, 180 F. Supp. 2d 1360 (2002) ........................................................ 27

*Atlantic Sugar, Ltd. v. United States,*
    744 F.2d 1556 (Fed. Cir. 1984) ........................................................ 10

*BIC Corp. v. United States,*
    21 CIT 448, 964 F. Supp. 391 (1997) ........................................................ 21, 22

*Burlington Truck Lines, Inc. v. United States,*
    371 U.S. 156 (1962) ........................................................ 9

*Coal. for the Pres. of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States,*
    22 CIT 520, 15 F. Supp. 2d 918 (1998) ........................................................ 21

*Coalition for Fair Trade in Hardwood Plywood v. United States ITC,*
    180 F. Supp. 3d 1137 (Ct. Int'l Trade 2016) ........................................................ 26, 29

*Comm. of Domestic Steel Wire Rope & Specialty Cable Mfrs. v. United States,*
    17 CIT 233, 818 F. Supp. 376 (1993) ........................................................ 22

*Consol. Fibers, Inc. v. United States,*
    32 CIT 855, 574 F. Supp. 2d 1371 (2008) ........................................................ 27

*Dak Ams. LLC v. United States,*
    456 F. Supp. 3d 1340 (Ct. Int'l Trade 2020) ........................................................ 14

*Dastech Int'l, Inc. v. United States,*
    963 F. Supp. 1220 (Ct. Int'l Trade 1997) ........................................................ 4

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
    140 S. Ct. 1891 (2020) ........................................................ 14

*JMC Steel Group v. United States,*
    24 F. Supp. 3d 1290 (Ct. Int'l Trade 2014) ........................................................ 21

*Nippon Steel Corp. v. United States,*
    27 CIT 1856, 301 F. Supp. 2d 1355 (2003) ........................................................ 7, 10, 11

*Suramerica de Aleaciones Laminadas, C.A. v. United States,*
   44 F.3d 978 (Fed. Cir. 1994) ............................................................... 10

*Taiwan Semiconductor Indus. Ass'n v. United States,*
   24 CIT 914, 118 F. Supp. 2d 1250 (2000) ...................................... 23

*Timken Co. v. United States,*
   12 CIT 955, 699 F. Supp. 300 (1988) .............................................. 10

*Trent Tube Div., Crucible Materials Corp. v. United States,*
   14 CIT 386, 741 F. Supp. 921 (1990) .............................................. 22

*U.S. Steel Group v. United States,*
   162 F. Supp. 2d 676 (Ct. Int'l Trade 2001) ................................ 9, 11

*United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allied Indus., and Serv. Workers Int'l Union v. United States,*
   348 F. Supp. 3d 1328 (Ct. Int'l Trade 2018) ................................. 20

*Universal Camera Corp. v. NLRB,*
   340 U.S. 474 (1951) .................................................... 3, 7, 9, 10

## Statutes

19 U.S.C. §1516a(b) ....................................................................... 9

19 U.S.C. §1677(4)(A) .................................................................. 21

19 U.S.C. §1677(7)(B)(i)(II) .................................................... 13, 18

19 U.S.C. §1677(7)(C)(ii) ........................................................ 13, 18

19 U.S.C. §1677(7)(C)(iii)(V) ...................................................... 22

# INTRODUCTION AND SUMMARY OF ARGUMENT

The Commission defends its decision both by distorting the standard of review and by viewing the evidence in isolation rather than fairly considering the record as a whole. The Commission's determination was essentially an outcome in search of a rationale that could only be found by dismissing without any serious considerations key pieces of contrary evidence.

The Commission seeks to strip the standard of review of any practical meaning. The standard of review is not a rubber stamp, requiring the Court to defer to anything the Commission might say. Rather, the standard of review requires courts to review carefully what the Commission said, with particular attention to any contrary evidence the Commission disregarded. The standard of review requires more than simply checking whether the Commission explicitly mentioned and then disregarded something. Rather, the core of the standard of review requires the court to examine <u>why</u> the Commission disregarded contrary evidence. In this case, the Commission utterly failed to provide any sound rationale explaining why it disregarded the contrary evidence.

Moreover, the Commission viewed issues and the supporting evidence in isolation, focusing on certain points while ignoring others. The Commission built its rationale largely on the alleged effects of lower priced imports, but then disregarded extensive record evidence that the overwhelming volume of subject imports — virtually all of which came from OCTAL in Oman — were being purchased for non-price reasons. And the Commission dismissed without any meaningful discussion the evidence that contradicted its overall narrative: (1) the specific evidence from the largest purchasers

that they bought from OCTAL for non-price reasons; (2) the evidence showing no price depression or price suppression, which are normally needed to show that underselling is actually having some price effect; (3) the evidence of improving profitability for the domestic industry as a whole, which again is normally needed to show that underselling is actually having some adverse effects; and (4) the evidence of low dumping margins, which underscored the lack of any significant adverse effects from "dumped imports" on the domestic industry.

The Commission would have this Court deferentially rubber stamp the decision. OCTAL asks this Court to review each issue, but then to step back and consider the Commission's rationale as a whole. It simply does not logically fit together and cannot be reconciled with the record evidence when considered in its entirety.

