Slip Op. 21-133

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **OCTAL INC., AND OCTAL SAOC-FSZ**, | |
| Plaintiffs, | |
| v. | Before: Timothy M. Reif, Judge |
| **UNITED STATES**, | Court No. 20-03698 |
| Defendant, | **PUBLIC VERSION** |
| and | |
| **ADVANCED EXTRUSION, INC., ET AL**, | |
| Defendant-Intervenors. | |

## <u>OPINION</u>

[The Final Injury Determination of the United States International Trade Commission is sustained.]

Dated: <u>September 30, 2021</u>

<u>Daniel L. Porter</u> and <u>James P. Durling</u>, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, D.C., argued for plaintiffs OCTAL Inc. and OCTAL SAOC-FSZ.  With them on the brief were James Beaty and Ana Amador.

<u>Jason F. Miller</u>, Attorney-Advisor, Office of the General Counsel, U.S. International Trade Commission, of Washington, D.C., argued for defendant United States.  With him on the brief were <u>Dominic L. Bianchi</u>, General Counsel, and <u>Andrea C. Casson</u>, Assistant General Counsel for Litigation.

<u>Brooke M. Ringel and Paul C. Rosenthal</u>, Kelley Drye & Warren LLP, of Washington, D.C., argued for defendant-intervenors Advanced Extrusion, Inc., Ex-Tech Plastics, Inc. and Multi-Plastics Extrusions, Inc.  With them on the brief were <u>Kathleen W. Cannon</u> and <u>Elizabeth C. Johnson</u>.

**PUBLIC VERSION**

Reif, Judge: Before the court is a U.S. Court of International Trade ("USCIT")

Rule 56.2 motion for judgment on the agency record filed by plaintiffs OCTAL SAOC-

FSZ ("OCTAL SAOC"), the sole producer/exporter of subject merchandise from Oman,

and OCTAL Inc., the sole importer of subject merchandise from Oman (collectively,

"OCTAL" or "plaintiffs").  *See* Pls.' Br. in Supp. of Mot. for J. on Agency R. ("Pls. Br."),

ECF No. 25.  By its motions, plaintiffs contest the final affirmative material injury

determination by the U.S. International Trade Commission ("Commission") in its

antidumping duty investigation of polyethylene terephthalate ("PET") sheet from the

Republic of Korea ("Korea") and the Sultanate of Oman ("Oman").  *See Polyethylene*

*Terephthalate (PET) Sheet From Korea and Oman* (Sept. 10, 2020) ("Final Injury

Determination"), PR 140; *see also* the accompanying views of the Commission in

*Polyethylene Terephthalate (PET) Sheet from Korea and Oman*: *Investigation Nos. 731-*

*TA-1455 and 731-TA-1457 (Final)* (Sept. 2020) ("Views"), CR 403, PR 141.

The Commission opposes plaintiffs' motion and asks the court to sustain the

Commission's Final Injury Determination.  Def.'s Opp'n to Pl.'s Mot. for J. on Agency R.

("Def. Br."), ECF No. 28.

Defendant-intervenors, Advanced Extrusion, Inc., Ex-Tech Plastics, Inc. and

Multi-Plastics Extrusions, Inc., join the Government in opposing plaintiffs' motion.  *See*

Def.-Intervenors' Resp. in Opp'n to Pls.' Mot. for J. on Agency R., ECF No. 29.

For the reasons set forth below, the court sustains the Final Injury Determination.

Court No. 20-03698              **PUBLIC VERSION**                    Page 3

## BACKGROUND

On August 19, 2019, the U.S. Department of Commerce ("Commerce") initiated antidumping investigations on PET sheet from Oman and Korea in response to petitions filed by the U.S. domestic industry on July 9, 2019. S*ee Polyethylene Terephthalate Sheet from the Republic of Korea, Mexico, and the Sultanate of Oman: Initiation of Less-Than-Fair-Value Investigations*, 84 Fed. Reg. 44,854 (Dep't of Commerce Aug. 27, 2019).

On September 13, 2019, the Commission issued its preliminary injury determinations finding that there was a "reasonable indication that an industry in the United States is materially injured by reason of imports of [PET] sheet from Oman and Korea . . . ." *Polyethylene Terephthalate (PET) Sheet from Korea, Mexico, and Oman*, USITC Pub. 4970, Inv. Nos. 731-TA-1455-1457 (Preliminary) (Sept. 2019) ("Preliminary Injury Determination") at 1.

On February 25, 2020, Commerce published its affirmative preliminary determinations in the antidumping duty investigations of imports of PET from Korea and Oman. *Polyethylene Terephthalate Sheet From the Republic of Korea: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 85 Fed. Reg. 12,500 (Dep't of Commerce Mar. 3, 2020); *Polyethylene Terephthalate Sheet From the Sultanate of Oman: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 85 Fed. Reg. 12,513 (Dep't of Commerce Mar. 3, 2020).  On July 16, 2020, Commerce

announced its affirmative final determinations in the antidumping duty investigations of

imports of PET from Korea and Oman, determining that PET was being sold at less

than fair value and finding dumping margins ranging 7.19 to 52.01 percent for subject

imports from Korea, and a dumping margin of 4.74 percent for subject imports from

Oman.  *See Polyethylene Terephthalate Sheet from the Republic of Korea: Final*

*Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 44,276, 44,277 (Dep't of

Commerce July 22, 2020); *Polyethylene Terephthalate Sheet from the Sultanate of*

*Oman: Final Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 44,278

(Dep't of Commerce July 22, 2020).

On September 3, 2020, the Commission issued its unanimous conclusion that

subject imports of PET sheet from Korea and Oman, which were sold at less than fair

value, materially injured the domestic industry in the United States.  Final Injury

Determination; Views at 3.  The Commission published its Final Injury Determination in

the *Federal Register* on September 10, 2020.  *See* Final Injury Determination.

## STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(i) of the Tariff Act of

1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2018), and 28 U.S.C. § 1581(c)

(2018).[1]  This Court is required to assess the factual and legal findings underpinning the

Commission's determinations and "hold unlawful any determination, finding, or

conclusion . . . unsupported by substantial evidence on the record, or otherwise not in

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant portions of
Title 19 of the U.S. Code, and references to the U.S. Code are to the 2018 edition.

**PUBLIC VERSION**

accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).  The Supreme Court has defined

"substantial evidence" as being "more than a mere scintilla.  It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."

*Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938) (citation omitted).  "The 'whole

record' means that the Court must consider both sides of the record.  It is not sufficient

to merely examine the evidence that sustains the agency's conclusion."  *Timken Co. v.*

*United States*, 12 CIT 955, 962, 699 F. Supp. 300, 306 (1988) (citing *Universal Camera*

*Corp. v. NLRB*, 340 U.S. 474 (1951)).

    In reviewing the whole record, "[i]t is not within the Court's domain either to weigh

the adequate quality or quantity of the evidence for sufficiency or to reject a finding on

grounds of a differing interpretation of the record."  *Id.* (citing *Matsushita Elec. Indus.*

*Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984)).  "The possibility of drawing

two inconsistent conclusions from the evidence does not prevent the court from holding

that the Commission's determinations, findings, or conclusions are supported by

substantial evidence."  *ITG Voma Corp. v. U.S. Int'l Trade Comm'n*, 41 CIT __, __, 253

F. Supp. 3d 1339, 1347 (2017) (citing *Nippon Steel Corp. v. United States*, 458 F.3d

1345, 1352 (Fed. Cir. 2006)), *aff'd without op.*, 753 F. App'x 913 (Fed. Cir. 2019).

### LEGAL FRAMEWORK

    The Commission is charged under the Tariff Act of 1930 with determining

whether a U.S. domestic industry is "materially injured" or is "threatened with material

injury . . . by reason of" unfairly dumped or subsidized imports.  19 U.S.C. §§

1671d(b)(1), 1673d(b)(1).  "There are two components to an affirmative material injury

determination: 'a finding of present material injury or a threat thereof, and a finding of causation.'" *Hynix Semiconductor, Inc. v. United States*, 30 CIT 1208, 1210, 431 F. Supp. 2d 1302, 1306 (2006). "Material injury" is defined as "harm which is not inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A). A finding of causation requires that the Commission conclude that the material injury to the domestic industry is "by reason of [the subject] imports." *Id.* § 1677(7)(B)(ii); *see also ITG Voma Corp.*, 41 CIT at __, 253 F. Supp. 3d at 1348 ("The Court of Appeals for the Federal Circuit has interpreted the 'by reason of' statutory language to require the Commission to consider the volume of subject imports, their price effects, their impact on the domestic industry, and to establish whether there is a causal connection between the imported goods and the material injury to the domestic industry." (citing *Swiff-Train Co. v. United States*, 793 F.3d 1355,1361 (Fed. Cir. 2015))).