**ARGUMENT**

## I. CONTRARY TO THE COMMISSION'S ARGUMENT, THE APPLICABLE STANDARD OF REVIEW DOES NOT REQUIRE THE COURT TO RUBBER STAMP THE COMMISSION'S DETERMINATION

The Commission has fundamentally mischaracterized Plaintiffs' approach to the standard of review. This dispute is not about weighing the evidence. Rather, this dispute is about whether various Commission assertions have a sufficient defensible basis in substantial evidence to justify affirmation by the Court. This is not a case of "two fairly conflicting views." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488 (1951). The record evidence simply does not support the Commission's view of the injurious effects of PET sheet imports. This Court must assess whether the Commission's affirmative injury conclusion is truly supported by substantial evidence.

The Commission suggests that the standard of review for an injury determination is far more deferential than it really is, effectively seeking for this Court to be a rubber stamp for the Commission's determination. *See* Commission's Br., ECF No. 28 at 4, 37 ("Commission Brief"). Meaningful judicial scrutiny, however, is neither uncommon nor inconsistent with the statutory standard of review. Indeed, based on our research, over the past twenty-five years, 44 Commission injury (AD-CVD) determinations have been appealed to the Court of International Trade. Of these, the Court of International Trade has found fault (in whole or in part) in 13 Commission original determinations, or almost a third of the time.

Such statistics are consistent with the notion that this Court, in fact, conducts serious and substantive reviews of Commission determinations and probing examinations of the record evidence to evaluate the foundation of the Commission's findings.  As the Court itself has noted:

> Despite the deference that this court must give the Commission's determination the court's review is neither passive nor powerless.  "A court does not depart from its proper function when it undertakes a study of the record, hopefully perceptive, even as to the evidence on technical and specialized matters, for this enables the court to penetrate to the underlying decisions of the agency, to satisfy itself that the agency has exercised a reasoned discretion, with reasons that do not deviate from or ignore the ascertainable legislative intent.  'The deference owed to an expert tribunal cannot be allowed to slip into judicial inertia.'"

*Dastech Int'l, Inc. v. United States*, 963 F. Supp. 1220, 1222-23 (Ct. Int'l Trade 1997) (internal citations omitted).

Finally, we note that the Commission's Brief repeatedly accuses Plaintiffs of asking this Court to reweigh the evidence, *see*, *e.g.*, Commission Brief at 2, 24, and yet the Commission cannot actually cite to anywhere in OCTAL's brief making such request. In fact, OCTAL is not asking this Court to reweigh the evidence.  Consistent with the standard of review, OCTAL only asks that this Court determines whether the Commission's affirmative determination is based on substantial evidence on the record viewed in its entirety.  The Court does not reweigh the evidence when it applies this standard and tests a Commission conclusion against the record as a whole.  Rather, the Court properly determines whether the Commission could have reasonably come to the conclusions it reached based on the record as a whole and whether the Commission's findings are logically consistent and otherwise reflect reasoned decision-making.

## II. THE COMMISSION'S VIEWS ON INJURY ARE NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND ARE OTHERWISE NOT IN ACCORDANCE WITH LAW

### A. The Commission's Conclusion That U.S. Customers Purchased OCTAL PET Sheet Because of Price Rather Than Non-Price Reasons Is Not Supported by Substantial Evidence

OCTAL's Brief discussed extensive evidence demonstrating that those customers that purchased OCTAL's PET sheet did so because of non-price reasons; namely, the superior performance attributes of OCTAL's PET sheet and OCTAL's ability to offer large volumes.[1] *See* OCTAL Brief, ECF No. 25 at 11-17 ("OCTAL Brief"). We did so because this very question — the reason that customers purchased OCTAL's PET sheet — was a central issue in the Commission's injury finding. There was no question that OCTAL increased its market share — based solely on the *volume* of subject imports sold — over the investigation period examined. But given that change in market share, the central question before the Commission was *why*. If the evidence demonstrated those customers that purchased OCTAL PET sheet primarily because OCTAL PET sheet has a lower price, then arguably the increase in subject import market share (which was

---

[1]  The Commission's argument that it has no legal obligation to determine whether subject imports had adverse legal "effects" mischaracterizes the issue. OCTAL's Brief makes clear that, vis-à-vis the volume of subject imports, OCTAL challenges the Commission ultimate substantive conclusion that the increase in the volume of subject imports was "significant" and therefore injurious to the domestic industry. This challenge rested on the Commission's rejection of OCTAL's argument that the reason for the increase in the volume of subject imports occurred for non-price reasons. Or stated differently, the failure of the Commission to appreciate the substantial evidence of customers choosing OCTAL's PET sheet for non-price reasons is a volume-impact point, not a price effects point. And therefore, just as OCTAL had done in the proceeding below (without any objection by the Commission), in its opening brief OCTAL presented the argument about non-price reasons in the context of whether the volume of subject imports could be considered "significant."

overwhelming from OCTAL) was the result of dumped imports. However, if those customers purchased OCTAL PET sheet for non-price reasons, then the Commission could not conclude superficially that the increased market share was the result of dumped subject imports, and there would be little to no justification for an affirmative injury conclusion. This is why there was so much attention on this issue in the Commission proceeding below and why OCTAL devoted so many pages in its Brief to the evidence on the issue.