In making its preliminary and final determinations the Commission is required to consider:

(I) the volume of imports of the subject merchandise,
(II) the effect of imports of that merchandise on prices in the United States for domestic like products, and
(III) the impact of imports of such merchandise on domestic producers of domestic like products, but only in the context of production operations within the United States . . . .

19 U.S.C. § 1677(7)(B)(i)(I)-(III). The Commission is permitted to consider also "such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports." *Id.* § 1677(7)(B)(ii). This Court and the U.S. Congress have been clear that "[n]o single factor is dispositive and 'the significance to

be assigned to a particular factor is for the [Commission] to decide.'" *ITG Voma Corp.*,

41 CIT at __, 253 F. Supp. 3d at 1348 (quoting S. Rep. No. 96-249, at 88 (1979),

*reprinted in* 1979 U.S.C.C.A.N. 381, 474).

 "To provide a reasoned explanation [in its determinations], the Commission must

'make the necessary findings and have an adequate evidentiary basis for its findings'

and 'examine the relevant data and articulate a satisfactory explanation for its action

including a rational connection between the facts found and the choice made.'"

*Chemours Co. FC, LLC v. United States*, 44 CIT __, __, 443 F. Supp. 3d 1315, 1321

(2020) (quoting *In re NuVasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016)).

## DISCUSSION

 Plaintiff challenges the Final Injury Determination in several respects by arguing

that: (1) the Commission was required to consider the volume effects of the subject

imports instead of absolute and relative increases of the volume of the subject imports;

(2) the Commission's finding of adverse price effects, in the absence of price

depression or price suppression, was not supported by substantial evidence; and, (3)

the Commission failed to address in its adverse impact analysis (a) the correlation

between subject import volume and the domestic industry's financial performance and

(b) the magnitude of the dumping margin.  Pls. Br. at 5-6, 10.

I.      **Whether the Commission's volume determination is supported by substantial evidence and is otherwise in accordance with law**

        A.      **Legal framework**

        The Commission is directed to "consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant."  § 1677(7)(C)(i).  "[T]he statute provides that an affirmative volume analysis may conclude that the *absolute* volume of subject imports, or increases in the *relative* subject import volume (i.e., the market share), is significant."  *Hynix Semiconductor, Inc. v. United States*, 30 CIT 1208, 1212, 431 F. Supp. 2d 1302, 1308 (2006) (citing 19 U.S.C. § 1677(7)(C)(i) (1999)).  Any of the approaches provided for in the statute — for example, a consideration of whether the *absolute* volume of subject imports, or any increase in that volume, is significant, or whether the volume of the subject imports *relative to* production or consumption in the United States is significant — may be sufficient to support for a finding of injury.  In sum, "Any one of these calculations is sufficient to support a finding of injury under the statute . . . .  [E]ven if the calculation for [one measure of volume] is invalid, the injury determination [may] nevertheless [be] supported by substantial evidence" so long as one calculation is valid.  S*ee Hyundai Elecs. Indus. Co. v. United States*, 21 CIT 481, 485 (1997).  The Commission must evaluate what is "significant" in a volume determination on a case-by-case basis.  *See Arlanxeo USA LLC v. United States*, 43 CIT __, __, 389 F. Supp. 3d 1330, 1338 (2019).  "The statute does not define what is considered 'significant' [in a volume determination] because, '[f]or one industry, an

apparently small volume of imports may have a significant impact on the market; for another, the same volume might not be significant.'" *Id.* (quoting S. Rep. No. 96-249, at 88 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 474).

### B.    Analysis

The court starts with the Commission's determination on volume.  First, the court will address the issue of cumulation.  Second, the court will address plaintiffs' argument that the Commission was required to consider OCTAL's non-price explanations for growing volumes before rendering a finding on volume.  Third, the court will review whether the Commission's conclusion that the volume of subject imports is significant was reasonable.

### 1.    Cumulation

In plaintiffs' briefs, plaintiffs seek to focus on the Omani imports instead of the cumulated Omani and Korean imports addressed in the Commission's Views.  The statute states that "the Commission shall cumulatively assess the volume and effect of imports of the subject merchandise from all countries with respect to which [] petitions were filed . . . on the same day."  19 U.S.C. § 1677(7)(G)(i).  In the instant case, petitioners filed the antidumping duty petitions with respect to subject imports from Korea and Oman on the same day, July 9, 2019, and the Commission cumulated the subject imports from Korea and Oman for its material injury analysis.  Views at 16.  The Commission found that the subject imports met the criteria established by the statute and stated that "accordingly [it would] consider subject imports from Korea and Oman on a cumulated basis for [its] analysis of whether the domestic industry is materially

injured by reason of subject imports."  *Id.* at 18.  Further, OCTAL did not oppose or

contest the cumulation of the subject imports for purposes of the Commission's material

injury determination.  *Id.* at 15.  Therefore, this Court will look to the Omani and Korean

import data as discussed in the Views — not solely the Omani data — in assessing

whether the Commission acted reasonably in its findings with respect to import

volumes.

> **2.      Whether non-price explanations are required to be considered in the Commission's volume analysis**

In making a volume determination, the Commission is directed to "consider

whether the volume of imports of the merchandise, or any increase in that volume,

either in absolute terms or relative to production or consumption in the United States, is

significant."  19 U.S.C. § 1677(7)(C)(i).  There is no dispute between the parties that the

volume of the subject imports increased in absolute terms and in terms of market share

over the Period of Investigation ("POI").  The Commission found that cumulated subject

imports increased in the merchant market by more than [[    ]] percent during the POI —

from [[                ]] pounds in 2017 to [[                ]] pounds in 2019.  Views at 30-31.

Plaintiffs acknowledge that the volume of the subject imports increased both in

absolute and relative terms.  *See* Pls. Br. at 11 ("Although subject imports increased

and gained market share . . . ."); *see also* Pls. Reply Br. in Supp. of Mot. for J. on

Agency R. ("Pls. Reply Br.") at 5, ECF No. 31 ("There was no question that OCTAL

increased its market share — based solely on the *volume* of subject imports sold —

over the investigation period examined.").  However, plaintiffs assert that the

Commission's finding that the volume of the imports was "significant" may not, in this case, be based on volume alone.  Pls. Br. at 10.  Rather, plaintiffs assert, the Commission's analysis was not based on substantial evidence because the Commission did not take into account whether there were other reasons that subject imports may have increased.  *Id.* at 10-11.

Plaintiffs claim that the facts in the instant case do not meet the statutory standard for "significant" because import volumes should "not be considered in a vacuum" and, therefore, should "not [] have a 'significant' effect regardless of the surrounding circumstances."  *Id.*  Plaintiffs argue that the key question is *why* OCTAL's market share increased.  *Id.* at 11.

The Government disagrees, asserting that plaintiffs "seek[] to rewrite the statute" to require that the "*effects* of subject imports" be considered in evaluating volume.  Def. Br. at 15-16.  The Government argues that plaintiffs' interpretation is incorrect for two seminal reasons: (1) the heading in 19 U.S.C. § 1677(7)(B) indicates that volume and effects are separate inquiries; and, (2) the USCIT disposed of the same argument in *ITG Voma Corp. v. U.S. International Trade Commission.*  Def. Br. at 16.

First, the Government points out that the heading in 19 U.S.C. § 1677(7)(B) is "[v]olume and consequent impact," which "bifurcates the Commission's injury assessment between an analysis of 'volume,' on the one hand, and its '*consequent* impact' (*i.e.*, its effects), on the other)."  Def. Br. at 16 (quoting 19 U.S.C. § 1677(7)(B)). This Court has confirmed that volume and consequent impact are separate inquiries. *See Taiwan Semiconductor Indus. Ass'n v. United States*, 23 CIT 410, 412, 59 F. Supp.

Court No. 20-03698 **PUBLIC VERSION** Page 12

2d 1324, 1327 (1999) ("The Commission evaluates the volume and price effects of the

subject imports and their consequent impact on the domestic industry by applying the

standards set forth in 19 U.S.C. § 1677(7)(C).").

Second, the Government cites *ITG Voma Corp. v. U.S. International Trade*

*Commission* to demonstrate that the Commission does not need to consider effects in

its volume analysis.  *See ITG Voma Corp. v. U.S. Int'l Trade Comm'n*, 41 CIT __, __,

253 F. Supp. 3d 1339, 1357 (2017), *aff'd without op.*, 753 F. App'x 913 (Fed. Cir. 2019)

("ITG Voma's argument presumes incorrectly that the Commission is required by law to

consider the domestic industry's condition and financial performance in its volume

analysis.  Rather, the Commission must consider the domestic industry's condition and

financial performance when analyzing whether subject imports adversely impacted the

domestic industry." (citing 19 U.S.C. § 1677(7)(C)(iii))).