> **1.** **The record evidence contradicts the Commission conclusion about the importance of non-price factors for purchasing OCTA PET sheet**

The Commission's Brief does not — because it cannot — dispute any of the core evidence referenced in OCTAL's Brief. All of that evidence constitutes undisputed facts. Specifically:

- It is undisputed that the largest customers believed that OCTAL's PET sheet contained superior performance attributes compared to domestically produced PET sheet *See* [                    ] U.S. Purchasers' Questionnaire Response, CR248 at Sworn Declaration of [                    ] ("Declaration of [                ]"), p. 1; [                    ] U.S. Purchaser Questionnaire Response, CR252 at 26-27; [                    ] U.S. Purchaser Questionnaire Response, CR360 at Sworn Declaration of [          ], p. 1.

- It is undisputed that those firms that explicitly stated that the ability to purchase D-PET was "very important" to their purchasing decision accounted for [      ] percent of all D-PET sheet purchases from OCTAL. OCTAL's Post-Hearing Brief, CR370 at Exhibit 3 providing tabulation of U.S. Purchaser Questionnaire Responses.

- It is undisputed that those U.S. customers accounting for [      ] percent of total purchases of OCTAL PET informed the Commission (in response to a specific Commission question) that price was not the most important factor

for purchasing OCTAL PET sheet. OCTAL Pre-Hearing Brief, CR362 at Exhibit 3.

In OCTAL's Brief, we demonstrated why the Commission was wrong to discount and effectively ignore the above undisputed facts in rendering its conclusion to dismiss the non-price reasons unrelated to any dumping that led to the volume increase in OCTAL's PET sales. We demonstrated that the Commission's conclusion was premised upon cherry-picking less relevant facts and thereby not addressing all of the evidence, including whatever in the record fairly detracts from its weight. *Nippon Steel Corp. v. United States,* 27 CIT 1856, 1864, 301 F. Supp. 2d 1355, 1364 (2003) (*citing Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488 (1951)).

In its response brief, the Commission purports to respond to OCTAL's arguments about the substantial evidence of non-price reasons for customers' purchases of non-subject imports by adopting three approaches. First, the Commission simply reiterates the same conclusions and discussion set forth in the Commission's written determination on this issue. *See* Commission Brief at 23-24. Petitioners arguments do the same. Petitioners' Brief at 7-15, ECF No. 26 ("Petitioners' Brief). As a reply, we simply refer this Court to the detailed discussion in our opening brief as to why the Commission's written determination on its face does not satisfy the substantial evidence standard. *See* OCTAL Brief at 12-24.

Second, the Commission spends several paragraphs on a red herring; namely, OCTAL's word choice in arguing that the Commission effectively "ignored" the substantial evidence about non-price reasons. Commission Br. at 26-27. The

Commission's Brief posits that our argument that the Commission effectively ignored evidence cannot possibly be correct because the Commission's determination explicitly says "the Commission acknowledged" OCTAL's arguments. *Id.* at 27. This argument is just silly. OCTAL knows full well that the Commission claims to have considered OCTAL's argument about non-price factors. Indeed, OCTAL's Brief specifically quoted that part of the Commission's decision in which the Commission stated: "We are unpersuaded by OCTAL's argument that purchases of PET sheet from Oman increased mainly for non-price reasons." *See* OCTAL Brief at 20. The Commission simply stating that it considered respondent's argument, however, does not satisfy the substantial evidence standard. Rather, under the substantial evidence standard, the Commission must provide a <u>reasoned</u> explanation of its views that shows how it considered the respondent's argument. The Commission's decision must include "an examination of the relevant data and a reasoned explanation supported by a stated connection between the facts found and the choice made." *U.S. Steel Group v. United States,* 25 CIT 1046, 1046, 162 F. Supp. 2d 676, 677 (2001) (*citing Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 (1962)).

Third, the Commission's Brief effectively argues that this Court is not allowed to question the Commission's analysis of different pieces of evidence. *See* Commission Brief at 24 (OCTAL's argument "overlooks that it is within the Commission's discretion as factfinder to choose *any* reasonable methodology and to make reasonable interpretations of the evidence.") (emphasis in original). But the Commission's attempt to prevent the Court from analyzing this aspect of the

Commission's determination is just wrong. Under the applicable standard of review, this Court must analyze whether the Commission's determination is supported by substantial evidence on the record. *See* 19 U.S.C. §1516a(b). As we detailed in our opening brief and again in Section I above, the applicable substantial evidence standard requires a reviewing court to consider the "record as a whole." *Id.* at 1351 (*citing Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477-78 (1951) . "The 'whole record' means that the Court must consider both sides of the record. It is not sufficient to merely examine the evidence that sustains the agency's conclusion." *Timken Co. v. United States,* 12 CIT 955, 962, 699 F. Supp. 300, 306 (1988), *aff'd*, 894 F.2d 385 (Fed. Cir. 1990 (*citing Universal Camera,* 340 U.S. at 474 ). The reviewing court, in addition to considering the evidence upon which the agency did rely, must also "take into account 'whatever in the record fairly detracts from its weight.'" *Nippon Steel Corp.,* 27 CIT at 1864, 301 F. Supp. 2d at 1364 (emphasis supplied) (*citing Universal Camera,* 340 U.S. at 488 ; *Suramerica de Aleaciones Laminadas, C.A. v. United States,* 44 F.3d 978, 985 (Fed. Cir. 1994); *Atlantic Sugar, Ltd. v. United States,* 744 F.2d 1556, 1562 (Fed. Cir. 1984)). This precedent is particularly important because the approach to the judicial review is precisely what the Commission argues this Court should not adopt.