In sum, the statute does not require that the Commission consider the effects of

subject imports in its volume analysis.  *See* 19 U.S.C. § 1677(7)(C)(i).  In fact, the

statute instructs that a finding that the volume of imports is "significant" may be based

on increased volume alone because the statute allows for a determination based on

"absolute terms."  *See id.*  Further, the Court in *ITG Voma Corp. v. U.S. International*

*Trade Commission* expressly addressed this point, stating clearly that the Commission

is not required to consider effects on the domestic industry in assessing the significance of import volume.[2]  *See ITG Voma Corp.* at 1357.

### 3.    Whether the Commission's conclusion that the volume of subject imports is significant was reasonable

The court now turns to addressing whether the Commission's finding that the volume of subject imports was "significant" was reasonable.  The Commission found "that the volume of cumulated subject imports, and the increase in that volume, are significant in both absolute terms and relative to consumption" in the United States.  Views at 32.  The statute requires that the Commission determine whether the volume of subject imports increased significantly "in absolute terms *or* relative to production or consumption in the United States."  19 U.S.C. § 1677(7)(C)(i) (emphasis supplied); *see also Hynix Semiconductor, Inc. v. United States*, 30 CIT 1208, 1212, 431 F. Supp. 2d 1302, 1308 (2006).  The Commission here found both.  *See* Views at 32.

The Commission supported its findings with information on the record.  First, the Commission found that the cumulated subject imports' volume in the merchant market

---

[2] In *ITG Voma Corp. v. U.S. International Trade Commission*, ITG Voma asserted that "the Commission failed to explain why the volume of subject imports was significant in light of the domestic industry's strong financial performance and capacity constraints." *ITG Voma Corp. v. U.S. Int'l Trade Comm'n*, 41 CIT __, __, 253 F. Supp. 3d 1339, 1357 (2017), *aff'd without op.*, 753 F. App'x 913 (Fed. Cir. 2019).  ITG Voma wanted the Commission to consider subject imports' effect on the domestic industry in making its volume determination.  *Id.*  In response, the Court stated that "ITG Voma's argument presumes incorrectly that the Commission is required by law to consider the domestic industry's condition and financial performance in its volume analysis.  Rather, the Commission must consider the domestic industry's condition and financial performance when analyzing whether subject imports adversely impacted the domestic industry."  *Id.* (citing 19 U.S.C. § 1677(7)(C)(iii)).

increased overall by [[      ]] percent from [[                ]] pounds in 2017 to [[

      ]] pounds in 2019.  Views at 30-31.  Second, the Commission found that the

subject imports' share of the U.S. market increased from [[      ]] percent in 2017 to

[[      ]] percent in 2019.  *Id.* at 31.  As the Commission noted, this increase of [[     ]]

percent allowed the subject imports to capture more than half of the U.S. market.  *Id.*

Further, the Commission concluded that the "increase in market share came at the

direct expense of the domestic industry, which experienced a [[     ]] percentage point

decrease in market share in the merchant market from 2017 to 2019."  *Id.*

      "The court will uphold the Commission's volume determination unless it is

unsupported by substantial evidence in the record."  *Arlanxeo USA LLC v. United*

*States*, 43 CIT __, __, 389 F. Supp. 3d 1330, 1338 (2019), *aff'd*, 819 F. App'x 925 (Fed.

Cir. 2020) (internal citation omitted).  As explained above, the Commission must

evaluate what is "significant" in a volume determination on a case-by-case basis.  *See*

*id.*  Whether a particular volume of imports is "significant" varies across industries and

circumstances.  Here, the Commission concluded that subject imports increased [[     ]]

percent to capture over half of the U.S. merchant market.  Views at 31.  The

Commission found further that this gain "came at the direct expense of the domestic

industry."  *Id.*  These findings are supported by the record and are reasonable.

Accordingly, the Commission's conclusion that "the volume of cumulated subject

imports, and the increase in that volume, are significant in both absolute terms and

relative to consumption" was reasonable.  *Id.* at 32.

II.    **Whether the Commission's conclusion of significant adverse price effects is supported by substantial evidence and otherwise in accordance with law**

A.    **Legal framework**

The statute provides that the Commission "*consider*" whether:

(I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and

(II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii) (emphasis supplied).

B.    **Analysis**

Plaintiffs allege that the Commission found "adverse effects based solely on price underselling while ignoring the evidence about price depression and price suppression that contradicted the existence of any adverse price effects."  Pls. Br. at 2.  On this basis, plaintiffs argue that the Commission's conclusion that the subject imports caused "[a]dverse [p]rice [e]ffects [i]s [n]ot [s]upported [b]y [s]ubstantial [e]vidence and [i]s [n]ot [i]n [a]ccordance [w]ith [l]aw."  *Id.* at 24.

Defendant argues that the statute does not require that the Commission find *either* price depression or price suppression to determine that subject imports have had adverse price effects on the domestic industry.  Def. Br. at 35.  Defendant asserts that "[t]he Commission's finding . . . [of] adverse price effects . . . is supported by substantial evidence" because the Commission's found that there was "pervasive" underselling and

that the domestic industry lost sales due to the lower prices of subject imports.  *Id.* at

28.

  The court will address (1) the extent to which the statute requires that the

Commission consider whether there has been significant price depression and

significant price suppression in determining whether there are significant adverse price

effects, and (2) whether the Commission's finding of significant adverse price effects

was reasonable.

   **1. The requirement to consider price depression and price suppression**

  Plaintiffs argue that "[t]he structure of the statute puts underselling in one

provision and price depression/suppression in another provision.  But the statutory term

'and' means that all of these factors must be considered."  Pls. Br. at 33.

  Defendant argues that plaintiffs "seek to add a limitation to the statute that does

not exist, [and that plaintiffs' interpretation] is also wrong because it reads a specific

provision – the price underselling provision – out of the statute."  Def. Br. at 35 (citing 19

U.S.C. § 1677(7)(C)(ii)(I)).

  This Court has made clear that "the plain language of the statute" provides that

an analysis of underselling, on the one hand, and price suppression and price

depression, on the other, are "two statutorily-mandated discrete inquiries."  *Altx, Inc.  v.*

*United States* ("*Altx I*"), 25 CIT 1100, 1109-10, 167 F. Supp. 2d 1353, 1366 (2001)[3];

---

[3] In *Altx, Inc.*, domestic producers challenged the Commission's final negative
determination in an antidumping case involving circular seamless (footnote continued)

*United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. United States*, 42 CIT __, __, 348 F. Supp. 3d 1328, 1335 (2018).[4]  Further, the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") and this Court have made clear that the Commission may rely on evidence *either* of significant underselling *or* significant price suppression or depression to support a finding for adverse price effects.  *See Grupo Indus. Camesa v. United States*, 85 F.3d 1577, 1582 (Fed. Cir. 1996) (upholding the Commission's final determination of negative price effects — lost market share and lost sales — based on the Commission's

---

stainless steel hollow products from Japan.  *Altx, Inc. v. United States*, 25 CIT at 1100, 167 F. Supp. 2d at 1357.  "The Commission determined that underselling was not significant and that subject imports caused neither price depression nor price suppression."  *Id.* at 1109, 167 F. Supp. 2d at 1365.  The court remanded the case holding that "[s]ection 1677(7)(C)(ii) requires the Commission to undertake two distinct analyses to examine (1) the significance of underselling *and* (2) the causal connection between subject imports and price depression and/or suppression."  *Id.* at 1109-10, 167 F. Supp. 2d at 1366.  The court concluded that the Commission "may not simply refer to its conclusion regarding the effect of underselling on price depression and/or suppression as a basis for finding underselling not to be significant . . . [as doing so] collapses the two statutorily-mandated discrete inquiries and is therefore contrary to the plain language of the statute."  *Id.*

[4] In *United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial & Service Workers International Union, AFL-CIO, CLC*, a domestic labor union challenged the Commission's final negative determination in an antidumping and countervailing duty case involving truck and bus tires from China.  *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. United States*, 42 CIT __, __, 348 F. Supp. 3d 1328, 1331 (2018).  In that case, "the Commission found that underselling was pervasive" but not significant because underselling did not cause price suppression or depression.  *Id.* at __, 348 F. Supp. 3d at 1335.  The court held that substantial evidence did not support the Commission's price effects finding because "[b]y merely relying on its finding for price suppression and price depression, the Commission conflated the two-pronged analysis mandated by the statute."  *Id.*

finding of underselling alone); *see also Companhia Paulista De Ferro-Ligas v. United States*, 20 CIT 473, 478 (1996) ("'[T]o require findings of underselling would be inconsistent with the proposition that price suppression or depression is sufficient.'" (quoting *Cemex, S.A. v. United States*, 16 CIT 251, 261, 790 F. Supp. 290, 299 (1992), *aff'd without op.*, 989 F.2d 1202 (Fed. Cir. 1993))).  In *ITG Voma Corp.*, the Court stated that "[plaintiff's] argument presumes incorrectly that price depression or suppression is required to find that imports have had an adverse effect on domestic prices."  *ITG Voma Corp. v. U.S. Int'l Trade Comm'n,* 41 CIT __, __, 253 F. Supp. 3d 1339, 1361 (2017), *aff'd without op.*, 753 F. App'x 913 (Fed. Cir. 2019).