Although completely wrong as a matter of law, it is not surprising that the Commission would attempt to foreclose this Court from reviewing critically the Commission's evidentiary conclusions. On the issue of the evidence of non-price reasons for the increase in purchases of OCTAL PET sheet, the Commission's conclusion is not supported by substantial evidence. In particular, the Commission

has ignored rather than properly taken into account the evidence in record that "fairly detracts" from the evidence cited by the Commission. *See Nippon Steel,* 27 CIT at 1864, 301 F. Supp. 2d at 1364 . Again, simply asserting that contrary evidence was considered does not satisfy this aspect of the substantial evidence standard. The Commission's determination must provide "a reasoned explanation supported by a stated connection between the facts found and the choice made." *U.S. Steel Group*, 25 CIT at 1046, 162 F. Supp. 2d at 677.

> **2. The Commission efforts to dismiss the importance of non-price factors fail**

On the issue of non-price reasons, the Commission's Brief references three general facts about all purchasers: (1) the majority of *all* purchasers reported that price is a very important factor in their purchasing decision, (2) *half* of all purchasers stated that non-price factors were only sometimes or never important in purchasing decisions, and (3) the majority of purchasers (11 of 17) reported that they usually purchase the lowest priced PET sheet. Commission Brief at 23-24. Yet the Commission never explains — not in the written determination nor in the response brief — why these three pieces of evidence in isolation are more compelling than all of the other undisputed facts identified by OCTAL.

Specifically, concerning the Commission's first piece of evidence the Commission fails to acknowledge the context of the data. The data is a compilation of a single, particular question in the purchaser questionnaire as to whether the purchaser believes price is important in purchasing decisions. *See* C.R. 230-236, 248-253, 256,

271-275, 282, 295, 330, 349, 353, and 360. The Commission attempts to make a huge deal about the fact that virtually all the purchasers agree that price is important when buying something. *See* Commission Brief at 33; *see also* Petitioners' Brief at 17-19. But noting a questionnaire response that acknowledges a universal truism is not — by itself — substantial evidence, particularly when ignoring other more specific evidence that suggests something quite different.

And the second and third pieces of evidence identified by the Commission suffer the same fatal flaw; namely, the Commission does not explain at all why more general and less relevant information is more important than more specific and thus more relevant information. The Commission jumped quickly to the superficial conclusion, but did so by ignoring the other more probative evidence.

Vis-à-vis the second piece of the Commission's evidence, the Commission fails to explain why the fact that "*half* of responding purchasers, reported that non-price factors were only sometimes or never a significant factor in purchasing decisions," C.R.430 at 17, 29, is so determinative when the evidentiary proves unequivocally that the other half — those that did identify non-price factors — accounted of the overwhelming majority of customers that actually purchased OCTAL PET sheet. OCTAL Br. at 29-30. The half of purchasers that stated non-price factors rarely mattered did not actually purchase OCTAL's subject PET sheet from Oman. *Id*. Presumably, the reasons for purchasing OCTAL PET sheet can best be learned from those who actually purchase that product.

And vis-à-vis the third piece of evidence, the Commission fails to explain why the fact that 11 of 17 purchasers reported that they usually purchase the lowest priced PET sheet is so determinative, Commission Brief at 7, 24, when the evidentiary record proves unequivocally that the other 6 accounted for the overwhelming majority of purchase of OCTAL's subject PET sheet from Oman. OCTAL's Post-Hearing Brief, CR370 at Exhibit 3. In addition, the evidentiary record demonstrates most of the 11 of 17 purchasers who also purchased the lowest price never purchased OCTAL PET sheet during the investigation period. *Id.*

The Commission's Brief claims this Court cannot review whether the Commission offers a sufficient explanation for the decided mismatch among the evidence pointing to very different conclusions. Commission Brief at 4 and 37. But this narrow view of the Court's responsibility under the substantial evidence standard is just wrong. Under the substantial evidence standard, properly understood, such a careful and critical review of the record as a whole is precisely the Court's role.

**B.**     **The Commission Conclusion of Adverse Price Effects Is Not Supported By Substantial Evidence and Is Not In Accordance With Law**

OCTAL's Brief vigorously challenged the Commission's key conclusions about the importance of price to purchasers of PET sheet. OCTAL argued that the Commission seriously distorted the record evidence about the importance of price to purchasers. OCTAL Brief at 1, 24-38. Thus the Commission both improperly discounted the role of non-price factors (as discussed in Section II.A), and also improperly exaggerated and distorted the role of price to purchasers (as discussed in Section II.B.1 below). The

Commission and Petitioners seek a false equivalence, treating each customer the same regardless of how much they purchased or whether they purchased at all. That approach to the evidence makes no logical sense.[2]

This illogic can also be seen in the absence of any evidence in this case of price depression or price suppression. Price underselling alone is a static concept. That is why the statute requires the Commission to consider price underselling in context, and to see whether price depression and price suppression confirm that the underselling is actually having some effect, pursuant to 19 U.S.C. §1677(7)(B)(i)(II) and 19 U.S.C. §1677(7)(C)(ii). That is the Commission's normal approach, which it ignored in this case. The overall conclusion about significant adverse price effects thus lacks any factual or logical foundation.