In sum, the Commission may find adverse price effects without a finding of significant price depression or price suppression.  However, the Commission is required by statute to *consider both* underselling, and price suppression and depression.  The court now turns to whether the Commission's finding of significant adverse price effects due to underselling, without a finding that there was significant price depression or suppression, was reasonable.  In that analysis, the court focuses on whether the Commission considered adequately price depression and price suppression.

>    **2.    Whether the Commission's finding of significant adverse price effects was reasonable**

>    **a.    Substitutability**

The Commission began its discussion of price effects by recalling its finding that there was a "high degree of substitutability between the domestic like product and cumulated subject imports, and that price is an important factor in purchasing decisions

for PET sheet."  Views at 33.  The Federal Circuit has previously identified the close

nexus between substitutability, price and underselling.  *See NSK Corp. v. U.S. Int'l*

*Trade Comm'n*, 716 F.3d 1352, 1367 (Fed. Cir. 2013) ("[T]he Commission . . . stressed

that there is a high degree of substitutability among domestic [products], subject

imports, and non-subject imports, making price a very important factor in purchasers'

decision-making.  With respect to the likely impact of revocation of the orders on pricing

and competition, the Commission determined that 'subject imports were likely to

significantly undersell the domestic products and were likely to have significant adverse

effects on domestic prices upon revocation of the orders.'" (quoting *Certain Ball*

*Bearings and Parts thereof from Japan and the United Kingdom*, USITC Pub. 4131, Inv.

Nos. 731-TA-394-A and 399-A (Second Review) (Second Remand) (Jan. 2010) at 57)).

The Commission found that "substantial majorities of responding market

participants, in comparisons between and among PET sheet from Korea and Oman and

the domestic like product, reported that such PET sheet is always or frequently

interchangeable . . . ."  Views at 27 (citing *Final Staff Report*, at II-21 tbl.II-10, CR 403

(Int'l Trade Comm'n Aug. 6, 2020), ECF No. 17-1 ("*Staff Report*")).[5]  The Commission

found also that "majorities or pluralities of purchasers reported that the domestic like

---

[5]  Table II-10 shows that 16 of 21 U.S. producers, six of seven U.S. importers and six of
nine purchasers reported that the domestic like product and subject imports from Oman
were always or frequently interchangeable.  *Staff Report* at II-21 tbl.II-10.  Additionally,
Table II-10 shows that sixteen of seventeen U.S. producers, nine of 10 U.S. importers
and two of two purchasers reported that the domestic like product and subject imports
from Korea were always or frequently interchangeable.  *Id.*

product and subject imports from Oman were comparable in 15 of 22 purchasing factors

. . . ." *Id.*

In its discussion of substitutability, the Commission noted the importance of price

in purchasing decisions and summarized the record supporting this conclusion:

> Nearly all responding purchasers (16 of 17) reported that price is a very
> important factor[6] in their PET purchasing decisions.  Moreover, as
> discussed, majorities of U.S. producers and importers, and at least half of
> responding purchasers, reported that non-price differences were only
> sometimes or never significant in purchasing decisions for PET sheet in
> comparisons between and among the domestic like product and subject
> imports from Korea and Oman.  In the same vein, the majority of
> purchasers (11 of 17) reported that they usually purchase the lowest-
> priced PET sheet, and more purchasers (20 firms) ranked price as among
> the top three factors they consider in their purchasing decisions for PET
> sheet than any other factor besides quality (21 firms).

*Id.* at 29.  The Commission concluded, "[t]hus, while other factors may also be

important, the record clearly indicates that price is an important factor in purchasing

decisions for PET sheet."  *Id.*

Plaintiffs challenge substitutability on two grounds: (1) that other qualities of D-

PET — such as its "superior quality" and market perception of the product, not only

---

[6]  Question III-24 on the purchasers' questionnaire asked purchasers to "[p]lease rate
the importance of the following factors in your firm's purchasing decisions for PET
sheet."  U.S. Purchasers' Questionnaire at 16, PR 85.  Purchasers were able to rate
each of the twenty-two factors as "Very important," "Somewhat Important," or "Not
Important."  *Id.*

price — are driving purchasing decisions; and, (2) that price is not "the most important factor."  Pls. Br. at 15-16 (quoting *Staff Report* at I-18), 26.[7]

### i.    Plaintiffs' other factors argument

Plaintiffs argue that "[t]he Commission improperly ignored or dismissed . . . evidence that [OCTAL's] largest customers perceived . . . D-PET [sheet] differently" than PET sheet.  Pls. Br. at 19.  Notably, OCTAL raised similar arguments during the investigation.  *See generally* Pre-Hearing Brief of OCTAL SAOC FZC and OCTAL Inc. (July 7, 2020) at 23, CR 362, PR 108.  The Commission considered the argument and responded that it is "unpersuaded by OCTAL's argument that purchases of PET sheet from Oman increased mainly for non-price reasons."  Views at 35.

Plaintiffs argue that OCTAL's D-PET is "a superior product that provides better physical performance characteristics."  Pls. Br. at 13.  Plaintiffs tout that D-PET is produced from a patented production process.  *Id.* at 12.  Plaintiffs quote the Commission's Staff Report as support: "Purchasers identified the superior quality of D-PET as the main *non-price reason* for purchasing imported rather than U.S. produced product."  *Id.* at 16 (original emphasis removed, emphasis supplied) (quoting *Staff Report* at I-18).[8]  Further, plaintiffs point to excerpts from the questionnaire responses of two sizeable U.S. purchasers expressing their opinions that D-PET sheet is superior to

---

[7] The citation provided in Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record appears to cite incorrectly to page I-18 of the Staff Report.  *See* Pls. Br. at 16. The cited material appears to come instead from page V-18 of the Staff Report.  *See Staff Report* at V-18.

[8] *See supra* note 7.

Court No. 20-03698                    **PUBLIC VERSION**                    Page 22

traditional PET sheet.  *Id.* at 17-18.  Plaintiffs also note that OCTAL's customers "that

explicitly stated that the ability to purchase D-PET was 'very important' to their

purchasing decision accounted for 82.2 percent of all D-PET sheet purchases from

OCTAL."  *Id.* at 22.

In its Views, the Commission stated that it "do[es] not find that D-PET's physical

qualities or its other characteristics meaningfully limit the substitutability between

subject imports from Oman and the domestic like product."  Views at 28.  "In particular,

majorities of purchasers found the domestic like product comparable to subject imports

from Oman in factors of product clarity, product formability, and quality meets industry

standards, each of which was deemed very important by at least 14 of 17 reporting

purchasers."  *Id*.  The Commission continued, "[b]y contrast, most purchasers (12 of 17)

rated 'PET is D-PET' as not important or only somewhat important as a purchasing

factor."  *Id.*

### ii.      Price is an important factor

Plaintiffs maintain that price is not the "most important factor" for purchasers

when making purchasing decisions.  Pls. Br. at 26.  However, and as defendant points

out, the Commission did not find that price was the "most important factor," but rather

"an important factor."  Views at 29; *see also* Def. Br. at 23 n.10.  Additionally, the

Commission stated that "other factors may also be important."  Views at 29.

In Commission determinations, price does not need to be the *most* important

factor to be a *very important* factor and potentially even a *determining* factor to a

purchasing decision.  *See Acciai Speciali Terni, S.p.A. v. United States*, 19 CIT 1051,

1059 (1995).[9]  Plaintiffs argue that "[i]t is undisputed that those U.S. customers accounting for [[     ]] percent of total purchases of OCTAL PET informed the Commission (in response to a specific Commission question) that price was not the most important factor for purchasing OCTAL PET sheet."  Pls. Reply Br. at 6-7 (citing OCTAL Pre-Hearing Brief (July 7, 2020) at Ex. 3, CR 362).[10]  However, plaintiffs' [[     ]] percent figure fails to take into account that almost all of those who responded to the questionnaire listed price as a key factor in their purchasing decisions.  OCTAL Post-Hearing Brief (July 21, 2020) at Ex. 3, CR 370.[11]

---

[9] In *Acciai Speciali Terni, S.p.A.*, Acciai Speciali argued that "the Commission's findings as to the importance of price [were] exaggerated, because . . . two large purchasers . . . noted . . . that factors other than price were also important to their purchase decisions." *Acciai Speciali Terni, S.p.A. v. United States*, 19 CIT 1051, 1059 (1995).  The court rejected plaintiff's argument because "[both] purchasers . . . indicated . . . that a [five] to 10 percent rise in import price would cause them to purchase domestic products," and "one of the two large purchasers stated that it found the quality of domestic and imported products to be comparable."  *Id*. at 1059-60.  Therefore, although some "purchasers did not list price as the *most* important factor, price was listed as *a very* important factor."  *Id*. at 1059 (emphasis supplied).