1.      **The Commission's conclusion about the importance of price to purchasers of OCTAL's PET sheet from Oman is not supported by substantial evidence**

Specifically, the Commission disregarded the evidence showing that those large customers accounting for the overwhelming majority of imports from OCTAL specifically confirmed the importance of non-price factors. The Commission instead focused on a handful of smaller customers, many of whom did not even source from OCTAL and had no factual basis to evaluate the distinct product that OCTAL offered.

---

[2] In addition, the Petitioners' argument regarding the importance of a "subset" it deems "relevant to the Commission's inquiry" includes no citation to the Commission's views. Petitioners' Brief at 23-24. This Court may only review the Commission's determination on the grounds "that the agency invoked when it took the action." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020); *Dak Ams. LLC v. United States*, 456 F. Supp. 3d 1340, 1360 (Ct. Int'l Trade 2020).

Plaintiffs argued that the evidentiary record demonstrated that the unique characteristics of D-PET (the product) and OCTAL (the producer) fully explained why non-price factors were so important to these larger customers.  But instead of addressing this solid factual basis, the Commission based its Views on the shaky foundation of a few boxes checked by smaller customers.  *See* OCTAL Brief at 1-2, 30-31.

In its response brief, the Commission does not attempt to dispute — because it cannot — all of the evidence referenced in OCTAL's Brief.  Rather, the Commission offers the startling assertion that the Commission can mechanically treat all individual customers the same — no matter how different they are — when tabulating purchaser questionnaire responses and this Court is not allowed to question this approach.  *See* Commission Brief at fn. 12 and 24.  The Commission's conclusion is wrong.  The Commission can adopt whatever analytic approach it wants, but this Court is not powerless to conclude that the Commission's conclusion from such a superficial analytic approach is not supported by substantial evidence.

A simple hypothetical example demonstrates just the ludicrousness of the Commission's argument:

**Hypothetical Compilation of Customer Responses.**

|  | Total Qty Purchased | Purchased subject imports | Identified non-price factors |
|---|---|---|---|
| **Customer 1** | 5,000 | No | No |
| **Customer 2** | 5,000 | No | No |
| Customer 3 | 35,000 | Yes | Yes |
| Customer 4 | 35,000 | Yes | Yes |
| Customer 5 | 5,000 | Yes | Yes |
| **Customer 6** | 5,000 | No | No |
| **Customer 7** | 4,000 | No | No |
| **Customer 8** | 4,000 | No | No |
| **Customer 9** | 1,000 | No | No |
| **Customer 10** | 1,000 | No | No |
| *Total* | *100,000* | | |

In the above hypothetical, it is true that seven of ten customers (those in bold) did not identify non-price factors as being important when purchasing PET sheet. But it also true that these seven customers accounted for only 25 percent of total PET sheet purchases in the hypothetical U.S. market and none of the seven ever purchased subject import PET sheet.

The Commission argues it can cite as substantial evidence the questionnaire responses of the seven customers (in bold) for the proposition that non-price factors are not important for customers deciding *whether to purchase subject import or U.S. produced PET sheet*. The emphasis in the previous sentence is critical. This entire case is about alleged injury <u>from subject imports</u>. And therefore, vis-à-vis the importance (or not) of non-price factors, the critical question is whether those customers that actually purchased subject imports (rather than U.S. produced PET sheet) identified non-price

reasons for their purchasing decision.  In the above example, a Commission superficial conclusion of the lack of importance of non-price factors based on the above data does not satisfy the substantial evidence standard.

We note that the Commission's Brief also attempts to argue that, even when the examination is limited to those customers that purchased OCTAL's PET sheet, the Commission's ultimate conclusion about the lack of non-price factors in the purchasing decision still holds.  *See* Commission Brief at 24 -25.  This argument is completely contradicted by the evidentiary record.  We ask this Court to review the actual individual questionnaire responses[3] of the [                    ] responding purchasers who purchased OCTAL PET sheet.  Specifically, we ask this Court to review the complete purchaser questionnaire responses, including affidavits submitted with the questionnaire responses, of [            ], U.S. Purchaser Questionnaire Response, CR248; [                                ]; U.S. Purchaser Questionnaire Response, CR360; and [            ] U.S. Purchaser Questionnaire Response, CR360.We are very confident that the questionnaire responses completely refute the Commission's argument.

### 2.	The comments by an OCTAL official were taken out of context

The Commission and Petitioners both note the statement by OCTAL official (Joe Barenberg) during the hearing that he was concerned about a possible loss of business by an increase in selling prices. Commission Brief at 30; Petitioners Brief at 2, 21.  Indeed, Petitioners go as far as arguing that this single statement during the all-day Commission

---

[3] The 17 Purchasers relied on by the Commission can be found at CR 230, 231, 232, 233, 234, 235, 248, 249, 250, 252, 253, 271, 272, 274, 330, 360.

hearing is proof that OCTAL's entire case is wrong. However, this analysis and assessment are wrong.