[10] The citation provided in Plaintiffs' Reply Brief in Support of Rule 56.2 Motion for Judgment on the Agency Record appears to cite incorrectly to Exhibit 3 of the OCTAL Pre-Hearing Brief.  *See* Pls. Reply Br. at 6-7; OCTAL Pre-Hearing Brief (July 7, 2020) at Ex. 3, CR 362.  The cited material appears to come instead from Exhibit 3 of the OCTAL Post-Hearing Brief.  *See* OCTAL Post-Hearing Brief (July 21, 2020) at Ex. 3, CR 370.

[11] Question III-23 on the purchasers' questionnaire asked purchasers to "[p]lease list, in order of their importance, the main factors your firm considers in deciding from whom to purchase PET sheet (examples include availability, extension of credit, contracts, price, quality, range of supplier's product line, traditional supplier, etc.)."  U.S. Purchasers' Questionnaire at 15.  Purchasers were given three blank lines to write their main factors as well as an opportunity to "list any other factors that are very important in your purchase decisions."  *Id.*

The Commission expressly addressed OCTAL's arguments that factors other than price were driving purchasing decisions.  *See* Views at 35 n.150 ("The only possible adverse effect of the underselling is market share.  But . . . the shifts in market share are . . . demonstrably unrelated to price.  Such shifts in market share cannot be linked to the underselling . . . ." (quoting OCTAL Post-Hearing Brief (July 21, 2020) at 4-5, CR 370)).  After considering OCTAL's arguments, the Commission weighed the evidence and concluded:

> We are unpersuaded by OCTAL's argument that purchases of PET sheet from Oman increased mainly for non-price reasons. We acknowledge that the record contains statements from certain firms that they purchased subject imports from Oman for non-price reasons, such as quality or carbon footprint. However, we find that these statements do not outweigh the aggregate data from market participants as a whole, which, as discussed above, reflects that price is an important factor in purchasing decisions for PET sheet and that most purchasers usually purchase the lowest-priced product. Further, OCTAL itself testified at the hearing as to the importance of price in purchasing decisions for PET sheet from Oman, and the questionnaire responses of the same firms indicating that they purchased subject imports from Oman for non-price reasons reflect that they consider price as very important in their purchasing decisions for PET sheet. Moreover, all five firms reporting price as a primary reason for their purchase of subject imports rather than the domestic like product purchased subject imports exclusively from Oman, which, as explained above, pervasively undersold the domestic like product.

> Because the record as a whole indicates that price is an important factor in purchasing decisions for PET sheet, including PET sheet from Oman, and that the domestic industry lost sales due to price to lower-priced subject imports, we find that this underselling caused the shift in market share from the domestic like product to cumulated subject imports over the POI.  We thus find the underselling by cumulated subject imports to be significant.

Views at 35-38 (citations omitted).

**PUBLIC VERSION**

"It is the Commission's task to evaluate the evidence it collects during its investigation.  Certain decisions, such as the weight to be assigned a particular piece of evidence, lie at the core of that evaluative process."  *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1357 (Fed. Cir. 1996).  The Commission's finding that price was an important factor was reasonable and supported by the record, and was sufficient to support the Commission's finding of significant adverse price effects.

    **b.    Price effects**

The Commission found that "data indicate[d] that cumulated subject imports pervasively undersold the domestic like product throughout the POI by significant margins."  Views at 34. The Commission observed that "between 2017 and 2019, cumulated subject imports undersold the domestic like product in 74 of 76 possible quarterly comparisons," or 97.4 percent.[12]  *Id.*  The record shows that the "average underselling margin [was] 16.6 percent."  *Id.*

The Commission determined that the "underselling by cumulated subject imports caused the [U.S.] domestic industry to lose sales."  *Id.*  The Commission pointed to two sources of information in the record to support this finding: (1) purchaser questionnaires where five out of the ten purchasers "reported price as a primary reason for their purchase of the subject imports [over] the domestic like product"; and (2) "contemporaneous documentation of price negotiations" between U.S. producers and

---

[12] "[[            ]] pounds of subject imports [were] reported in those quarters."  Views at 34.  In the two quarters in which the cumulated subject imports oversold the domestic like product, "[[        ]] pounds of subject imports [were] reported, and [the] average overselling margin [was] [[    ]] percent."  *Id.*

purchasers demonstrating that certain U.S. producers were losing sales because they could not match OCTAL's lower prices.  *Id.*

The Commission also found that "there was a market share shift from the domestic industry to cumulated subject imports over the POI."  *Id.* at 35.  The Commission described this shift as "[c]onsistent with lost sales due to underselling by subject imports," *id.* at 35, and referenced its volume determination where the "cumulated subject imports gained [[     ]] percentage points . . . at the domestic industry's expense in the merchant market."  *Id.* at 35 n.149.  As described by the court above, the Commission concluded that the underselling was "significant."  *Id.* at 37.[13]

The Commission then addressed the "price trends for the domestic like product and subject imports."  *Id.* at 37-38.  The Commission did "not find that cumulated subject imports depressed [or suppressed] prices for the domestic like product to a significant degree."  *Id.* at 38.  The Commission concluded that the "cumulated subject imports had significant adverse price effects on the domestic industry" based on the Commission's finding "that subject imports significantly undersold the domestic like product, gaining sales and market share at the domestic industry's expense due to their lower prices."  *Id.*

Plaintiffs raise two principal types of arguments to challenge the Commission's adverse price effects finding.  First, plaintiffs argue that the Commission "ignore[d] the record evidence" with regard to price depression and suppression.  Pls. Br. at 31-32.

---

[13] *See supra* Section 2(a)(ii).

Had the Commission considered price depression and suppression, plaintiffs argue, the Commission would not have found that there were adverse price effects.  *See id.* ("The Commission apparently believes the statute gives them a series of alternative boxes, and that checking any one of those boxes is enough.  But the Commission must consider all of the evidence, including the evidence that might undermine the conclusion the Commission is contemplating.").  Second, plaintiffs argue that "[i]nstead of identifying any adverse price effects, the Commission turned to various measures of volume.  The Commission pointed to individual lost sales and an overall market share shift."  *Id.* at 35 (emphasis omitted) (citing Views at 34-35).  Defendant disagrees and states that "the record confirms" that "the market [share] shift from domestic product to imports from Oman" is due to lower prices.  Def. Br. at 29.

"[T]o determine the substantiality of the evidence, the court must also take into account 'whatever in the record fairly detracts from its weight.'"  *Nippon Steel Corp. v. United States*, 27 CIT 1856, 1864, 301 F. Supp. 2d 1355, 1364 (2003) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).  "The possibility of drawing two inconsistent conclusions from the evidence does not prevent the court from holding that the Commission's determinations, findings, or conclusions are supported by substantial evidence."  *ITG Voma Corp. v. U.S. Int'l Trade Comm'n*, 41 CIT __, __, 253 F. Supp. 3d 1339, 1347 (2017) (citing *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006)), *aff'd without op.*, 753 F. App'x 913 (Fed. Cir. 2019).

The Commission's finding of pervasive underselling is supported by the record. "[C]umulated subject imports undersold the domestic like product" 97.4 percent of the

time in quarterly comparisons between 2017 and 2019 — "with an average underselling margin of 16.6 percent."  Views at 34.  The Court has upheld cases in which the Commission found significant underselling, but no significant price depression or suppression, in instances in which there was underselling in substantially less than 97.4 percent of quarterly comparisons.  *See Cleo Inc. v. United States*, 30 CIT 1380, 1396-98, 1402 (2006) (stating that "combined data" demonstrating underselling in 33 of 45 quarters or 73.3 percent supported the Commission's underselling determination), *aff'd*, 501 F.3d 1291, 1303 (Fed. Cir. 2007).[14]  Further, the Commission has found adverse price effects in other investigations where the Commission did not find significant price depression or suppression and found underselling in fewer quarterly comparisons.  *See Certain Aluminum Extrusions from China*, USITC Pub. 4229, Inv. Nos. 701-TA-475 and 731-TA-1177 (Final) (May 2011) at 22 (finding that "subject imports undersold the domestic like product in 43 of 58 quarterly comparisons, or 74 percent of the time, at margins ranging from 1.6 to 66.1 percent"); *see also Aluminum Foil from China*, USITC Pub. 4771, Inv. Nos. 701-TA-570 and 731-TA-1346 (Final) (Apr. 2018) at 30 (finding "[t]he pricing data show that subject imports undersold the domestic like product in 40 of 77 instances, or 52 percent of comparisons, at margins ranging from 1.2 percent to 23.0 percent").