At the outset we note that Petitioners are taking Mr. Barenberg's statement out of context. Mr. Barenberg's statement came from a longer colloquy with Commissioner Schmidtlein about how OCTAL's thinks about prices, profitability, and customer constraints when selling PET sheet. We simply refer this Court to the entire colloquy (from page 169 -174). Commission Hearing Transcript. PR115. As the Court will see from this colloquy, Mr. Barenberg was not admitting (as Petitioners suggest) that price is the only thing that matters when selling PET sheet.

But perhaps more importantly, a statement by an OCTAL official does not (because it cannot) constitute evidence of what the *purchasers* believe is most important when choosing among PET sheet suppliers. And therefore Mr. Barenberg's statement does not contradict the extensive evidence directly from purchasers detailing the non-price reasons cited by the purchasers for their desire to purchase OCTAL PET sheet. This case started because of Petitioners' allegation that purchasers chose to buy subject imports (the vast majority of which came from OCTAL) rather than U.S. produced PET sheet because of lower prices caused by dumping. And so, a critical question is whether actual purchasers agree with this allegation. As detailed by OCTAL, the evidentiary record demonstrates that the answer is no, regardless of any cherry-picked statement by Joe Barenberg.

### 3. The Commission failed to integrate its findings about the different elements of possible price effects

OCTAL has argued that the Commission must evaluate the effect of imports based on all of three of the statutory price effects. The existence of underselling alone does not mean there is by definition some "effect" that is adverse on the domestic prices. Any such adverse effect on domestic prices must be shown, and not assumed. And when the three elements — underselling, price depression, and price suppression — point to different conclusions, the Commission must evaluate and address that conflicting evidence. OCTAL Brief at 24-25, 32-38.

The Commission now seeks to recharacterize OCTAL's argument so as to defeat a straw man. Contrary to the Commission's argument, Commission Brief at 4, 35, OCTAL never argued that the statute "does not permit" a finding of price effects from underselling alone. Rather, OCTAL's argument is that the statute requires the Commission to "consider" all three elements together as part of an integrated analysis of whether there truly are adverse price effects. The Commission cannot note and then ignore its findings about price depression and price suppression, and then ground its finding of price effects solely on one of the three requirement elements, while ignoring the other two required elements concerning prices. OCTAL's statutory argument was not about a prohibition, but about the proper framework within which the Commission should have conducted its analysis.

The Commission also mistakenly argues that OCTAL's argument would collapse price underselling into the price depression/suppression. Commission Brief at 36. Price

underselling, price depression, and price suppression are all intermediate findings. Underselling does not feed into price depression and price suppression. Rather, all of these elements together feed into the requirement to find "the effect of imports" on prices. The overall "effect" on imports set forth in 19 U.S.C. §1677(7)(B)(i)(II) and 19 U.S.C. §1677(7)(C)(ii) must rest on proper analysis of all of these intermediate findings, not just price underselling.

Contrary to the Commission and Petitioners arguments, Commission Brief at 36 and Petitioners Brief at 28-29 the courts have not upheld an overall finding of price effects based solely on price underselling. Indeed, the Commission itself cites cases where the court remanded back to the Commission precisely because there was too much reliance on the element of price underselling, and insufficient attention to price depression and price suppression as distinct elements that must also be considered. *See United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allied Indus., and Serv. Workers Int'l Union v. United States,* 348 F. Supp. 3d 1328, 1335 (Ct. Int'l Trade 2018) (remand for scarce analysis of absence of price depression or price suppression without further analysis); *Altx, Inc. v. United States,* 25 CIT 1100, 1109, 167 F. Supp 2d 1353, 1365 (2001), *aff'd,* 501 F. 3d 1291 (Fed. Cir. 2007) (must evaluate both price underselling and price depression/suppression).

Moreover, the Commission and Petitioners ignore other cases that stress the importance of considering all the intermediate elements of the pricing analysis, and how they affect each other in making an overall finding of the "effect of imports" on prices, if there is actually any such effect. *See JMC Steel Group v. United States*, 24 F. Supp. 3d

1290, 1303 (Ct. Int'l Trade 2014) ("The court has repeatedly held that underselling combined with increasing import volumes does not 'necessarily indicate{} injury due to pricing in cases involving fungible products.'"); *BIC Corp. v. United States*, 21 CIT 448, 456-57, 964 F. Supp. 391, 400 (1997) ("different features, consumer perceptions of quality and reliability, price differences, and brand loyalty all affect how fungible two products are, and hence, whether underselling by one product will suppress or depress the price of the other."); *Coal. for the Pres. of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States,* 22 CIT 520, 526, 15 F. Supp. 2d 918, 924 (1998) ("To the extent plaintiff argues that evidence of underselling is a per se indication of injury, its argument fails"); *Trent Tube Div., Crucible Materials Corp. v. United States*, 14 CIT 386, 402, 741 F. Supp. 921, 934-35 (1990) (the court confirmed the need to discount underselling in light of other factors including small volume of imports, relatively stable domestic prices, customer preferences, and price differences across the geography).