---

[14] The Federal Circuit affirmed, albeit with reference only to data from three of four products, for a total of 29 of 41 quarters or 70.7 percent with underselling.  *Cleo Inc. v. United States*, 501 F.3d 1291 (Fed. Cir. 2007).

Regardless of the Commission's finding on underselling, the Commission is still required to consider price depression and suppression in its price effects analysis.  *See* 19 U.S.C. § 1677(7)(C)(ii).  Plaintiffs do not dispute the Commission's finding that the subject imports did not significantly depress or suppress the domestic industry's prices. Plaintiffs' dispute boils down to questioning whether the Commission "consider[ed]" price depression and suppression "[i]n evaluating the effect of [subject] imports . . . on [domestic] prices."  *Id.*

The Commission found that the "cumulated subject imports [did not] depress[] prices for the domestic like product to a significant degree" because, among other reasons, "[p]rices for all four domestically produced pricing products were higher in the fourth quarter of 2019 than in the first quarter of 2017."  Views at 37-38.  The Commission determined also that "cumulated subject imports [did not] prevent[] price increases . . . to a significant degree."  *Id.* at 38.  The Commission reached this conclusion by looking at the domestic industry's ratio of cost of goods sold to net sales and determining that "the domestic industry's price increases were sufficient to cover its rising costs on a per unit basis in the merchant market over the course of the POI."  *Id.* In conclusion, the Commission considered price depression and suppression in its price effects analysis in the instant case.  The fact that the Commission did not find significant price depression or suppression does not mean that the Commission's adverse price effects finding is unsupported by substantial evidence.

Plaintiffs' second argument is that "the Commission's approach [for finding price effects] relies twice on adverse volume effects."  Pls. Br. at 36.  Plaintiffs maintain that in

"blaming underselling for the shift in market share[, the Commission] largely ignores

contrary record evidence . . . .  For example, in its submissions to the Commission,

OCTAL . . . [argued] . . . that the vast majority of the shift in market share occurred for

reasons demonstrably unrelated to prices."  *Id.* at 37.  As discussed by the court above,

the Commission considered OCTAL's arguments and determined otherwise.  Views at

35.  Having considered OCTAL's positions, the Commission disagreed:

> Notwithstanding some improvements in the industry's performance, which
> occurred as apparent U.S. consumption increased over the POI,
> cumulated subject imports had adverse effects on the domestic industry.
> Cumulated subject imports, as discussed above, captured sales and took
> market share from the domestic industry during the POI due to their lower
> prices.

*Id.* at 42.

The Commission found that the underselling by the cumulated subject imports

caused adverse price effects — lost sales and lost market share — to the U.S. domestic

industry.  *Id.* at 34-35.  As noted above, the Commission pointed to two sources of

information in the record to support its finding of lost sales: (1) purchaser

questionnaires; and (2) "contemporaneous documentation of price negotiations"

between U.S. producers and purchasers.  *Id.* at 34.  This Court has determined that the

Commission may rely on purchaser questionnaire responses to determine that price

sensitivity affects the domestic industry especially when subject imports and the

domestic like product are substitutable, as the subject merchandise was found to be in

the instant case.  *See Chefline Corp. v. United States*, 26 CIT 878, 891, 219 F. Supp.

2d 1303, 1316 (2002); *Swiff-Train Co. v. United States*, 37 CIT __, __, 904 F. Supp. 2d

1336, 1343 (2013).

The Commission relied also on the record to determine that "there was a market

share shift from the domestic industry to the cumulated subject imports over the POI."

Views at 35.  In conclusion, the Commission considered the record as a whole, and its

finding of adverse price effects was reasonable based on the information in the record.

**III.    Whether the Commission's conclusion of significant adverse impact is supported by substantial evidence and is otherwise in accordance with law**

   **A.    Legal framework**

The third consideration in an antidumping injury determination is the impact of

the subject imports on the domestic industry.  19 U.S.C. § 1677(7)(C).  In evaluating this

impact, the Commission "shall evaluate all relevant economic factors which have a

bearing on the state of the [domestic] industry."  *Id*. § 1677(7)(C)(iii).  These factors

include, but are not limited to:

> (I) actual and potential decline in output, sales, market share, [] profits, . . .
> ability to service debt, productivity, return on investments, return on
> assets, and utilization of capacity,
> (II) factors effecting domestic prices,
> (III) actual and potential negative effects on cash flow, inventories,
> employment, wages, growth, ability to raise capital and investment,
> (IV) actual and potential negative effects on the existing development and
> production efforts of the domestic industry, . . . and
> (V) . . . the magnitude of the margin of dumping.

*Id.*  The Commission is instructed to "evaluate all relevant economic factors described in

[19 U.S.C. § 1677(7)(C)(iii)] within the context of the business cycle and conditions of

competition that are distinctive to the affected industry."  *Id.*  As such, while profit can be

an important indicator, "[t]he Commission may not determine that there is no material injury . . . to an industry in the United States merely because that industry is profitable or because the performance of that industry has recently improved."  *Id.* § 1677(7)(J).

> **B.    Analysis**

The Commission's finding of significant adverse impact is supported by substantial evidence.  The Commission weighed the evidence, noted some improvements in the performance of the domestic industry as apparent U.S. consumption increased over the POI, and found that "the domestic industry's production, shipments, and revenues were lower than they would have been [without the lower priced subject imports]."  *Id.* at 42-43.  Additionally, the Commission pointed to the record, which shows that total net sales decreased from 2017 to 2019 by approximately 24.7 million pounds, or in terms of value, 15.6 million dollars.  *Id.* at 44 (citing *Staff Report* at F-5 tbl.F-3).

Plaintiffs challenge the Commission's adverse impact determination on two grounds: (1) the Commission failed to establish a correlation between subject import flows and the condition of the domestic industry; and (2) the Commission did not evaluate properly OCTAL's low dumping margin.  Pls. Br. at 2-3.  The court will consider each of these challenges in turn.

> **1.    Whether the Commission's finding of correlation between the increased volumes of imports and the domestic industry's injury was reasonable**

The Commission considered properly the record information, including financial performance, and concluded reasonably that the domestic industry suffered an adverse

impact.  Plaintiffs argue that the Commission's analysis erred in failing to "consider the relationship between [the increase in] subject imports and the [improving] condition of the domestic industry."  Pls. Br. at 40.  Plaintiffs assert that the evidentiary record before the Commission demonstrated the lack of "correlation between [the] increase in the subject imports and changes in domestic industry profitability."  *Id.* at 41.

Specifically, plaintiffs challenge correlation on two grounds: (a) the Commission in its affirmative impact determination ignored and failed to reconcile positive industry performance indicia, such as the industry's increase in operating profits; and (b) the Commission failed to consider the record as a whole and, therefore, failed to establish causation — that the domestic industry's condition was "'by reason of'" the subject imports.  *Id.* at 41 (quoting 19 U.S.C. § 1673d(b)), 43.

### a.    Whether the Commission addressed properly the positive industry performance indicia on the record

Plaintiffs argue first that the Commission did not take into account positive industry performance indicia — particularly, the financial performance of the industry — in the Commission's conclusion that the domestic industry was suffering material injury. *See* Pls. Br. at 39-43.  Plaintiffs assert, without offering any support, that this case stands in contrast to the "vast majority of injury cases [in which] a domestic industry . . . suffers decreasing profitability over the period."  *Id.* at 39.  In the instant case, plaintiffs maintain, "the domestic industry was consistently profitable, at a high level, and with improving profitability."  *Id.*  Plaintiffs emphasize that, "[a]s subject imports increased

[their] market share, the domestic industry [increased its operating profits]." *Id.* at 42

(citing *Staff Report* at C-11 to C-12).

The Commission noted that the profitability of most domestic producers

deteriorated over the POI.  Views at 44 (citing *Staff Report* at F-5 to F-15 tbl.F-3).[15]  In

addition, the Commission concluded that, although there are some industrywide data

suggesting a positive profitability trend, the "domestic industry as a whole would have

performed materially better in the absence of the dumped imports." *Id*.

Plaintiffs point out that the Commission noted that "[m]easures of the domestic

industry's output were mixed over the POI" and found several positive performance

indicators, such as improving employment metrics.  *Id.* at 39; Pls. Br. at 39, 43 (citing

Views at 41).  Plaintiffs assert that the Commission is required to explain "how it

reconciles the [] positive indicia [on the record] with its finding of [an] adverse impact" —

and that the Commission's failure, in plaintiffs' view, to do so renders the Final Injury

Determination not in accordance with law.  Pls. Br. at 43-44.