Indeed, the Commission has often used the absence of price depression and price suppression to discount price underselling in making an overall finding of whether there are price effects. *BIC Corp. v. United States,* 21 CIT 448, 458, 964 F. Supp. 391, 401 (1997) ("evidence of underselling alone is legally insufficient to support an affirmative injury determination"); *see also Comm. of Domestic Steel Wire Rope & Specialty Cable Mfrs. v. United States*, 17 CIT 233, 238, 818 F. Supp. 376, 381 (1993) ("although there is evidence of underselling, there is nothing in the record indicating that subject imports will have a suppressing or depressing effect on U.S. prices"): *Taiwan Semiconductor Indus. Ass'n v. United States* 24 CIT 914, 926, 118 F. Supp. 2d 1250, 1261 (2000)

(Despite the evidence on "significant underselling", the "Commission majority reasonably concluded that the subject imports did not significantly depress or suppress domestic prices").

But in this case, the Commission failed to provide this integrated analysis of its intermediate findings, showing how it reconciled the evidence on price underselling on the one hand, and price depression and price suppression on the other hand that pointed to very different conclusions.

In the end, what matters is how the Commission analyzed the record evidence, and the extent to which the Commission actually addressed and reconciled conflicting evidence rather than just ignore it. In this case, the Commission largely ignored the conflicting evidence, convinced apparently that price underselling is sufficient. But the Commission erred in so quickly reaching this conclusion without fully considering the contrary evidence showing no price effects from imports.

**C.      The Commission Conclusion of Adverse Impact Is Not Supported by Substantial Evidence And Is Otherwise Not In Accordance With Law**

**1.      The Commission did not properly evaluate the lack of correlation between imports and the condition of the domestic industry**

OCTAL has argued the Commission improperly evaluated the record evidence on correlation, focusing on individual firms and not the industry as a whole. *See* OCTAL Brief at 41-44. The Commission now repeats those same facts, without really grappling with the statutory requirement to consider the domestic industry as a whole. Commission Brief at 39-41.

Like its error in analyzing price effects, the Commission mistakenly counts firms without taking into account the size of those firms. Commission Brief at 39-40. That a large number of smaller firms had one experience is less important when the larger firms that account for most the domestic industry had a different experience. That is why the Commission traditionally looks to the overall experience of the industry as a whole, following the statutory requirement that the domestic industry consists of the "producers as a whole" of the domestic like product. 19 U.S.C. §1677(4)(A). Such an approach considers all of the firms, and gives them different weight in proportion to their size.

The Commission also seeks to discount the experience of one firm, Commission Brief at 39 and n.28, without acknowledging the inconsistency of its logic. The Commission largely ignores evidence of OCTAL providing a premium product, deeming everything to be PET sheet, yet inconsistently elevates the importance of a premium product when seeking to dismissing inconveniently inconsistent data from one domestic producer. The Commission's approach reflects selective review of the record evidence, picking out the evidence to support any outcome without fairly considering the contrary evidence.

Finally, the Commission mischaracterizes Plaintiffs' argument about the implication of the lack of correlation. Contrary to the Commission's straw man, Commission Brief at 39-40, Plaintiffs never argue the lack of correlation required a negative determination. Profitability is only one of many factors to be considered. But profitability is an important factor, and one that typically weighs heavily in the

Commission's approach.  It is the lack of correlation in conjunction with the other errors and omissions that renders the Commission's final determination legally defective.

### 2. The Commission did not properly evaluate OCTAL's low dumping margin as required by the statute

OCTAL has also argued the Commission ignored the explicit statutory requirement to "evaluate" the "magnitude of the margin of dumping." 19 U.S.C. §1677(7)(C)(iii)(V).  *See* OCTAL Brief at 44-53.  The Commission and Petitioners now argue that because the statute does not specify how to conduct this evaluation, the Commission has the discretion to mention the margin in passing, and then otherwise ignore the "magnitude" of the dumping.  Commission Brief at 41-43; Petitioners Brief at 36-44.  This reading of the statute is simply wrong.

First, the Commission improperly shifts to different issues so as to side step the fundamental error of the Commission largely ignoring the "magnitude" of any dumping. The focus on the effects of the merchandise and the need ultimately to find a causal connection does not change the statutory requirement to "evaluate" the "magnitude of the margin" of dumping.  The Commission reading of the statute simply cannot be reconciled with the ordinary meaning of "evaluate" and "magnitude,"  or with the mandatory requirement that the Commission "shall" evaluate the magnitude of dumping.  To treat all margins of dumping as the same – as "dumped" merchandise – impermissibly reads "evaluate"' and "magnitude" out of the statute.

Second, the courts have not upheld this flawed reading of the statute.  The Commission cites a few cases rejecting the argument that dumping must "cause" the

material injury, but this argument mischaracterizes Plaintiffs' position. Plaintiffs have

not argued that the dumping itself must be the cause of the injury. Rather, Plaintiffs have

argued the Commission failed in this case to "evaluate" the "margin" of dumping and

thus ignored one of the key statutory elements that must go into the Commission's overall

causation analysis.