The statute requires that the Commission consider all the factors set out in

section 1677(7)(C)(iii) in determining the condition of the domestic industry.  19 U.S.C. §

1677(7)(C)(iii).  The Federal Circuit has explained that:

> [Section 1677(7)(C)(iii)] list[s] factors which the Commission "shall," not
> may, consider and evaluate in determining the effect on the domestic
> industry.  Depending on the circumstances, the Commission may not need
> or be able to consider each listed factor; it may also consider other

---

[15]  Table F-3 shows the "[s]elect results of operations of U.S. producers, merchant
market, by company, 2017-19."  *Staff Report* at F-5 tbl.F-3.  The total net sales lost by
all firms from 2017 to 2019 was approximately 24.7 million pounds, or in terms of
money, 15.6 million dollars.  *Id.*

relevant factors, such as the intent of the importer or the effect on competition.  However, the Commission cannot *ignore or bypass* the core factors directed by the statute.

*Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*, 975 F.2d 807, 814 (Fed. Cir. 1992) (emphasis supplied); *accord Coalition for Fair Trade of Hardwood Plywood v. U.S. Int'l Trade Comm'n*, 40 CIT __, __, 180 F. Supp. 3d 1137, 1172 (2016).

In considering the five categories of impact factors, the Commission is required to "tak[e] into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Suramerica de Aleaciones Laminadas, C.A v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  However, "the significance to be assigned to a particular factor is for the [Commission] to decide," and none of the factors on its own is dispositive.  S. Rep. No. 96-249, at 88 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 474; *ITG Voma Corp. v. United States*, 41 CIT __, __, 253 F. Supp. 3d 1339, 1358 (2017), *aff'd without op.*, 753 F. App'x 913 (Fed. Cir. 2019).

The statute directs the Commission to evaluate using a variety of factors, such as domestic sales, profit, market share and capacity utilization, whether subject imports have had an adverse impact on the domestic industry.  19 U.S.C. § 1677(7)(C)(iii).  In considering this range of factors in this case, the Commission expressly discussed both positive and negative indicia — for example, the Commission noted that capacity, domestic employment and gross profits all improved over the POI.  Views at 39-41.

However, the Commission also discussed that other indicia, such as U.S. shipments, capacity utilization and market share, declined.  *Id.* at 40.  The Commission

emphasized that subject imports "captured sales and took market share from the domestic industry during the POI." *Id.* at 42.  In addition, "the quantity and value of the domestic industry's commercial U.S. shipments, and the revenues from its commercial sales, decreased over the POI, despite the [[      ]] percent increase in apparent U.S. consumption in the merchant market over this period." *Id.* at 43.

After considering all of these indicators, the Commission concluded that "[n]otwithstanding some improvements in the industry's performance, which occurred as apparent U.S. consumption increased over the POI, cumulated subject imports had adverse effects on the domestic industry." *Id.* at 42.  In sum, the Commission considered all the information on the record, including information that arguably conflicted with the Commission's conclusion that the domestic industry suffered material injury as a result of the subject imports.  The Commission's analysis on its face makes clear that it did not "ignore or bypass" any key factor in its analysis. *Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*, 975 F.2d 807, 814 (Fed. Cir. 1992).

As previewed above, plaintiffs focus heavily on the industry's financial performance over the POI.  *See* Pls. Br. at 39 (stating that "the domestic industry was consistently profitable, at a high level, and with improving profitability at the end of the period").  However, as the Commission explained, neither profit nor any other factor is dispositive in the Commission's analysis.  Views at 44 (discussing 19 U.S.C. § 1677(7)(J)).  Further, it is well established that when positive data on profitability conflict with other negative industry trends, the Commission may find adverse impact as a result

of the subject imports so long as the Commission's determination makes clear that the

Commission considered the record as a whole.  *See United Steel, Paper & Forestry,*

*Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v.*

*United States*, 44 CIT __, __, 425 F. Supp. 3d 1374, 1380 (2020) ("Even though the

domestic industry's profit increased, the Commission characterized the profit increase

as 'modest' in light of the significant increase in demand and decline of raw material

costs . . . .  Because the record shows that the domestic industry had fewer shipments

and obtained lower revenues even during a period of increased demand, the court

concludes that it was reasonable for the Commission to conclude that the subject

imports significantly impacted the domestic industry."); *see also ITG Voma Corp.*, 41

CIT at __, 253 F. Supp. 3d at 1358-59 (upholding the Commission's affirmative impact

determination because, although the industry had strong financial performance, other

indicia, such as domestic shipments, employment and net sales, experienced an overall

decline during the POI).

        In addition, in the instant case, the Commission's Final Injury Determination

makes clear that the industrywide profit data are not as straightforward as plaintiffs'

argument may suggest.  *See* Views at 44.  In particular, the Commission pointed out

that (1) nine of 13 U.S. merchant market producers suffered operating losses in 2019,

(2) "14 of 22 [U.S.] producers reported that the subject imports had negative effects on

[their] investment[s], and (3) 13 of 22 U.S. producers reported that the subject imports

had "negative effects on [their] growth and development."  *Id.*  The Commission also

found that one producer, [[          ]], which produces a "niche product that may not

compete directly with subject imports," likely drove the positive profitability trend.  *Id.*
This single producer "had far better operating performance than any other domestic
producer each year of the POI," and "the other producers overall had lower operating
margins in 2019 than in 2017."  *Id.*

　　　In sum, the Commission's examination of the industry's profitability trends taken
in conjunction with the findings on industry declines in other areas, such as market
share, shipments and capacity utilization, demonstrate that the Commission considered
the range of industry performance data and made a reasonable impact determination.

> **b.    Whether the Commission adequately established that
> the impact to the domestic industry was "by reason of"
> the subject imports**

　　　Plaintiffs next contend that the Commission failed to establish a correlation
between the "increase in the subject imports and [the] changes in the domestic industry
profitability" and that the record information "suggests that the condition of the domestic
industry is not 'by reason of' the subject imports as required by the statute."  Pls. Br. at
41 (quoting 19 U.S.C. § 1673d(b)).  Overall, plaintiffs maintain that "the Commission's
decision does not address [the lack of correlation] evidence at all" and that "the word
'correlation' is nowhere to be found in the entire Commission decision."  Pls. Br. at 42-
43.

　　　Defendant responds that the word correlation is nowhere to be found in the
statute, let alone that the statute nowhere requires that the Commission make a finding
of a "correlation" between the subject imports and the condition of the domestic
industry.  Def. Br. at 41 (citing 19 U.S.C. § 1677(7)(C)(iii)).  Further, defendant

maintains that the statute does not require that the Commission apply any "specific methodology" related to the impact analysis. *Id.* Nonetheless, defendant contends that the Commission did evaluate the causation in regard to — as well as correlation between — the increase of subject imports and the condition of the domestic industry, finding "that cumulated subject import volume increased during the POI while also finding . . . that during this same period, the domestic industry suffered declines in production, shipments, and revenues." *Id.* (citing Views at 30-31, 42-43).

To issue an affirmative adverse injury determination, the statute requires that the Commission find that an "industry in the United States . . . is materially injured . . . by reason of [the subject] imports." 19 U.S.C. § 1673d(b)(1). However, the statute does not prescribe any "Procrustean formula for determining whether a domestic injury was 'by reason of' subject imports." *Mittal Steel Point Lisas Ltd. v. United States*, 542 F.3d 867, 879 (Fed. Cir. 2008). Rather, the "by reason of" standard "does not require the Commission to address the causation issue in any particular way . . . . The Commission is simply required to give full consideration to the causation issue and to provide a meaningful explanation of its conclusions." *Id.* at 878; *see also* S. Rep. 96-249 at 75 ("The determination of the [Commission] with respect to causation is . . . complex and difficult, and is a matter for the judgment of the [Commission].").

In the instant case, the Commission stated expressly its causation finding: "Cumulated subject imports . . . captured sales and took market share from the domestic industry during the POI due to their lower prices. As a result, the domestic industry's production, shipments, and revenues were lower than they would have been

otherwise."  Views at 42-43.  The Commission considered also "whether there are other

factors that may have had an impact on the domestic industry during the POI to ensure

that [the Commission did] not attribut[e] injury from such other factors to [the] subject

merchandise."  *Id.* at 45.  The Commission determined that "neither demand trends nor

[non-subject] imports explain the magnitude of the domestic industry's sales and market

share losses over the POI."  *Id.* at 45-46.  Finally, as discussed, the Commission also

expressly considered and addressed the question of the positive operating performance

of the industry as a whole.  *Id.* at 44.

    For the foregoing reasons, the Commission gave "full consideration to the

causation issue and . . . provide[d] a meaningful explanation of its conclusions."  *Mittal*,

542 F.3d at 878.

**2.    Whether the Commission evaluated the magnitude of the
       margins of dumping in assessing subject imports' impact**

    Plaintiffs' final challenge to the Commission's affirmative impact determination is

that "the Commission refused to consider the magnitude of the dumping margin . . .