Moreover, recent court decisions have specifically faulted the recent Commission

practice of devoting so little attention to the "magnitude" of the margin of dumping as to

ignore the statutory requirement. Plaintiff Brief at 46-47. Ultimately, what matters is

what the Commission did in this case, and whether the record actually shows any

evidence the Commission actually "evaluated" the "magnitude" of the margin of

dumping.

The Commission tries to distinguish *Coalition for Fair Trade in Hardwood

Plywood v. United States ITC*, 180 F. Supp. 3d 1137 (Ct. Int'l Trade 2016), but that effort

fails. Noting it is only one case, Commission Brief at 43, does not do justice to this

decision by Judge Eaton that carefully reviewed the statute and the history of this issue

over time, noting how the Commission's treatment of the magnitude of dumping changed

over time and discussing the recent case law on this issue. The Commission would rather

cite earlier cases and ignore Judge Eaton's careful and thoughtful consideration of this

issue. *Coalition for Fair Trade in Hardwood Plywood* is the most recent precedent

dealing with the evaluation of margin of dumping in the context of assessing material

injury, and as such, it deserves careful consideration. Furthermore, *Coalition for Fair

Trade in Hardwood Plywood* explicitly distances itself from some of the earlier cases

cited by the Commission including *Asociacion De Productores De Salmon Y Trucha De Chile Ag v. United States ITC*, 26 CIT 29, 180 F. Supp. 2d 1360 (2002), and *Consol. Fibers, Inc. v. United States* 32 CIT 855, 574 F. Supp. 2d 1371 (2008).

In *Coalition for Fair Trade in Hardwood Plywood*, the Commission did not go beyond merely reciting the margins of dumping, which even the Commission reluctantly concedes is not enough. Commission Brief at 43. The Commission effort to show it "evaluated" the "magnitude" of dumping, Commission Brief at 43-45, just underscores how little the Commission actually did in this case. None of the Commission points withstand any scrutiny.

First, mentioning the margins of dumping for all producers, including those in Korea, does not "evaluate" the "magnitude" of those margins. The legal requirement is to "evaluate" and not just mention. Indeed, the very different margins of dumping by Omani producers and Korean producers in this case – each of whom had very different volumes of imports – just underscores why some "evaluation" was needed. The Commission here treated a dumping margin of under 5 percent as the same as a dumping margin of over 50 percent. If they are the same, there should at least be some discussion of why. Yet the Commission here said nothing at all about the widely disparate margins of dumping. And Petitioners make much of the comment by an OCTAL official of the effect of 10 percent increase in price, Petitioners Brief at 2, conceding that the magnitude of price changes and the magnitude of dumping matters. Yet when it comes to the dumping margin, Petitioners would permit the Commission to ignore the magnitude of dumping as long as there was any level of dumping.

Second, mentioning that Commerce made an affirmative final determination also does not evaluate the magnitude of those margins. The Commerce final determination announces the final dumping margins, but says nothing at all about how one might "evaluate" in the context of an injury determination the "magnitude" of those final margins. That the Commission cites to the Commerce final adds nothing at all.

Third, stressing the degree of underselling does not say anything about the "magnitude" of the margins of dumping. Again, the Commission argument actually makes Plaintiffs' point. The gap between the margins of dumping and the margins of underselling – particular for different foreign suppliers from different countries – required some "evaluation." That means some discussion of the issue, grounded in record evidence. To state a conclusion without any analysis is not "evaluation." Yet that is what the Commission did here.

Finally, noting a legal position about causation does not say anything factually about the margins of dumping in this case. Indeed, this argument basically explains why the Commission did not "evaluate" the "magnitude" of the margin of dumping in this case. The Commission seems to think it need not "evaluate" the margins of dumping. Even after the recent and pointed reminder by Judge Eaton about this statutory requirement in *Coalition for Fair Trade in Hardwood Plywood*, the Commission continued with business as usual and gave only "short shrift" to this important issue. *Coal. for Fair Trade of Hardwood Plywood,* 180 F. Supp. 3d at 1169. Indeed, the cases cited by the Commission do not address the issue of whether it actually "evaluated" the

margins of dumping, but focus on the lack of a statutory requirement to prove that a particular margin of dumping is the actual *cause* of injury.

In sum, none of the Commission arguments establish that the Commission, in this case, actually "evaluated" the "magnitude" of the margins of dumping. The Commission's discretion as to how to "evaluate" the margins of dumping does not extend to basically ignoring the margins. The Commission's arguments try to defend an approach to the dumping margins in this case that essentially reads this requirement out of the statute.

## CONCLUSION

For all of the foregoing reasons, OCTAL respectfully requests this Court hold unlawful the Commission's final affirmative views on injury rendered in the underlying investigation.

Respectfully submitted,

/s/ Daniel L. Porter

Daniel L. Porter
James P. Durling
James C. Beaty
Ana Amador

*Counsel for Plaintiffs*

Dated: June 24, 2021

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2010 using a proportionally spaced typeface 13-point Times New Roman font.

In accordance with the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that this brief complies with the word limitations set forth in the Chambers Procedures. Specifically, excluding those exempted portions of the brief as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains 6,835 words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Daniel L. Porter

Daniel L. Porter

Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, NW
Washington, D.C., 20006

*Counsel for Plaintiffs*

Dated: June 24, 2021