[and, therefore,] never complied with the statutory requirement to [analyze] how the

magnitude of the dumping margin affected the purported adverse impact."  Pls. Br. at

40-41.  However, the Final Injury Determination makes clear that the Commission met

its statutory obligation to evaluate the magnitude of the dumping margins in assessing

the impact of the subject imports on the domestic industry.

    The statute requires that the Commission "evaluate all relevant economic

factors," including "the magnitude of the margin of dumping."  19 U.S.C. §

1677(7)(C)(iii).  The magnitude of the dumping margin is not dispositive in the Commission's impact evaluation.  *See Consol. Fibers, Inc. v. United States*, 32 CIT 855, 863, 574 F. Supp. 2d 1371, 1380 (2008) ("The statute only requires the Commission to evaluate antidumping margins as one of many relevant economic factors.").

This Court has held on several occasions that "[n]othing in the statutory scheme compels [the Commission] to reach a certain conclusion concerning the dumping margins -- the statute only compels [the Commission] to consider such margins." *Asociacion de Productores de Salmon y Trucha de Chile AG v. U.S. Int'l Trade Comm'n*, 26 CIT 29, 45, 180 F. Supp. 2d 1360, 1376 (2002).  Therefore, the statute requires that the Commission consider the magnitude of the dumping margins; however, the statute does not require that the Commission "demonstrate that dumped imports, through the effects of particular margins of dumping, are causing injury." *Whirlpool Corp. v. United States*, 37 CIT 1775, 1798-99 (2013) (quoting *Iwatsu Elec. Co. v. United States*, 15 CIT 44, 48, 758 F. Supp. 1506, 1510 (1991)); *accord Consol. Fibers, Inc.*, 32 CIT at 863, 574 F. Supp. 2d at 1380 (quoting *Iwatsu Elec. Co.*, 15 CIT at 48, 758 F. Supp. at 1510) (citing § 1677(7)(C)(iii)(V)).In the instant case, the Commission discussed the dumping margins primarily in two footnotes.  In the first footnote, the Commission acknowledged the statutory requirement to evaluate the magnitude of the dumping margins and identified the specific dumping margins for the subject imports from Korea and Oman.  Views at 39 n.162.  The Commission then explained:

> We take into account in our analysis the fact that Commerce has made
> final findings that all subject producers in Korea and Oman are selling
> subject imports in the United States at [lower than fair value].  In addition
> to this consideration, our impact analysis has considered other factors
> affecting domestic prices.  Our analysis of the significant underselling,
> described in both the price effects discussion and below, is particularly
> probative to an assessment of the impact of the subject imports.

*Id.*  In the second footnote, the Commission addressed the extent of its obligation to

evaluate the dumping margins.  *See* Views at 43 n.184.  Specifically, the Commission

responded to "OCTAL's argument that . . . the Commission must find a linkage between

material injury and the act of dumping."  *Id.*  The Commission emphasized that the

"statute does not task the Commission with determining whether the domestic industry

is materially injured by reason of *dumping*.  Rather, it directs the Commission to

determine whether the domestic industry is materially injured by reason of *dumped*

*imports*."  *Id.* (internal citations omitted).

Plaintiffs argue that the Commission failed to meet its statutory obligation under

section 1677(7)(C)(iii) because, rather than "evaluate" the magnitude of the dumping

margin, the Commission only mentioned "the dumping margins in passing with little

more."  Pls. Br. at 47.  Specifically, plaintiffs argue that the Commission (1) failed to

explain how or whether it took this factor into account and (2) failed also to respond to

"the unique fact in this case that the dumping margin was just a fraction of the overall

margin of underselling the Commission found, which called into question the inferences

about adverse impact."  Pls. Br. at 49.

Plaintiffs cite *Coalition for Fair Trade of Hardwood Plywood v. U.S. International*

*Trade Commission*, 40 CIT __, __, 180 F. Supp. 3d 1137, 1169 (2016) ("*Hardwood*

*Plywood*"), to support their argument that "the importance of the magnitude of the

margins can be enhanced or discounted based upon the specific facts, but in all cases,

the role of the magnitude of the margins must be evaluated."  Pls. Br. at 47 (quoting

*Hardwood Plywood*, 40 CIT at __, 180 F. Supp. 3d at 1173).  In *Hardwood Plywood,* this

Court found that the Commission failed to evaluate the magnitude of the dumping

margin when the Commission simply listed the dumping margins determined in

Commerce's final determination.  *Hardwood Plywood*, 40 CIT at __, 180 F. Supp. 3d at

1174-75 ("The Commission's consideration of this factor amounts to nothing more than

the recitation of the dumping margins found by Commerce in a footnote.").

Still, a requirement to provide more than a recitation does not mean that the

Commission must provide any particular type or extent of analysis.  *See Altx, Inc. v.*

*United States*, 26 CIT 1425, 1432 (2002) ("noting that while the [Commission] has a

statutory obligation to consider the dumping margin, it has little significance if there is no

connection between the pricing of the foreign product and the condition of the domestic

industry." (citing *Comm. of Domestic Steel Wire Rope & Specialty Cable Mfrs. v. United*

*States*, 26 CIT 403, 419-21, 201 F. Supp. 2d 1287, 1302-04 (2002))).

In the instant case, the Commission provided more than a mere "recitation of the

dumping margins."  *Hardwood Plywood*, 40 CIT at __, 180 F. Supp. 3d at 1174-75.  In

footnote 162 the Commission stated, "in addition to this consideration, our impact

analysis has considered other factors affecting domestic prices."  Views at 39 n.162.

The Commission continued that its analysis of the significant underselling "is particularly

probative to an assessment of the impact of the subject imports," indicating that the

magnitude of the margin of dumping was a less probative factor.  *Id.*  The Commission,

therefore, evaluated the magnitude of the dumping margin along with other factors.  *See*

*Asociacion de Productores de Salmon*, 26 CIT at 45, 180 F. Supp. 2d at 1376.

Separately, the court is not convinced by plaintiffs' second argument that the

Commission needed to analyze the "unique fact in this case that the [OCTAL] dumping

margin was just a fraction of the overall margin of underselling the Commission found,

which called into question the inferences about adverse impact."  Pls. Br. at 49.  As the

court stated above in Section I.B.1, the Commission cumulated the Omani and Korean

subject imports as provided in statute.  *See* 19 U.S.C. § 1677(7)(G) ("[T]he Commission

shall cumulatively assess the volume and effect of imports of the subject merchandise

from all countries with respect to which . . . petitions were filed . . . on the same day.").

As such, the court finds that the Commission's consideration of the margin of dumping

in this case was reasonable.

The Commission addressed adequately the correlation between subject import

volume and the domestic industry's financial performance and considered properly the

magnitude of the dumping margin.  For the foregoing reasons, the Commission's finding

of adverse impact was reasonable.

## CONCLUSION

Christopher Plummer, the Academy Award-, Tony Award- and Emmy Award-

winning actor (and Grammy-nominated singer) opens his autobiography with the

Court No. 20-03698                **PUBLIC VERSION**                Page 45

sentence: "I was brought up by an Airedale."[16]  The sentence may, at least for Airedale

aficionados, potentially rival such other notable opening sentences as, just for instance,

"Call me Ishmael."[17]  Without prejudice to which work may arguably hold a firmer place

in the annals of American literature, it cannot be gainsaid that an Airedale is (most of

the time, at least) a better being to host as a *pet* in one's home — or, at a minimum, a

somewhat more sensible one — than an 85-foot long, roughly 55-ton sperm whale.

\* \* \*

        In conclusion, the Commission's determination in its investigation of *PET* sheet

from Korea and Oman is supported by substantial evidence and is otherwise in

accordance with law.  Therefore, the court sustains the Commission's Final Injury

Determination.  Judgment will enter accordingly.


                                                        /s/      Timothy M. Reif
                                                        Timothy M. Reif, Judge


Dated:  September 30, 2021
        New York, New York

---

[16] Christopher Plummer, *In Spite of Myself: A Memoir* 3 (2008) ("I won't deny it, 'tis the truth and nothing but, Your Honour — a bumbling, oversized, shaggy great Airedale. The earliest memory I have of anything resembling a pater familia, bouncer, male-nurse or God is that dear slobbering old Airedale.").

[17] Herman Melville, *Moby-Dick; or, the Whale.* 1 (1851).

ERRATA

In *OCTAL Inc. et al v. United States*, Court No. 20-03698, Confidential Slip Op. 21-133, dated September 30, 2021

Page 14: On line 5, replace "percent" with "percentage points."  On line 16, replace "percent" with "percentage points."


October 8, 2021